UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAN AGAINST XTINCTION A/K/A M.A.X. **FN1**, | ) | |
| | ) | |
| *Citizen Attorney General* | ) | Civil Action No. |
| | ) | |
| v. | ) | |
| | ) | **1:21-cv-01131-TJK** |
| MICHAEL PENTONY, as an individual | ) | |
| | ) | |
| ADMINISTRATOR of the NATIONAL OCEANIC AND | ) | 28 February 2022 |
| ATMOSPHERIC ADMINISTRATION ("NOAA") ` | ) | |
| | ) | |
| JANET COIT in his official capacity as the assistant | ) | |
| administrator of the NATIONAL MARINE FISHERIES | ) | |
| FISHERIES ("NMFS") **FN2** | ) | |
| | ) | |
| ATLANTIC STATES COASTAL | ) | |
| MARINE FISHERIES COMMISSION ("ASMFC") | ) | |
| | ) | |
| JANE DAVENPORT & | ) | |
| DEFENDERS OF WILDLIFE **FN3** | **)** | |
| | **)** | |
| AMY KNOWLTON & NEW ENGLND AQUARIUM | ) | |
| | ) | |
| ARTHUR SAWYER | ) | |
| *Defendants* | ) | |

---

VERIFIED CORRECTED & AMENDED PETITION FOR DECLARATORY &
INJUNCTIVE RELIEF & REQUEST FOR A JURY TRIAL

---

I, Richard Maximus Strahan, serving as Citizen Attorney General Man Against Xtinction

hereby SPEAKS:

---

1 M. A. X. is a licensed commercial lobster fisherman, an avid whale watcher, a conservation scientist & a professional recovery agent for whales and other endangered marine wildlife.

2 Replacing original defendant Paul Doremus.

3 WINGO is an acronym for "Whale Interested Non-Government Organization." WINGOS now constitute a main source of consultation and partnership for NOAA/NMFS' program to evade and not enforce the ESA concerning its licensing and regulating of marine fisheries.

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 2 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

2

1.      Man Against Xtinction ("MAX") is prosecuting the Defendants in the name of the People of the United States, pursuant to his appointment by Congress pursuant to the Public Attorney General provisions of the Endangered Species Act. 16 USC Sec. 1540(g). Pursuant to this appointment, the Congress gives me Article III standing and the authority to prosecute the Defendants for their engaging in conduct that constitutes ESA Section 9 prohibited taking of ESA Listed Species of wildlife. I am authorized by Congress to petition the Court in the name of the People of the United States for an order requiring the Defendants to immediately cease any activity that they are engaged in or directly supporting that is causing or resulting in ESA Listed Species being "taken" as defined pursuant to ESA Section 9. Congress pursuant to the ESA has imposed a mandatory and non-discretionary duty on the Court to enforce the ESA Section 9 take prohibition against the Defendants regardless of the Defendants NOAA/NMFS failure to do so. As such, the Court is required to immediately stop any ongoing prohibited taking by the Defendants the Court recognizes them to be responsible for and to do so despite any adverse consequence to the Defendants or the US economy.

2.      Defendants NOAA/NMFS and their employees are maliciously acting in concert over the span of the last several decades to deliberately insure the extinction of the Northern Black Whale species. Their intent is to prevent any adverse impact on the US commercial fishing industry from the enforcement of the Endangered Species Act against it. The instant action is a Public Interest prosecution of the government employee scofflaws of NOAA/NMFS for engaging in their multi-decanal pattern of malicious activities that are supporting the prohibited killing, injuring and otherwise \ taking of ESA Listed Species of whale and sea turtles.

3.      The Northern Black Whale species now faces inevitable extinction within the next decade. NOAA/NMFS themselves recognize that the remaining Black Whale population is crashing with about a ten percent annual rate of population loss ("Black Whale Decline"). This decline commenced four decades after their becoming an ESA Listed Species in 1969. The Black Whale's Decline is a direct result of NOAA/NMFS deliberate and knowing crimes of commission & omission against ESA Listed Species. Example, since 1973 NOAA/NMFS required the use of vertical buoy ropes and other fishing gear that annually catches, kills and otherwise decimates ESA Listed Species of whales and sea turtles. Example, NOAA/NMFS has refused since 1973 to the present date to enforce the ESA/MMPA prohibitions against ALL individual fishers whose fishing gear has caught and killed ESA Listed Species of whales and sea turtles.  Example, NOAA/NMFS

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 3 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

3

has deliberately failed to implement any meaningful program that takes proactive measures to increase the size of the Northern Black Whale population so that it is no longer requires protection under the ESA.

4.     These Defendants then and now maintain an occupational culture among their employees that works deliberately to encourage the extinction of the Black Whale in order to protect the commercial fishing industry off the US Atlantic coastline from being adversely affected by the whale's ESA Listed Species status. These Defendants have known since 1997 that their requiring their licensed fishers to use vertical buoy ropes in their regulated lobsterpot and gillnet fisheries ("Fishing Activity") routinely catches, kills and injures Northern Black Whales and other ESA Listed Species of whales and sea turtles. By 1997 these defendants knew that their requiring the use of VBR constitutes a ESA9 prohibited taking of ESA Listed Species of whales and sea turtles. **FN4** Despite this awareness, NMFS employees continued maliciously acting collaboratively to the present day to continue their required use of VBR and to prevent lawful and proper enforcement of the ESA's take prohibitions against the fishing that would have immediately ended any further ESA9 prohibited taking by the Defendants' Fishing Activity.

5.     In 1973, Defendant NOAA began the Northern Black Whale species path to inevitable extinction. Congress assigned ESA/MMPA superintendent authority to NOAA who then capriciously delegated it its infra-agency NMFS. In doing, NOAA ignored its other infra-agencies — like the National Ocean Service – that would be a better choice to manage a species recovery program. At the outset, NMFS would be the worst possible choice for protecting Ocean biodiversity. NMFS under its organic statute only promote the industrial killing of marine wildlife for commercial gain. In 1973 as now, NMFS licensing and regulating marine fisheries is the main cause for most of the anthropogenic destruction of Black Whales and other ESA Listed Species of whales and sea turtles living along the US Atlantic coastline.

6.     As a result of its continuing prohibited killing by NMFS, in 2021 the Northern Black Whale species is facing an inevitable extinction by the beginning of the 21st Century if not even sooner. For the past several decades, the Defendants acting in concert have protected the Atlantic fishing industry's obsession with using vertical buoy ropes (VBR) that routinely catch ESA Listed Species of whales and sea turtles. The Defendants position as government employees allow them to do this

---

[4] See *Strahan v. Coxe*, 939 F. Supp. 963 (Dist. Mass. 1996) and 127 F. 3d 155 (1st Circuit, 1997).

Case 1:21-cv-01131-TJK Document 73 Filed 02/28/22 Page 4 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

4

despite federal courts since 1997 repeatedly ruling that these defendants requiring the use of VBR by the fishing industry constitutes ESA Section 9 prohibited taking of these ESA protected species.

7.      Defendants Atlantic States Marine Fisheries Commission ("ASMFC") and the Defenders of Wildlife ("Defendant WINGO") or just "WINGO") are acting in concert with NMFS to prevent the full enforcement of the ESA take prohibition against the commercial and recreational fishing industry operating in US coastal waters off the Atlantic coastline. The ASMFC is developing the fisheries management plans requiring the use of VBR that NMFS simply rubber stamps in adopting them. Defendant WINGO serves on NMFS Atlantic Large Whale Take Reduction Team as NMFS official consultant. It that capacity Defendant WINGO has voted to ignore the ESA and continue the use of VBR. As NMFS and the industry's agent, has issued propaganda to deflect the Public from blaming the ongoing entanglement of Black Whales on the US fishing industry.

### M. A. X. has Article III Standing Supplied by 16 USC 1540(g) to Prosecute the ESA Take Prohibitions against the Defendants

8.      In adopting 16 USC 1540(g) in 1973, Congress recognized that federal wildlife agencies then and still are wholly dedicated under their organic statutes to the commercial and recreational destruction of wildlife. And that the employees of these agencies were unlikely to prosecute anyone for the prohibited taking of ESA/MMPA protected wildlife pursuant to these agencies regulated activities, including prosecuting the agencies themselves. Congress therefore agreed to take the extraordinary action to authorize citizens pursuant to 16 USC 1540(g) to prosecute on behalf of the Public individuals and government agencies in federal courts for their prohibited taking of ESA Listed Species. Congress in doing so empowered federal courts to enjoin ongoing commercial and recreational activities that historically and currently cause the prohibited taking of animals whose species are now ESA Listed Species.

### The Supreme Court Requires Judges to Independently Search for and Apply Legal Theory to Justify Pro Se Petitioners Sought for Relief

9.      M. A. X. is petitioning the Court for relief without the use of an attorney. The Supreme Court and other federal courts have ruled that a Court is under a constitutionally imposed duty to not burden these petitioners with obligation to provide the correct legal theory to justify a court granting their sought for relief. A pro se petitioner only needs to allege pertinent fact and clearly state the relief it seeks from a court. Courts then have a mandatory duty to find *sua sponte* any legal basis to justify the court issuing the relief sought by the pro se petitioner.

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 5 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

5

10.     M. A. X. while under no obligation to supply legal arguments justifying his requested relief from the Court will none the less raise meritorious legal claims and claims of fact that should allow the Court to grant his requested relief against the Defendants. That said, the Plaintiff encourages the Court to supply its own theories of law that will allow it to order the Defendants to stop their prohibited taking of ESA Listed Species of whales and sea turtles and grant him all his other requested relief from the Court.

**NOAA Violated ESA Section 7 Mandates to Protected ESA Listed Species of Whales and Sea Turtles by Delegating Its ESA Superintendent Authority to NMFS**

11.     Congress adopted the ESA 1973. It then assigned Defendant NOAA superintendent authority to administer and enforce the ESA for ESA Listed Species of whales and sea turtles. This assignment made NOAA responsible for enforcing the ESA Section 9 take prohibitions against government agencies and private individuals' activities. It also made NOAA responsible for developing and coordinating the overall implementation of conservation plans to recover these endangered species from their biological endangered status in facing extinction.

12.     NMFS promptly surrendered its ESA superintendent authority to its infra-agency in a knee jerk manner without any rational basis for doing so. NOAA violated its ESA Section 7 mandated duty to enter the required consultation in order to review its plan to delegate its ESA superintendent authority to one of its infra-agencies. NOAA violated its ESA Section 7 mandated duty to determine FIRST on whether delegating its said authority to NMFS would jeopardize the continued survival of ESA Listed species of whales and sea turtles. History has now demonstrated that NOAA's said violation directly led to the beginning of the modern decline of the Right Whale species population and their current status of facing inevitable extinction.

 13.     NMFS's organic statute gives it only the duty and authority to promote and regulate the economic success of US marine commercial fishing industry. Historically NMFS and its originating agency only licensed the killing and harvesting of whales and other marine mammals. The enactment of the ESA was a direct result of the wholesale depletion of marine biodiversity promoted and licensed by NMFS. Then and to this very day, NMFS is responsible for and authorizes the killing and destruction of marine wildlife populations. It has no demonstrated expertise in the conservation or recovery of wildlife species outside of its occasional limiting the killing and destruction. NOAA's delegating ESA superintendent status to NMFS not only violated its ESA Section 7 mandated duties, but its duties under the ESA not to delegate its ESA

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 6 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

6

superintendent authority to an infra-agency whose licensed agents routinely engage in ESA Section 9 prohibited taking of ESA Listed Species of whale and sea turtles from entanglement in their fishing gear.

14.     NMFS is the wolf in the nursery staring into the cradle. NOAA is pouring ketchup on the baby by delegating to it its ESA superintendent authority. NMFS administrators and employees since 1973 have deliberately dedicated themselves to develop and implement an occupational culture for NMFS that supports and protects the marine fishing industry from the enforcement of environmental laws. As a result, handing the ESA superintendent authority to NMFS only gave it the authority to evade any enforcement of the ESA against the commercial interests of the marine fishing industry. NMFS employees are trained from the start to recognize that they must not hurt the industry by enforcing environmental laws against it. Upon information and belief, NMFS employees have been fired or transferred from their jobs based on nothing more than making a suggestion that the industry needs to obey environmental laws.

15.     NMFS has a *de facto* policy of never enforcing MMPA or ESA Section 9 prohibitions against any state or federally licensed marine fisher when a ESA Listed Species of whale or sea turtle is entangled by the vertical buoy ropes on its fishing gear. Upon information and belief, NMFS has never issued a single citation to a fisher whose gear is known to have entangled an ESA Listed Species of whale or sea turtle.

16.     I am petitioning the Court to enjoin NMFS current delegation of ESA superintendent authority to NMFS and any attempt by it to do so in the future. I am petitioning the Court to order NMFS to conduct the required ESA Section consultation on any future decision to delegate its ESA Superintendent authority to any of its other infra-agencies.

### Defendant NMFS' Occupational Culture Seeks Protecting the Use of VBR by Exterminating the Northern Black Whale

17.     Today, the number one source of death and injury of ESA Listed Species of whales and sea turtles is there being entangled in the vertical buoy rope. The VBR is one of the required features of pot and gillnet fishing gear licensed and regulated by NMFS. Defendant NMFS itself is liable for the killing and otherwise prohibited taking of ESA Listed Species from its licensing and regulating marine fisheries activities. It is the only agency that licenses and regulates the commercial and recreational harvesting of marine wildlife. Its ESA/MMPA prohibited takings of these ESA Listed

28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

7

Species is malicous and intentional. Defendant NMFS is well aware the VBR is requires fishermen to use catches ESA Listed Species of whales and sea turtles. Defendant NMFS is deliberately engaging in conduct prohibited by the ESA Section 9 take prohibitions.

18.     The Defendant NMFS is deliberately authorizing agents to catch ESA Listed Species through NMFS licensed and regulated marine fisheries. Defendant NMFS refuses to cite any of its licensed fishers when they catch ESA Listed Species in their fishing gear. Defendant NMFS now has a de facto policy -- that it instructs its employees to enforce -- of approving its licensed and regulated fishers catching of ESA Listed Species in their fishing gear. NMFS occupational culture acts to support the said policy by ensuring that no scientific research is permitted or funded by NMFS that will identify the actual locations and fishers (state or federally licensed) whose fishing gear catches members of  ESA Listed Species in US coastal waters.

19.     NMFS recognizes that the economic conflict between the marine fisheries industry and the ESA prohibiting the killing and otherwise taking of ESA Listed Species of whales and sea turtles is not reconcilable. Its industry biased occupational culture is resolving the complex by refusing to enforce the ESA against the marine fishing industry and to encourage and facilitate the extinction of the Northern Black Whale. It has implemented its pro-extinction program against the Black Whale for the past several decades. It and has been successful in causing the collapse of the Northern Black Whale population and insuring that its future extinction is inevitable.

20.     NMFS supporting the industry use of VBR by requiring the use of VBR since 1973 has resulted in "shrunken" Right Whales. FIRST, the Right Whales are shrinking in their numbers. In 2020, NMFS calculated that during the year before the Right Whales remaining population had shrunk by over ten percent. This loss was mostly do to the adverse effects from these whales routine entanglement in VBR laden pot and gillnet fishing gear licensed by NMFS.

21.     SECOND, the average length of a Right Whale shrunk by over a yard from the 1970's to the last decade. This average length reduction is seen as a direct result of VBR entanglements adverse impact on the health of entangled whales and its reduction of an entangled whales ability to feed and female whales ability to supply adequate amounts of milk to their young.

22.     THIRD, VBR entangled Right Whales are prevented from finding adequate nourishment and immediately begin to lose weight especially in its body fat. This results with shrinkage in the breadth of a whale's body. Additionally Right Whales buoyancy shrinks and staying afloat is more

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 8 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

8

laborious for entangled whales. When these whales die from the VBR entanglement, they immediately sink owing to their malnourished induce lack of buoyancy. This results in the dead whale not stranding on a beach or otherwise leaving evidence of its VBR entanglement caused death.

23.     The above facts require a finding that the mere act of deploying VBR laden fishing gear in Right Whale critical habitat constitutes *per se* prohibited conduct pursuant to the ESA's Section 9 prohibitions against the taking of ESA Listed Species. No subsequent entanglement of a Right Whale is needed for deployed VBR laden fishing gear to constitute a legally prohibited taking of the Right Whale.

24.     Defendants NOAA & NMFS employees are usurping their authority as federal employees in order to protect federal and state licensed fishing activity from any adverse impact on commercial fisheries ("Fishing Activity") from being required to comply with the ESA/MMPA prohibitions against the killing and injuring of ESA Listed Species of whales and sea turtles. NMFS in implementing its latest marine fisheries management plans ("2021 Fishing Rules") and subsequently issuing its 2021 ESA 7 Biological Opinion on these Fishing Rules unlawfully refused to consider banning the use of VBR by these marine fisheries. In developing and adopting its 2021 Atlantic Large Whale Take Reduction Plan ("ALWTRP"), it refused to consider the alternative of prohibiting the use of VBR by federal and state licensed marine fisheries. These failures by NMFS are a consequence of NMFS' occupational culture's commitment to prevent any provision of the ESA or MMPA from adversely affecting the marine fishing industry chosen way of operating. NOAA & NMFS in practice refuse to challenge at all fisheries management plans developed under the aegis of the Defendant Atlantic States Marine Fisheries Commission (ASMFC). It simply implements these plans with no significant alteration even in order to comply with their mandatory and non-discretionary duties imposed on them by the ESA & MMPA. They will never stop requiring the use of VBR as long as the marine fishing industry through the ASMFC continues to support its use.

### Partial Requested Relief Against the Defendants

25.     M. A. X.  is seeking a Permanent Injunction against the Defendants —

       a.     Declaratory Judgement that NMFS is engaged in ESA9 prohibited taking by licensing and requiring the use of vertical buoy ropes by lobsterpot and gillnet fisheries along the northeast US coastline

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 9 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

9

b.    Enjoining the Defendants from requiring the further use of Vertical Buoy Ropes in its Fishing Activity and from licensing any fishing activity using VBR. .

c.    Enjoining the Defendants from further licensing the use of fixed Gill Nets off the US northeast coastline.

d.    Order that the Defendants to enforce the ESA Section 9 take prohibitions against coastal state marine fishing agencies that license lobsterpot and gillnet fishing in US coastal waters. In doing so NOAA must authorize said state fisheries pursuant to the ESA's Section 10 requirements before it allows these states continue their lobsterpot and gillnet fisheries in US coastal waters that routinely entangle ESA Listed Species of whales and sea turtles.

e.    Enjoin NOAA's past delegation of its ESA superintendent authority to NMFS.

f.    Enjoin NMFS' further acting pursuant to a claim of ESA superintendent authority delegated to it by NOAA over ESA Listed Species, this includes stopping its supervising and overseeing further ESA Section 7 consultations & stopping its use of its 2021 Biological Opinion on its 2021 Fishing Rules and enforcing its 2021 ALWTRP.

g.    Order the Defendant NOAA to do the requisite ESA Section 7 consultation of any further action by it to delegate ESA/MMPA supervisory authority to any of its infra-agencies.

h.    Enjoin ASMFC from issuing any marine fisheries management plan that requires the use of VBR.

i.    Enjoin NMFS from conducting an MMPA Section 118 take reduction team for Northern Black Whales and other ESA Listed Species of whales and enjoying Defendant WINGO membership on any such team.

26.    M. A. X. is seeking a jury trial on his request for a declaratory judgment against the Defendants and for compensatory and punitive damages against Defendant Pentony, ASMFC, the WINGOS and Sawyer. He is also seeking an award against the Defendants of his costs of litigation in the instant action.

<h3 style="text-align:center">The Parties</h3>

27.    Citizen Attorney General Richard Maximus Strahan as Man Againt Xtinction recently graduated *magnum cum laude* with a Bachelor of Arts degree in Classics Studies from the University of Massachusetts in Boston MA. In 2020, M. A. X. was awarded a Master of Arts degree

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 10 of 96
**28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK**

10

by the University of New Hampshire in Durham, NH. He is a licensed commercial lobsterpot fisherman in New Hampshire and is a licensed recreation fisherman in Massachusetts. He is an avid whale watcher along the Massachusetts, Maine and New Hampshire coastlines. He volunteers as the Chief Science Officer of Whale Safe USA, a campaign to make the US coastline environmentally safe for endangered species of coastal whales and sea turtles. Strahan is a conservation scientist whose profession activities include designing and implementing conservation programs that protect Endangered Species of Whales and Sea Turtles in order to stop their extinction and to provide for their recovery from their endangered species status. He is an avid whale watcher. He observes and collects field data on Endangered Whales and Sea Turtles off the US northeast Atlantic coastline. Every major conservation effort for Endangered Whales in US coastal waters has originated and designed by him. This includes imposing 500 yard protection zones around the Northern Right Whale and the designation of protected critical habitat for it. Strahan is a licensed commercial lobster pot fishermen in New Hampshire. His mailing address is 83 Main Street, 6080 Granite Street Station, Durham NH 03824.

28.     Defendant Administrator of the National Oceanic and Atmospheric Administration is being sued in his official capacity. Its official business address is 1401 Constitution Avenue NW, Room 5128, Washington, DC 20230.

29.     Defendant Janet Coit is being sued in his official capacity as the appointed Assistant Administrator of the National Marine Fisheries Service. Its official business address is % Office of the Assistant Administrator, National Marine Fisheries Service, 1315 East-West Highway, Silver Spring MD 20910.

30.     Defendant Michael Pentony is being sued as an individual for his personally acting outside his duties as a government employee in order to violate the constitutionally and statutory protected rights of M. A. X. His business address is % Greater Atlantic Region Fisheries Office, NMFS, 55 Great Republic Drive, Gloucester MA 01830.

31.     Defendant Jane Davenport is being sued individually and with her employer Defenders of Wildlife ("DOW"). DOW is a WINGO (wildlife interested NGO) being sued as a member of the Defendant NMFS' Atlantic Large Whale Take Reduction Team. It is an official consultant to the fishing industry and also assisting NMFS employees in protecting the fishing industry's continued use of Vertical Buoy Ropes and its partner in evading its compliance with the ESA. Its business address is % CEO is Jamie Rappaport Clark, Defenders of Wildlife, 1130 17th Street, Washington DC, 20236-4604

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 11 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

11

32.     Defendant Atlantic States Marine Fisheries Commission is a compact of state employees and the commercial fishing industry that develops and adopts commercial fisheries plans for the pot and gillnet fisheries along the Atlantic coastline. Upon information and belief, the ASMFC is legally construed not to be either a state or federal agency. Its business address is % Robert Beal, executive director, Atlantic States Marine Fisheries Commission, 1050 N. Highland Street, Suite 200 A-N, Arlington, VA 22201

33.     Defendant Arthur Sawyer is being sued both as an individual and as chief executive officer of the Defendant Massachusetts Lobstermen Association. His business address is Arthur Sawyer, 368 Concord Street, Gloucester, MA 01930.

34.     Amy Knowlton is being sued individually and her employer the New England Aquarium (NEA"). NEA is a WINGO (wildlife interested NGO) being sued along with Knowlton as a member of the Defendant NMFS' Atlantic Large Whale Take Reduction Team. They are paid consultants to the fishing industry and by NMFS to assist its employees in protecting the fishing industry's continued use of Vertical Buoy Ropes and its partner in evading its compliance with the ESA. Their business address is % Vikki Spruill, CEO, New England Aquarium, 1 Central Wharf, Boston MA 02110

**Jurisdiction and Standing**

35.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) under the ESA, APA, 5 U.S.C. § 701 et seq. (APA), 28 U.S.C. § 1361 (mandamus) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. § 2202 (declaratory and injunctive relief). An actual, justiciable controversy now exists between Plaintiff and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 701–706, and 16 U.S.C. § 1540(g). Pursuant to 16 U.S.C. § 1540(g), Plaintiff on or about 4 June 2018 served a notice on each of the Defendants and the Secretary of Commerce pursuant to 16 USC § 1540(g) more than 60 days prior to his commencing the instant action ("ESA Notice"). In his ESA Notice Strahan notified the Defendants that he was going to commence a civil action against the Defendants for their said violations of the ESA. **FN5**

---

[5] Strahan "confirmed" the proper service of his ESA Notice on the Defendants by his filing a copy of his ESA Notice in a prior action against these Defendants in the US District Court for the District of Massachusetts. See *Strahan v. Administrator NOAA, et al.*, 18-CV-10392-DJC (D. Mass 2018). At no point henceforth has the Defendants claimed that they did not receive Strahan's ESA Notice. The Defendants were eventually dismissed without prejudice pursuant to FRCP Rule 41(a) from the

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 12 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

12

36.    Venue in this judicial district is proper under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States and officers of the United States acting in their official capacity. Additionally at least one Defendant resides in this district.

37.    M. A. X. as Richard Maximus Strahan has been granted Article III by Congress pursuant to 16 USC 1540(g) in order to prosecute the Defendants to stop they're entangling, injuring and killings of ESA Listed Species of whales and sea turtles which is prohibited by the ESA's Section 9 take prohibitions. Otherwise he has Article III standing tio serve as a Citizen Attorney General standing pursuant to his professional involvement and recreational observational activities of Endangered Whales and Sea Turtles off the US northeast Atlantic coastline.

38.    The Plaintiff has Article III standing because he is personally experiencing irreparable and monetary injury by the Defendants to their adverse impact on his following personal and professional interests —

a.    His "whale watching" of Endangered Whales and Sea Turtle on Jeffrey's Ledge, Stellwagen Bank National Marine Sanctuary, Cape Cod Bay, Narragansett Bay, and along the New York/New Jersey State coastlines. **FN6**

b.    His scientific research and data collection on Endangered Whales and Sea Turtles.

c.    His professional services to protect and recover endangered populations of Whales and Sea Turtles which involves his being paid by his clients to recover said endangered populations of marine wildlife.

d.    His being a commercial "Green Fishermen" who advertises that his commercial fishing activities are "whale safe" to prospective customers. He needs to have Endangered Whales and Sea Turtles recover so his own commercial lobsterpot fishing will be regarded as "whale safe" by his customers and not threaten Endangered Whales and Sea Turtles with the threat of extinction.

---

Massachusetts lawsuit.

[6] *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230 n.4 (1986) (plaintiffs "whale watching" activities establishes Article III standing to seek enforcement of conservation laws).

Case 1:21-cv-01131-TJK Document 73 Filed 02/28/22 Page 13 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

13

e.      The Plaintiff has Article III standing to protect his profession interests in his commercial fishing activities from violating the ESA Section 9 taking of Endangered Whales and Sea Turtles.  **FN7**

**The Regulatory Scheme for the Protection of Endangered Species**

39.      In enacting the ESA, Congress recognized that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction" and that these species are "of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a) (2) and (3). The ESA protects imperiled species by listing them as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(20). The Secretary of Commerce is charged with administering and enforcing the ESA for most marine species, including North Atlantic right whales, and has delegated this responsibility to NMFS. 50 C.F.R. § 402.01(b).

40.      The ESA seeks "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." 16 U.S.C. § 1531(b). The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." Id. § 1532(3). Accordingly, the ultimate goal of the ESA is not only to prevent listed species from going extinct, but also to recover these species to the point where they no longer require ESA protection

41.      To accomplish these goals, Section 9 of the ESA generally makes it unlawful for "any person" to "take" an endangered species. Id. § 1538(a)(1). A "person" includes private parties as well as local, state, and federal agencies. Id. § 1532(13). "Take" is defined broadly under the ESA to include harassing, harming, wounding, killing, or capturing a protected species (or attempting to engage in such conduct), either directly or by degrading its habitat enough to impair essential behavior patterns. Id. § 1532(19); 50 C.F.R. § 222.102. The ESA prohibits the acts of parties directly causing a take as well as the acts of third parties, such as governmental agencies, whose acts cause such taking to occur. 16 U.S.C. § 1538(g).  Additionally, Section 7(a)(2) of the ESA

---

[7] *Bennett v. Spear*, 520 US 154 (1997) (Rancher has standing since ESA hurts his business).

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 14 of 96
**28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK**

14

requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any" endangered or threatened species. Id. § 1536(a)(2).

42.     To comply with Section 7(a)(2)'s substantive mandate, federal agencies must consult with NOAA when their actions "may affect" a listed marine species. 16 U.S.C. § 1536(a)(2). NMFS and the action agency must utilize the "best scientific and commercial data available" during the consultation process. Id.; 50 C.F.R. § 402.14(a).

43.     Where, as here, NMFS is the action agency, NMFS must undertake intra-agency consultation. At the completion of consultation, the consulting branch of NMFS issues a biological opinion that describes the expected impact of the agency action on listed species. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of "the current status of the listed species," the "effects of the action," and the "cumulative effects." 50 C.F.R. § 402.14(g)(2), (g)(3). "Effects of the action" include both direct and indirect effects of an action "that will be added to the environmental baseline." Id. § 402.02. The "environmental baseline" includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." Id. "Cumulative effects" include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." Id.

44.     Thus, in issuing a biological opinion, NMFS must consider not just the isolated share of responsibility for impacts to the species traceable to the activity that is the subject of the biological opinion, but also the effects of that action when added to all other activities and influences that affect the status of that species. After NMFS has added the direct and indirect effects of the action to the environmental baseline and cumulative effects, it must make its determination of "whether the action is likely to jeopardize the continued existence of a listed species." 16 U.S.C. § 1536(b)(3), (b)(4); 50 C.F.R. § 402.14(h). A likelihood of jeopardy is found when "an action [] reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Recovery is defined as "improvement in the status

15

of listed species to the point at which listing is no longer appropriate." Id. A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but will result in take incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4).

45.     The incidental take statement must specify the amount or extent of incidental taking on such listed species, "reasonable and prudent measures" that NMFS considers necessary or appropriate to minimize such impact, and set forth "terms and conditions" that must be complied with by the action agency to implement the reasonable and prudent measures. Id.; 50 C.F.R. § 402.14(i). Additionally, when the listed species to be incidentally taken are marine mammals, the take must first be authorized by NMFS pursuant to the MMPA, and the incidental take statement must include any additional measures necessary to comply with the MMPA take authorization. If NMFS determines in its biological opinion that the action is likely to jeopardize the continued existence of a listed species, the biological opinion must include "reasonable and prudent alternatives" to the action that will avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

46.     Regardless of the conclusion reached in the biological opinion, the agency undertaking the federal action has an independent duty to ensure that its actions are not likely to jeopardize the continued existence of listed species. 16 U.S.C. § 1536(a)(2). An agency's reliance on a legally flawed biological opinion to authorize an action does not satisfy its substantive duty to ensure against jeopardy.

47.     Moreover, the ESA's implementing regulations further require an agency to reinitiate Section 7 consultation when: (a) the amount of take specified in the incidental take statement is exceeded; (b) new information reveals that the action may have effects not previously considered; (c) the action is modified in a way that was not previously considered; or (d) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16. The ESA specifies that Section 7 consultation must typically be completed within ninety days after initiation. 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e). The substantive duty to ensure against jeopardy of listed species remains in effect regardless of the status of the consultation.

**The Administrative Procedure Act**

48.     The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.   Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, or conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 16 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

16

"without observance of procedure required by law." Id. § 706(2)(A), (C), (D).

<b>Background on Endangered Species of Whales and Sea Turtles<br>Adversely Affected by Commercial Fishing</b>

49.     The Northern Black Whale (a/k/a the Northern Right Whale) is the world's most critically endangered large whale species and also one of the world's most endangered mammals. Northern Right Whale's essential marine habitat is within the 200 mile ECZ of mostly the US but extends northwards into Canada. They live in the "urban sea" of the United States. Their coastal marine habitat is no longer marine wilderness from having so hugely been adversely impact from commercial development of area within 100 miles inland of the US coast that spills outward to the Ocean.

50.     The Northern Right Whale living along the US coastline is more akin to a moose trying to live in a suburb of an eastern city like Boston or Concord NH. Not a good situation. Right whales migrate annually from their summer feeding grounds off the Northeast coast of the United States to their winter breeding grounds off the Southeast coast.

51.     Females typically reach sexually majority at age nine or ten and give birth to a single calf. The gestation period lasts roughly one year. From 2005 to 2014, the average right whale calving interval (i.e. the amount of time between the birth of a right whale calf and a subsequent calf from the same mother) ranged from three to five years. The average right whale calving interval has increased every year since 2014, to a high of 10 years in 2017. Right whales have raised patches of roughened skin on their heads, known as callosities. These callosities are found only on right whales and, like human fingerprints, have distinctive patterns that enable scientists to individually identify right whales. The callosities are covered by barnacles and tiny crustaceans known as whale lice.

52.     Although the Northern right whale has been protected under the ESA since 1973, the species has not recovered to a sustainable population level. NMFS own employees now estimate that the species consisted of only about 360 individuals as of 2019. This is a decline of over ten percent in one year since the 2018 estimates. Not a single new born Northern Right whale calf was sighted by dedicated survey efforts during the 2017-2018 calving season. NMFS has previously admitted that the species' survival is dependent on protecting every individual, concluding that the loss of even one whale may contribute to the extinction of the species. Entanglement in commercial fishing gear and ship strikes are the two most significant documented sources of mortality and serious injury for Northern Right Whales. Since 1973 Defendants NOAA/NMFS have failed to meaningfully manage

commercial fishing and vessel operations off the US eastern coastline in order to significantly reduce the unlawful taking of Endangered Whales and Sea Turtles by commercial fishing and vessel operations.

53.    To reduce the threat of ship strikes, NMFS issued regulations in 2008 as a result of law suits against it and then in 2013 requiring ships 65 feet in length and longer to slow to ten knots or less in Northern Right whale habitat areas at certain times of year. 73 Fed. Reg. 60,173 (Oct. 10, 2008); 78 Fed. Reg. 73,726 (Dec. 9, 2013). The rule has not reduced right whale mortalities from ship strikes. Entanglement in fishing gear has been the primary cause of death and serious injuries to Endangered Whales and Sea Turtles in recent years. NMFS has acted arbitrarily and capriciously in refusing to enforce ESA Section 9 prohibitions against individual commercial fishermen or otherwise regulate commercial fishing operation to minimize their causing the entanglement and otherwise unlawful taking of Endangered Whales and Sea Turtles.

54.    When Northern Black whales and other Endangered Whale s get caught by fishing gear, they can drown immediately. In a significant number of cases, however, the animals die over an extended time period as they become incapacitated by injuries or infections caused by the entanglement or starve. Gear often wraps around whales' flippers, mouths, and tails and, particularly in growing animals, cinches tighter over time. Such injury often results in major tissue and bone damage and systemic infection. The animals often lose weight, causing them to sink when dead so that death from entanglement is often underreported. From 2010 to 2014, there were 24 records of serious injuries and mortalities of right whales that involved entanglement or fishery interactions – an average of 4.65 whales per year.

55.    There is a clear historical record of Right Whales being entangled in the VBR of lobsterpot gear licensed and regulated by the Defendants. In 2015, there were at least 4 new confirmed entanglements of right whales in fishing gear; in 2016 there were at least 7 new confirmed right whale entanglements; and in 2017, there were at least 9 new confirmed right whale entanglements. From 2010 to 2016, entanglement related deaths accounted for 85% of diagnosed right whale mortalities.  In its 2016 stock assessment report, NMFS established an annual right whale PBR of 1. In other words, NMFS has determined that only a single right whale may be killed as a result of human activity while still allowing the species to reach its optimum sustainable population under the Marine Mammal; Protection Act. 16 U.S.C. § 1362(20). Therefore, current documented serious injuries and mortalities are unsustainable and vastly exceed the standards of the MMPA.

56.     Most right whale entanglements and mortalities go undocumented by NMFS. Documented serious injury and mortality rates may vastly underrepresent actual mortality. Scarring data may better reflect actual entanglement rates. For example, a study of scarification data estimated that between 1980 and 2009, nearly 83% of known right whales suffered entanglements and 59% of right whales have been entangled more than once. A recent follow-up study indicates that the pattern persisted through at least 2012, and there is no evidence to suggest this threat has been mitigated. In addition to causing serious injuries and mortalities, entanglement in fishing gear causes other significant harm to Endangered Whales and Sea Turtles. . For example, research indicates that survivorship probability for individual Northern Right whales is reduced by at least 40% after an entanglement event.

57.     Chronic entanglement impairs foraging and locomotion. Impaired locomotion can contribute to starvation, while an entanglement of the mouth directly impedes foraging, causing starvation. One entangled North Atlantic right whale gradually starved to death over the course of 320 days owing solely to his impairment of feeding and infection of wounds caused directly by entanglement. An entanglement can also increase stress hormone levels, which can contribute to the development of systematic infections. Severe wounding from an entanglement or repeated entanglements of right whales can increase their susceptibility to disease.

58.     Entanglements are reducing the reproductive success of right whales, inhibiting the species' ability to recover from the brink of extinction. Studies show that severe wounding and repeated entanglements of right whales can cause reduced reproduction. Studies have also found that female right whales seen alive and carrying gear or with severe wounds from entanglement had a significantly lower chance of calving again. Females that experienced moderate or severe entanglement wounds between calving events had a significantly longer calving interval than females that experienced minor or no entanglement wounds. Other studies have found that significant energetic impacts also occur from entanglements, especially in reproductive females. The drag from fishing gear can delay right whale reproduction by months or years.

59.     The myriad negative impacts from entanglements are contributing to the dire status of the right whale population. Just since 2010, calving rates have dropped by nearly 40%, and the last four decades have seen increasing numbers of right whales killed, primarily by entanglement in fishing gear. The right whale population is now in decline.

60.     The declining population trend was evident even before the spring and summer of 2017,

Case 1:21-cv-01131-TJK  Document 73  Filed 02/28/22  Page 19 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

19

during which at least 17 Northern Right whales were found dead in the United States and Canada. Twelve whales were found dead in Canadian waters, and five were found dead in U.S. waters. The cause of death is still being investigated for many of these deaths, but necropsies show that at least two of the whales found dead in Canadian waters appear to have died from entanglement in fishing gear. Two of the whales found dead in U.S. waters show evidence of entanglement. Some of the whales were too decomposed to determine cause of death.

61.    These recent mortalities, which amount to nearly 10% of the current right whale population, will compound negative impacts to right whales, especially considering that at least four of the dead whales have been identified as females and only five calves were born in 2017. Conservation scientists assign a high probability that Northern Right whales owing to their reduced viability cause just by the Defendants said commercial fishing activities that ESA Section 9 prohibits will become biologically incapable of survival as a species by the second half of this century. If the Court fails to order the Defendants to stop their ongoing said prohibited killing and injuring of Northern Right whales, they will soon be extinct even after being fully protected under law by the ESA.

62.    All ESA Listed Species of Whales and Sea Turtles become routinely become entangled in the VBR of Pot Gear and Gill Nets licensed and regulated by the Government Defendants. These Endangered Whales and Sea Turtles are then killed and injured as a result. In recent years the incidents of entanglements have increased for Endangered Whales and Sea Turtles. This is because there has been an explosion in the population of Amerikan Lobsters off the US northeastern coast coincident with an increase in the consumer market for lobster. Now more commercial fishermen are deploying more commercial fishing gear due to the greater market demand and the larger lobster population that can meet this demand.

63.    It is important to note that there are more lobsters because their main predator — the Cod fish — was recently wiped out by overfishing authorized and encouraged by Defendant NMFS. Despite its constantly decreasing population over many years, NOAA/NMFS refused to list the Codfish under the ESA as an endangered/threatened species and still refuses to do so to the current day. Their failure is a systemic error owing to their singular loyalty to the commercial fishing industry and not to the Public interest or to the rule of law. If the NOAA/NMFS are not ordered to do otherwise, they will continue to ignore the entanglement of Endangered Whales and Sea Turtles by the Pot Gear and Gill Nets that they license and regulate till the Northern Right Whale goes

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 20 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

20

extinct. It will be the first and not last species of whale or sea turtle to be extirpated by the
negligence and commercial loyalty of NOAA/NMFS — the "foxes guarding the chicken coop."

64.     Because of the extinction of Codfish off the US northeastern coast as a result of its being
overfished, the Amerikan Lobster population greatly increased from it no longer being preyed upon
by the Codfish. Once its predator was eliminated by overfishing the population of  Amerikan
lobsters was no longer restrained by predation. It must be noted as a lesson of history that it was the
refusal of NOAA/NMFS to list the Codfish as an endangered species that resulted in its remaining
population being totally depleted from overfishing leading to its extirpation in the US northeast
coastal waters. Despite all the data collected by NMFS clearly showing that the Codfish population
was decimated from overfishing and it was facing imminent extinction, NMFS refused to put any
moratorium on its further commercial exploitation nor did it list the species as endangered under the
ESA. To this day, NMFS' complete dedication to the commercial exploitation by commercial
fishing makes it incapable of stopping its licensing the commercial fishing of Cod.

65.     All of the above should be a convincing example of why NOAA & NMFS and the other
Defendants must be ordered by the Court to obey the ESA if there is any possibility of stopping
commercial fishing from causing the extinction of any of the Endangered Species of Whales and
Sea Turtles.

### Plaintiff's Claims Against the Defendants

**COUNT I:**   *Defendant NOAA Violation of 16 USC § 1536(a)(1) and the APA: Defendant NOAA*
*Failure to Comply with the Mandatory Duties Imposed on It to Insure the Continued*
*Survival of ESA Listed Species of Endangered and Threatened Whales and Sea*
*Turtles by Proactively Increasing Size and Range of Their Remaining Populations*
**FN8**

66.     Citizen Attorney General M.A.X. incorporates all allegations of fact and law made in
paragraphs 1 – 65.

67.     Upon information and belief, NOAA every year since 1973 has violated ESA Section 7(a)

---

[8] **ESA Section 7(a)(1)**: The Secretary [i. e. Secretaries of the Departments of Commerce and
Agriculture] shall review other programs administered by him and utilize such programs in
furtherance of the purposes of this Act. All other Federal agencies shall, in consultation with and
with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this
Act by carrying out programs for the conservation of endangered species and threatened species
listed pursuant to section 4 of this Act.

by abandoning its mandated and non-discretionary duties to fund, develop and implement proactive recovery efforts to increase the size of the remaining populations of ESA Listed Species of whales and sea turtles. NOAA delimited its mandated and non-discretionary duties assigning them to be solely carried out by its infra-agency whose sole statutory authority is to promote the commercial harvesting of marine wildlife – the National Marine Fisheries Service. As a direct consequence, NMFS since 1973 historically refuses to enforce the ESA to adversely affect the commercial fishing industry.

68.     The Northern Black Whale is now declining in number and its species facing inevitable extinction as a direct result of NOAA's delimiting its ESA7 mandatory duties to recover ESA Listed Species by delegating them to just one infra-agency whose licensing and regulating of US marine fisheries activities ("NMFS' Fishing Activity") violate and are prohibited by ESA9 take prohibitions.

69.     As a result, instead of NOAA enforcing the ESA take prohibitions against NMFS Fishing Activity, it has unlawfully delegated NMFS to be the "fox guarding the chicken coop" and empowering it to ignore and not comply with the ESA9 prohibitions against its entangling, killing and otherwise taking of ESA Listed Species of whales and sea turtles. Predictably since NMFS refuses to obey ESA9 prohibitions on taking it now refuses to enforce the ESA9 take prohibitions against state marine fishing agencies, shipping companies and recreational boaters to stop their own killing, injuring and otherwise ESA9 prohibited taking of ESA Listed Species of whales and sea turtles.

70.     NOAA has historically delegated its ESA superintendent authority to NMFS without a scintilla of expressed concern for its adverse impact on ESA Listed Species. Despite its delegation of ESA superintendent duties to NMFS it still retains the ESA mandated and non-discretionary duty to supervise and insure that NMFS carries out its ESA delegated duties faithfully and in compliance with the ESA statute. But NOAA has not done so. Although it has renewed its delegation to NMFS every year since 1973, it has wholly failed to review the consequences of its delegating its ESA superintendent duties to NMFS or made any attempt to assess whether or not NMFS is effectively carrying out its delegated ESA superintendent authority. As a result of its deliberate negligence the Northern Black Whale is now facing inevitable extinction.

71.     NOAA's historical delegation of ESA Superintendent authority to NMFS has been a disaster for the recovery and survival of ESA Listed Species of whales and sea turtles. NMFS refuses to

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 22 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

22

enforce the ESA & MMPA take prohibitions when fishers' gear entangles any member of an ESA Listed Species. Upon information and belief it does this out of its occupational culture commitment to protecting the fishing industry from enforcement of the ESA. As a result the fishing industry has no motivation to compel it to switch to Whale Safe fishing gear or pay to research and develop Whale Safe fishing equipment or techniques.

72.     The current plight of the Northern Right Whale is a telling example of the illegality and disastrous impact of NOAA's arbitrary handing the fate of the Right Whale species over to NMFS. Despite its being listed an ESA Listed Species since 1969, its population in 2021 is crashing towards inevitable extinction oin the next few decades. In 2020, the International Union for the Conservation of Nature, the world's most prestigious conservation organization, upgraded the species threat status to "critically endangered" which recognizes that the Black Whale faces imminent extinction over the next few decades. In short, the result of NOAA's delegating its superintendent authority to NMFS has been a declining whale population.

73.     The Black Whale endangered status is worst off than it was in 1973 and the species now facing imminent extinction as a direct consequence of NOAA delegating its ESA superintendent authority to NMFS than if it had not done so. It is incontrovertible as fact, that NOAA's repeated delegation of its ESA superintendent authority to NMFS since 1973 has jeopardize the survival of the Northern Right Whale and Leatherback Sea Turtle species.

74.     It is incontrovertible it was not a rational choice for NOAA to hand over the fate of ESA Listed Species of whales and sea turtles to an agency whose organic statute requires it to promote the commercial killing and harvesting of marine wildlife. By its own admission, NMFS licensing and regulating of marine fisheries is the number one source of anthropogenic killing, injury and impaired feeding/reproduction on the Northern Right Whale species. NMFS is requiring the use of vertical buoy ropes by marine fisheries that it licenses and regulates. This is what the northeast pot and gillnet fisheries management plans produced by Defendant Atlantic States Marine Fisheries Commission requires NMFS to do.

75.     Since VBR routinely and inevitably entangles Endangered Whales and Sea Turtles, VBR in any state or federal fishery prohibited by the ESA Section 9 prohibitions on the taking of ESA Listed Species.  Since 1997 federal courts have ruled this. **FN9** How likely is NMFS going to be to

---

9 See *Strahan v. Coxe*, 939 F. Supp. 963 (Dist. Mass. 1996) and 127 F. 3d 155 (1st Circuit, 1997)

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 23 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

23

enforce ESA Section 9 prohibitions against itself? History has shown that NMFS has never once cited any fishermen or itself when its gear entangled a member of an ESA Listed Species. NMFS in its pot and gillnet fisheries plans and in it ALWTRP is still requiring the use of VBR that routinely catches, kills and otherwise results in prohibited takes of ESA Listed Species of Whales and Sea Turtles.

76.    *Cui bono?* Who benefits from NOAA's annual delimiting its use of its ESA superintendent authority and to recover endangered marine wildlife species by delegating it to just one of its infra-agencies and in doing so making the worst possible choice, delegating its authority to one infra-agency that is dedicated to the commercial slaughter of marine wildlife. The obvious answer is that the US commercial fishing industry is the only beneficiary from NOAA's turning over its enforcement authority to NMFS and Endangered Whales or the marine fishing industry, ESA Listed Species of marine wildlife are the losers. This delegation is evidence of a de facto, unlawful policy by NOAA that the ESA should not be enforced against the marine fishing industry if it would either have an adverse impact on the industry and/or if an ESA regulation is not approved of by the industry. This policy is not sanctioned by the ESA or any other statute. It is largely unwritten but carried out faithfully by NOAA & NMFS since 1973.

77.    NMFS at present has an agency "occupational culture" wholly invested in protecting marine fisheries from being adversely affected by the enforcement of the ESA or any other federal law against it. As a consequence, NOAA abuses and violates its assigned ESA superintendent duties by delegating them to NMFS not to achieve the recovery of ESA Listed Species but to protect the marine fisheries industry from the adverse impact of enforcing the ESA on the industry in order to protect and recover these species from their endangered biological status. This is tragically expected. NMFS' organic statute mandates conflicts with the ESA. NMFS function by its organic statute is to insure the economic growth and success of the marine fishing industry despite this industry's killing and adverse impact on ESA Listed Species of whales and sea turtles.

78.    Pursuant to this culture, both NOAA and NMFS consider whales to be legally "fish" and to be only managed only for their possible future commercial harvesting. **See Addendum A.** NMFS considers whales and legally defined "fish" species a marine fisheries resource. It thus segregates whale species as "living marine (fisheries) resources" from its program for endangered Sea Turtles.

FN[10] Sea Turtles are managed under the requirements of the ESA. Whales and other legally defined "fish" species (i. e. other endangered marine mammals) are only managed under the requirements imposed on NMFS by the 1994 Amendments to the Marine Mammal Protection Act. These requirements wholly favor the marine fishing industry and immunize the fishing industry from the take prohibitions of the MMPA when they catch marine mammals in their gear. Because the MMPA immunizes fishermen from catching marine mammals in their gear, NMFS chooses to unlawfully ignore ESA Section 9 prohibited catching of ESA Listed Species of whales and sea turtles in fishing gear. This "transfer feature" is evidenced of NMFS occupational "extinction" culture.

79.     NOAA has several infra-agencies dedicated to scientific research and the development and use of advanced technology to solve environmental problems. These include the National Ocean Service (NOS) which oversees protected marine sanctuaries **FN11,** Office of Oceanic and Atmospheric Research (OAR) which does world class research on the effects of climate change on the environment (but not on ESA Listed Species). **FN12** The National Weather Service (NWS) **FN13**  The National Environmental Satellite, Data, and Information Service (NESDIS). **FN14**

80.     All of these sophisticated agencies are dedicated to the highest levels of environmental science were summarily gutted from any use by NOAA to recover ESA Listed Species by its handing these species over to the exclusive proprietary use. One of them is the National Ocean Service that is dedicated to the conservation of marine habitat and not its commercial exploitation. Another is NOAA's OAR which mostly does scientific research in climate, Ocean ecology and other areas of marine science. **FN15**  the OAR does not do research in fisheries management or any other area concerning the commercial exploitation of marine wildlife. The NESDIS builds and

---

10     NOAA has a "Live Marine Resources" research center at a state university called the NOAA LivingMarine Resources Cooperative Science Center (LMRCSC): True to its name it only does researchof fisheries management issues. NOAA has no such dedicated funded research program on any issue concerning the protection of Ocean biodiversity. https://www.noaa.gov/office-education/epp- msi/csc/noaa-living-marine-resources-cooperative-science-center.

11 https://oceanservice.noaa.gov.

12 https://research.noaa.gov.

13 https://www.weather.gov

14 https://www.nesdis.noaa.gov

15     https://oceanservice.noaa.gov/

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 25 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

25

launches remote sensing satellite and data networks. NESDIS possesses the needed technology infrastructure that could document the overall anthropogenic alteration of the marine environment that is preventing endangered marine species to recover despite their no longer being hunted. But NOAA has cut NESDIS out of any ESA conservation program for ESA Listed Species of whales and sea turtles by turning all marine wildlife over to NMFS so it can exploit them for its vested interests in commercial fisheries.

81.     NOAA has never considered delegating its ESA superintendent authority to any of these its said infra-agencies despite their being wholly focused on scientific research, conservation and environmental protection. NOAA has also refused to require that NOS, OAR, NESDIDS participate in any aspect of the recovery of ESA Listed Species of whale and sea turtles. This is evidence that the politically appointed NOAA & NMFS considers science and endangered wildlife conservation programs should ONLY serve the interests of protecting the marine fishing industry from any adverse economic consequences of ESA enforcement. This includes the preventing as a crime of omission any research efforts that will document and fully assess the state of the commercial fishing industry's ongoing killing, injuring and otherwise prohibited taking of ESA Listed Whales and Sea Turtles.

82.     NOAA repeated annual choice to delegate its superintendent authority to NMFS is wholly arbitrary and capricious. It is being done as part of NOAA's own occupational policy that the ESA should not be enforced against the marine fisheries industry unless it will have no adverse impact on it. NOAA wants ESA enforcement to be just a "positive program" for the fishing industry. In which NOAA only offers advanced technology and other services to the industry to lessen its impact on ESA Listed Species. What NOAA does not want to do is to enforce restraints to stop its killing of ESA Listed Species imposed on the marine fishing industry that will have a detrimental economic impact on the industry. NOAA's handing ESA Listed Species over to NMFS insures that will not happen.

83.     Instead since 1973, NOAA has failed to develop and implement an effective, proactive recovery program for the Northern Black Whale or any other ESA Listed Species of whale or sea turtle. This failing constitutes a repeated and malicious violation of its ESA Section 7(a)(1) non-discretionary and mandatory duties to recover ESA Listed Species of whales and sea turtles. By delimiting and not fully complying with its superintendent duties assigned it by Congress over ESA Listed Species of whales and sea turtles, it has allowed NMF's Fishing Activity to run

rampant in killing and injuring ESA Listed Species of marine wildlife.

84.     If NOAA was obeying its ESA superintendent mandated duties, it would summarily prohibit the use of Vertical Buoy Ropes by NMFS and its Fishing Activity. It is incontrovertible that in 2021, VBR is the leading known source for killing and injuring of Black Whales in US coastal waters.  In 2021, these unlawful takings of Endangered Whales and Sea turtles are not mere incidental takings. They are intentional takings pursuant to their commercial fishing and therefore fully prohibited without exception by ESA Section 9 prohibitions. Therefore, they cannot be allowed by MMPA Section 101(a)(5)(E).

85.     Similarly,  NOAA is also violating its said mandatory and non-discretionary superintendent duties under the Marine Mammal Protection Act by delimiting them through the delegation of them to NMFS. NMFS through its occupational culture of extinction its violating provisions of the MMPA by its forming a MMPA Atlantic Large Whale Take Reduction Team to falsely justify its ongoing violations of both ESA9and MMPA take prohibitions bu its Fishing Activity. The ALWTRT and its issued 2021 take reduction plan ("ALWTRP") is unlawful under the provisions of the MMPA. Since NOAA/NMFS has not issued the required MMPA Section 101(a)(5)(E) to itself, it cannot authorize the entanglement of a single Black Whale or any other ESA Listed Species of Whale in the US northeast and iots Fishing Activity is also prohibited from causing any such entanglement. But NMFS ignores the` law. It uses the ALWTRP to simply use an unlawful claim that it is "lessening but continuing more" prohibited entanglements of Black Whales and other ESA Listed Species of whales.

86.     As further evidence of its ESA Section 7 mandated duties to protect and recover its ESA Listed Species is its failure to comply with ESA7 requirement to conduct an internal consultation of the adverse impact of listed endangered wildlife by handing their fate over to NMFS and the commercial fishing industry. Since 1973 NOAA has never conducted the required consultation to determine if handing endangered marine wildlife over to NMFS would jeopardize the survival of any of these species instead of aiding their recovery.

87.     The Black Whale's is now facing inevitable extinction is a direct consequence of NOAA since 1973 annually delegating its ESA & MMPA superintendent authority to NMFS. It doing so, NOAA did not just jeopardize the survival of ESA Listed Species of whales and sea turtle. NOAA deliberately chose to sacrifice the Northern Black Whale species to inevitable extinction to protect the fishing industry from any adverse economic consequences of having the ESA enforced against

28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

27

it.

88.     These said violations by the Defendant will continue to reoccur annually until the Court enjoins NOAA from further delegating its ESA & MMPA superintendent authority to NMFS and orders to immediately develop and implement a proactive recovery program for the Blck Whale species and otherwise fully comply with its mandatory and non-discretionary duties under ESA Section 7(a)(1).

**COUNT II:**  *NOAA's Violation of ESA Section 7(a)(2) and APA*

89.     Citizen Attorney General M.A.X. re-alleges his claims of fact and law asserted in paragraphs 1 – 88.

90.     NOAA annual delegates its ESA & MMPA superintendent duties to NMFS in violation of its mandatory and non-discretionary duties under the ESA7(a)(2) to consult with itself over the adverse impacts on any said delegation to an infra-agency and to insure such delegation is not likely to jeopardize the continued existance of any ESA Listed Species of marine wildlife.  NOAA must do a ESA Section 7 internal consultation over any attempt to delegate any aspect of its superintendent authority to an infra-agency.

**COUNT III:** *NMFS Violation of ESA Section 7(a((2) and APA: NMFS 2021 ESA Section 7 Biological Opinion on Fisheries Management Plans and its 2021 Atlantic Large Whale Take Reduction Plan and its 2022 List of Fisheries designating the Massachusetts pot and gillnet fisheries as a MMPA Category II Fishery are Unlawful.*

91.     In 2018, The WINGO Defendants sued NMFS as "Trojan Horse" plaintiff over alleged ESA failing. In reality these WINGOS only were suing to get a court ordered sanction for NMFS continuing to require the use of VBR. As a result, NMFS recently  "consulted with itself" under ESA Section 7 one more time over the adverse impact on ESA Listed Species of whales and sea turtle by its 2016 fisheries management plans for its lobsterpot & gillnet fisheries along the Atlantic northeast coast (2015 Lobster & Gillnet FMP). This process also included NMFS preparing an Environmental Impact Statement under NEPA and revising its existing 2015 MMPA ALWTRP.

92.     Since NMFS was only forced by a court to simply review the same 2015 Lobster & Gillnet FMP one mor time, that is exactly what it did. NMFS consulted with itself under ESA7 over its continued use in the future of the identical 2015 Lobster & Gillnet FMP. Not unexpectedly, NMFS agreed with itself again that its licensing and regulating its said lobsterpot and gillnet fisheries would not "jeopardize" any ESA Listed Species of whale or sea turtle, including the Northern Black

Whale species.

93.     In issuing its 2021 BIOP, NMFS did admit to a few facts that contradicts its repeated "no jeopardy" finding. It admitted in 2020 that the Northern Black Whale population was declining at the annual rate of over ten percent. In October 2021 it officially announced a similar annual decline for the remaining Black Whale population over the last year. It admitted in the BIOP that federal fisheries were responsible for most of the killing and injuring of Black Whales. Despite these admissions, the BIOOP justified its repeated "no jeopardy" with phantasmagoria claims that: 1) Eliminating all killing and serious injury of the these whales from commercial fisheries would not stop their species population from further decline & 2) The further killing and injuries of Black Whales from any source will not cause their species to decline. The latter was NMFS repeating its past finding under the MMPA that the Black Whale species "Possible Biological Removal" was a positive number. All these findings are scientifically invalid, devoid of empirical support, and were issued in an arbitrary and capricious manner.

94.     NMFS only used its 2021 revised ALWTRP to justify its repeated "no jeopardy" opinion of its 2015 Lobster & Gillnet FMP. But NMFS failed to conduct any ESA Section 7 consultation of it and the proposed regulations to implement it.

95.     In 2021 it issued a ESA Section 7 biological opinion as a result of the said consultation ("2021 FMP BIOP"). NMFS' 2021 FMP BIOP expectedly simply issued itself another "no jeopardy" opinion on the impact of the said fisheries on all ESA Listed Species of whales and sea turtles. The "no jeopardy" finding is scientifically wrong and is categorically arbitrary and capricious owing to NMFS simple continuing "knee jerk" support of the 2015 Lobster a& Gillnet FMP adopted by Defendant ASMFC that requires the continued use of VBR.. Because the reviewed BIOP require the use of VBR, NMFS licensing and regulating pot and gillnet fisheries is guaranteed to continue to entangle, kill, injure and otherwise cause ESA Section 9 prohibited takings of Northern Black Whales and other ESA Listed Species of whales. It is a scientific fact that ANY entanglement of a Northern Black Whale lead to an irreparable adverse impact on the ability of the declining population of this whale to recover from its biologically endangered status. The 2021 BioOp "no jeopardy" decision concerning Black Whale species is prohibited under ESA Section 7.

96.     NMFS 2021 BioOp also violated ESA Section 7 by its failing to issue the required incidental take statement (ITS) on its fisheries future entanglement, killing, serious injury and all other prohibited takings of these whales. NMFS claimed that the MMPA Section 1372(a)(5)(E) first

requires that it must first issue itself a 3 year incidental take permit under this provision to allow it to authorize an incidental take by killing or injuring by the required ESA ITS. The 2021 BioOp is wrong. The said MMPA provision enforces the MMPA's taking prohibitions against NMFS unless NMFS can scientifically show that the mere entanglement of a single whale will NOT have an adverse impact on the ability of the Black Whale to recover from its endangered status. It is a scientific fact that a single entanglement of a Right Whale by VBR will likely have an irreparable adverse impact on the Black Whales ability to recover. ESA Section 7 therefore required NMFS to not issue any ITS to allow even a single entanglement of a Right Whale. NMFS 2021 BioOP violates the MMPA Section 1372(a)(5)(E) requirements and MMPA's taking prohibition and is therefore is facially decrepit and violative of ESA Section 7 requirements.

97.    NMFS violated the ESA Section 7 consultation requirements by failing to undergo the required consultation in developing and issuing its 2021 Atlantic Large Whale Take Reduction Plan (ALWTRP). The ALWTRP continues NMFS requirement for the use of VBR in by its US northeast coast pot and gillnet fisheries. This alone guarantees that the 2021 ALWTRP regulations will continue to cause more entanglements, killings, injuring and otherwise other ESA & MMPA prohibited takings of Right Whales and other ESA Listed species of whales and sea turtles. This reality makes the ALWTRP process unlawful *per se* as it was done in a manner to deliberately allow even more said taking of ESA Listed Species of whales. But the MMPA's take prohibitions as stated prohibit any taking at all of an ESA Listed Species of whale unless a three-year incidental take permit is first issued to NMFS under MMPA Section 1372 (a)(5)(E). This is a permit admits it cannot legally issue to itself.

98.    The above realities shows that NMFS' 2021 Atlantic Take Reduction Team is prohibited under the ESA Section 9 take prohibitions and is also unlawful under the MMPA regime. NMFS use of the unlawful ALWTRT process is evidence of its ongoing fraud and malicious practice of breaking the law in order to prevent the enforcement of the ESA against its marine fisheries industry. NMFS occupational culture since 1973 only offers to manage ESA Listed Species of Whales under the MMPA provisions of just having to reduce the immediate killing and serious injury of a whale from being caught by a marine fisheries operation. This is of course unlawful under the ESA as well as the MMPA. **See Appendix One.**

99.    NMFS prevents its ESA enforcement by only limiting its "management" of the species under an unlawful interpretation of the Marine Mammal Protection Act. As such it only focuses on

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 30 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

30

direct "killing and serious injure" requirements on commercial fisheries. NMFS wholly ignores other anthropogenic sources of mortality and injury. NMFS also ignores anthropogenic insult to generic whale health and reproductive potential. These are ESA requirements which NMFS ignores in its malicious focus only on meeting MMPA requirements of the fishing industry.

100.    NMFS violated the ESA Section 7 and the MMPA by its 2022 List of Fisheries that irrationally reclassifies Massachusetts pot and gillnet fisheries as an MMPA Category II fishery without having performed the requisite consultation over the adverse impact on ESA Listed Species of Whales from the said reclassification. It did this solely at bequest of the Massachusetts Division of Marine Fisheries and the Massachusetts lobsterpot industry calling to it for help to defeat M. A. X.'s ESA Section 9 prohibited takings prosecution of it its lobsterpot and gillnet fisheries that are also using VBR also are entangling ESA Listed Species of whales by the VBR the DMF also requires to be used. NMFS only reclassified the DMF fishery to serve as maliciously forged evidence to that federal court that DMF use of "weakened rope" VBR kills less whales after entangling the whale. Right Whales will still be entangled by DMF's fisheries use of "weakened VBR" at the same rate as it did in 2020 and before as a NMFS classified MMPA Category I fishery.

101.    Defendant NMFS in regulating and licensing marine fisheries will continue to violate ESA Section 7 mandatory and non-discretionary requirements unless ordered by the Court to immediately stop doing so.

**COUNT IV**: *Defendant NMFS Violation of 16 USC § 1538(a and g): The Defendants Violation of the ESA Section 9(a) Prohibitions by Requiring VBR Use in State and Federal Fishing Activity* **FN16**

102.    Citizen Attorney General M.A.X. re-alleges his claims of fact and law asserted in paragraphs 1 – 101.

103.    The Defendant NMFS is licensing and regulating commercial fishing operation off the northeast Atlantic coastline that is killing and injuring ESA Listed Species of whales and sea turtles

---

16    ESA Section 9(a):[I]t is unlawful for any person subject to the jurisdiction of the United States to—
    (A) import any such species into, or export any such species from the United States; (B) take any such species within the United States or the territorial sea of the United States; (C) take any such species upon the high seas; (D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C); … or (G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 4 of this Act and promulgated by the Secretary pursuant to authority provided by this Act.

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 31 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

31

since 1973. **FN17** The Defendants require that its pot and gillnet fisheries use vertical buoy ropes attached to its fishing gear. The said VBR routinely entangle Endangered Whales and Sea Turtles along the US coast line according to NMFS' own records concerning marine wildlife entangled by pot and gillnet fishing gear.

104.    The NMFS agents themselves are violating the ESA Sections 9 prohibitions by their mere deploying lobster pot gear in US coastal waters that historically entangles Endangered Whales and Sea Turtles in a routine and continuous manner since 1973. The simply deployment of VBR laden fishing gear pursuant to NMFS's regulations that require its use is on its own a per se prohibited taking under ESA Section 9 without the need for the VBR laden gear to entangle any ESA Listed Species after its deployment. The overwhelming majority of these entanglements are caused by VBR. NMFS never issued any ESA Section 10 Incidental Take Permit to its licensed fishers to authorize their incidental taking by them of Endangered Whales and Sea Turtles in the commercial fishing gear that they license and regulate to be deployed in US coastal waters under the concurrent state jurisdiction.

105.    ESA Section 9 requires that NMFS issue each of its fishers an ESA Section 10 Incidental Take Permits to immunize them ESA Section 9 prohibited taking from using VBR on their fishing gear. NMFS alleged conducting an ESA Section 7 consultation on its fisheries regulations does not extend to its "action" in issuing individual fish permits. The individual conduct in fishing is a separate issue of liability than the categorical establishing a fishing permit system by NMFS. **FN18** Both avenues result in NMFS ESA Section 9 liability for their prohibited entanglement and

---

17 Defendant NMFS established a northeast Atlantic coast regional office that manages NMFS fisheries operation in an area ranging from the Virginia coast north to the coast of Maine. The Plaintiff is claiming that the Court has jurisdiction to hear ESA claims throughout this range concerning ESA violations against NMFS northeast regional office's fisheries management actions. All Endangered Whales and Sea Turtles are migratory species along the northeast US coastline. So, as an example, a whale entangled by NMFS licensed lobsterpot fishery in Maine affects the quality of whale watching in Massachusetts on Stellwagen Bank since that whale migrates through the coastal waters of both states.

18 See *Strahan v. Coxe*, 939 F. Supp. 963 (Dist. Mass. 1996) and 127 F. 3d 155 (1st Circuit, 1997) (Massachusetts marine fishing agency liable under ESA Section 9(a) for unlawful taking of ESA listed species of endangered whales by entanglements of endangered whales in fishing gear licensed and regulated this agency). See also *Florida Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008) and *Florida Key Deer v. Stickney*, 864 F. Supp. 1222 (Dist. FL 1994) (Federal Emergency Management Agency violates ESA §§ 9 and 7 for its authorizing, regulating, and funding commercial development in habitat of ESA listed endangered deer species).

otherwise prohibited taking of ESA Listed Species of whales and sea turtles.

106.    NMFS and each of its licensed fishers will continue their said ESA Section 9(a) prohibited taking of Endangered Species of Whales and Sea Turtles into the future unless ordered to stop by the Court.


**COUNT V**:    *Defendant Pentony's Violation of the Richard Maximus Strahan's Constitution protected rights to Free Speech, to Petition the Courts, to Equal Treatment under the law and to Due process by Its enforcing a Gag Order to coerce NOAA/NMFS employees to not communicate with the Plaintiff.* **FN19**

107.    Citizen Attorney General M.A.X. re-alleges his claims of fact and law asserted in paragraphs 1 – 106.

108.    in 2019 Defendant Pentony issued an order to all NOAA employees of its Greater Atlantic Regional Fisheries Area including the Northeast Fisheries Science Center to not communicate directly in any manner with the Plaintiff absent his personal authorization to do so. Pentony did this in retaliation for the M. A. X.'s enjoyment of his constitutionally protected rights to fraternize with government employees, petition the courts for relief, engage in peaceful political activism to protect endangered wildlife from anthropogenic assault. Pentony also did this as retribution out of a generic fear that M. A. X. would use the knowledge gathered in his friendly and voluntary conversations with NMFS employees to bring lawsuits in the future against NMFS and in particular Pentony. Pentony also construed M. A. X. to be "bad company" for NMFS employees. He feared that M. A. X. would educate NMFS employees on issues of biology, conservation measures and law that would then make NMFS employees less willing to support and participate in NMF evading the enforcement of the ESA against the Marine fishing industry.

109.    Pentony issuing the Gag Order resulted in massive irreparable injury being inflicted on M. A. X. He was kept from getting information on all aspects of whale and sea turtle biology and conservation. His most simple request for a document was involuntarily converted into a FOIA request and the document not supplied using a pretense of cost or process to justify NMFS subsequent refusal to produce the document to him. from gathering information and facts needed to force the Defendants and their regulation of commercial fishing to comply with environmental law

---

[19] See *Bivens v. Six Unknown Federal Agents*, 403 US 388, 91 SCT 1999 (1971)

and to stop its killing and injuring of endangered marine wildlife and their marine ecosystem.

110.    Pentony poisoned his collegial relationship with NMFS employees and his participation in the scientific community surrounding the conservation of ESA Whales and Sea Turtles in the northeast. He could no longer get information on whales or sea turtles. He was banned for any access to fishing gear removed from whales or from information on entanglements. NMFS scientists that he met at scientific conferences were uncomfortable talking to him and excuse themselves by telling M. A. X. that Pentony had ordered them to not have any direct communication with him.

111.    The Plaintiff has repeatedly attempted to communicate with NOAA employees in 2018-2019. They told him that they wanted to talk to him but were ordered by Pentony not to have any communication with the Plaintiff, including supplying him Publicly available NOAA documents or data. NOAA employee Colleen Coogan — coordinator of its ALWTRT —told him that she wanted to communicate with him but Pentony ordered her not to do so.

112.    In issuing his Gag Order, Pentony deliberately violated the Plaintiffs First Amendment protected right to core political speech, the Petition Clause of the First Amendment's protection of his right to petition government agencies and the courts, and his 14th Amendment constitutional right to due process and equal treatment under the law.

113.    Because of Pentony's Gag Order the Plaintiff has been irreparably injured and prevented from meaningfully prosecuting his claims against the Defendants. He has been prevented from meaningfully seeking any injunctive relief from the Court. He has been prevented from having the necessary facts available to him in order to prepare and file a meaningful amended complaint in the instant action. Many Endangered Whales and Sea Turtles have horribly died unnecessarily as a result. Pentony has unlawfully cost the Plaintiff much time and money as a result of his enforcing the Gag Order against him.

114.    M. A. X. will never again be able to enjoy his constitutionally protected right to communicate and fraternize with personally willing NMFS employees unless the Court enjoins Pentony in his individual capacity from further enforcing his unlawful Gag Order against M.A.X.

**COUNT VI**:  WINGO *Defendants Davenport, DOW, Knowlton & NEA violation of the ESA Section9 Take Prohibitions by Acting in Concert with NMFS and Fishing Industry to Force the Plaintiff and other Green Fishers to be Required to Use VBR in Pot and Gill Net Fisheries in US Coastal Waters that Kill and Otherwise Take ESA Listed Species of*

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 34 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

34

*Whales and Sea Turtles.*

115.     Citizen Attorney General M.A.X. re-alleges his claims of fact and law asserted in paragraphs 1 – 114.

116.     The Defendants Defenders of Wildlife and the New England Aquarium are wildlife interested NGOs or WINGOS. As such they seeks to serve commercial pot and gillnet fishers – what these WINGOS seek out as "stake holderss" to assist them in evading the ruthless enforcement of the ESA against them, especially in ESA prosecutions brought by Citizen Attorney Generals like M. A. X. The WINGOs serves as protective agents for the fishing industry to aid them in evading the enforcement of the ESA against it.  As such they serves as a member of NMFS unlawful Atlantic Large Whale Take Reduction Team. In so doing they act in concert with the marine fishing industry members as their representatives to insure NMFS will never ban the use of VBR. In 2018, WINGOS voted with the industry members to continue the use of VBR indefinitely to allow more killing, entanglements, and other ESA Section 9 prohibited takings of ESA Listed Species of whales and sea turtles.

117.     The WINGO DOW also maliciously carries on as a Trojan Horse advocate for endangered wildlife. This means that as a agent for commercial developers it misdirects the Public opinion to believe that the continued killing of endangered wildlife is actually conservation just from killing less wildlife annually. In return the fishing industry supports DOW's NIMBY lawsuits to stop oil drilling off the Atlantic coast. One of the deliberate scams orchestrated by the WINGO as a member of the ALWTRT in 2018 is the following. It issued propaganda that climate change forced Black Whales to commence feeding in Canada's Gulf of St. Lawrence. That is when the Black Whale population began to collapse. Driven out of the "whale safe" waters of the US, where caring and lwhale loving fishermen willingly sacrificed their income to fish in a "whale safe" manner, they started to be slaughtered by the uncaring "baby seal killing Canucks." The WINGO lobbied the Congress to get congressman to support sanctions against Canada for causing the decline of Black Whales.

118.     As NMFS's and the fishing industry's agent on the ALWTRT, the WINGO acted in concert with the fishing industry to get the Public to believe "we got to save whales and fishermen" and to support not banning VBR until advanced technology became available that the industry could use to keep fishing but not threaten wildlife populations. Of course, the WINGO worked with NMFS to get its unlawful practice that VBR could continue until NMFS could also buy whale safe fishing

gear and then give it for free to the fishermen.

119.    Because of the WINGO acting in concert with NMFS and the fishing industry, the fishing industry is succeeding in evading any enforcement of the ESA9 take prohibitions against it and to be freely able entangle and kill ESA Listed Species of whales and sea turtle with impunity.

120.    Defendant Knowlton and NEA conspired with the fishing industry and NMFS in a malicious scheme to allow NMFS to claim that VBR with a 1700 LB breaking strength ("VBR-1700")  will not kill or seriously injure entangled whales. This irrational and erroneous claim is now used by NMFS to evade court's enjoining it from continuing to require VBR. Knowlton/NEA was paid hundred of thousands of dollars by NMFS and Massachusetts' marine fishing agency to fabricate a phony research project and to maliciously publish false claims in a professional journal that VBR-1700 will not kill or seriously injure whales. Based solely on Knowlton's fraudulent claims, NMFS issued a "no jeopardy" opinion in its 2021 BIOP for the US northeast lobsterpot FMP. Knowlton profited further by appearing as a paid witness for the state of Massachusetts in the June 2021 trial in *M. A. X. v. EOEEA* (D. Mass. 2019). Kit testified under oath that VBR-1700 would completely eliminate VBR's threat of death and serious injury ESA Listed Species of endangered whales. On cross exam she admitted under oath that her claims made no sense statistically and her claims amount only to her personal opinion as a non-scientists and advocate for commercial fishing industry.

121.    The Black Whale species is facing inevitable extinction owing to these WINGOS malicious acting in concert with NMFS and the fishing industry to insure the continued use of VBR and its continued killing/injuring of Black Whales that is now equally responsible for current ten percent annual decline in size of its remaining population. The Black Whale would not be facing inevitable extinction in 2021 if it were not for the efforts of these WINGOS to have NMFS continue requiring the use of VBR and their collaboration with the fishing industry to insure that the Public will nogt blame the industry for the inevitable extinction of the Black Whale Species.

**COUNT VII**: *Defendant Atlantic States Marine Fisheries Commission violation of the ESA Section 9 Take Prohibitions by Acting in Concert NMFS to Require the Use of VBR Pot and Gill Net Fisheries in US Coastal Waters that Kill and Otherwise Take ESA Listed Species of Whales and Sea Turtles.*

122.    Citizen Attorney General M.A.X. re-alleges his claims of fact and law asserted in paragraphs 1 – 121.

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 36 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

36

123.    The Defendant Atlantic States Marine Fisheries Commission is the partner in crime with NOAA/NMFS in committing ESA Section 9 crime with NMFS. The ASMFC is not a government agency. But it possesses a federal charter to operate and it has exclusive authority to develop coastal marine fisheries management plans for the implementation and licensing by NMFS. It's literally a mere "clubhouse" where the marine fishing industry gets exclusive opportunity to work in concert with  state and federal employees to issue the industry's desired pot and gillnet fisheries plans for the US northeast coast. The ASMFC has a written agreement with NMFS that NMFS will just "rubber stamp" and accept any fisheries plan served on it by the ASMFC.

124.    Since the fishing industry want to use VBR in its pot and gillnets fisheries, the ASMFC issues a fishing plan that requires the use of VBR. Because the ASMFC issues a fisheris plan requiring the use of VBR, NMFS rubber stamps the plan and promulgates regulations to implement it with little alteration.

125.    The ASMFC is therefore liable along with NMFS for the ESA Section 9 prohibited killing and injuring of ESA Listed Species of Whales and sea turtles pursuant to NMFS licensed agents deploying VBR ladened fishing gear into US coastal waters in which ESA Listed Species of whales and sea turtle co-occur.

126.    ASMFC and NMFS and each of NMFS' licensed fishers will continue their said ESA Section 9(a) prohibited taking of Endangered Species of Whales and Sea Turtles into the future unless ordered to stop by the Court.

**COUNT VIII**. *Defendant Sawyer's Engaging in the ESA9 Prohibited Taking of ESA Listed Species of Whales and Sea Turtles by His Deploying Vertical Buoy Ropes and Associated Fishing Gear in ESA Designated Listed Critical Habitat for the Northern Black Whale.*

127.    Citizen Attorney General M.A.X. re-alleges his claims of fact and law asserted in paragraphs 1 – 126.

128.    The Defendant Sawyer is a government licensed commercial fisher who deploys VBR laden fishing gear into US coastal waters primarily off the Massachusetts coast. Upon information and belief he deploys the said fishing gear almost exclusively in marine waters within the boundaries of the ESA listed designated critical habitat for the Northern Black Whale ("Black Whale Critical Habitat"). By its character, VBR laden lobsterpot and gillnet fishing gear deployed by Sawyer routinely catches and entangles ESA Listed Species of whales and sea turtles principally owing to

the use of the VBR and gillnetting.

129.    The ESA9 take prohibitions prohibit the deployment of any VBR laden fishing gear in Black Whale Critical Habitat. Currently in 2021 the deployment of VBR laden fishing gear is now a *per se* ESA9 prohibited activity on its own without any need to actually catch/entangle any animal who is a member of an ESA Listed Species. This is due tio the historical reality that VBR fishing gear is scientifically proven to devastate the Northern Black Whale population. The extinction of the Black Whale is a "death by a thousand cuts." All fishermen share a percentage of liability for the inevitable extinction of this endangered species. Owing to the chaotic character of Black Whales being caught by VBR laden fishing gear, there is no realistic way of predicting when or which fisher's VBR gear will catch a Black Whale. Therefore the ESA9 prohibitions must be equally enforced against all fishers deploying VBR lkaden fishing gear at all times in order to prevent any future entanglement.

130.    Currently any entanglement of a Black Whale constitutes a species extinction event. To stop the extinction of the Black Whale requires that Defendant Sawyer be enjoined from deploying any more VBR laden fishing gear in Black Whale Critical Habitat.

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 38 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

38

## Claims Under the Court's Supplementary Jurisdiction

**COUNT IX**. *Defendants ASMFC, DOW, NEA, Sawyer Davenport, & Knowlton as a Public Nuisance*

131.    Citizen Attorney General M.A.X. re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 130.

132.    The Defendants ASMFC, DOW, NEA, Davenport, Sawyer & Knowlton are Public Nuisances that have adversely injured the property interests and otherwise inflicted tortious injury on the protectable interest of the M.A.X. Together that have acted in concert to insure required use of VBR ("Fishing Activity") by the all lobsterpot and gillnet fishers in the northeastern United States coastal waters. In doing so these Defendants have maliciously and negligently destroyed the Northern Black Whale's species ability to thrive and condemned it to an inevitable extinction. The People are suffering recurring and continuing tortious injury from these Defendants' their said unlawful activities. The M.A.X. also suffered much financial loss inflicted on him by the said unlawful activities of the Defendant. His ability to make a living studying and gathering data on these whales has been devastated by them. His ability to engage in Green Fishing is being prevented by them. Tax payers have spent over a half-billion dollars to stop the extinction of wildlife species these Defendants are causing. As a commercial fishermen the Defendants' Fishing Activity is costing him ongoing losses in time and money as a result of the Endangered Whales being kept from recovering from their biologically endangered status by these Defendants. As a commercial fisherman M.A.X. has a unique status distinguished from that by other members of the Public.

133.    M.A.X. is asking the Court to award him compensatory damages for the decades of economic loss and the lost ability for him to enjoy the marine environment, that is guaranteed under the Massachusetts Constitution, that is being inflicted on him by NMFS' Fishing Activity. M.A.X. is also asking the Court for an award of punitive damages against the Defendants. The Defendants negligence has hurt all members of the Public and their ability to enjoy the marine environment. There are fewer whales to be seen on commercial whale watch vessels, kayaks, by swimmers and surfers. The Defendants need to be punished economically in order to put an end to their deliberate destruction of the Public Weal – the wildlife of the Ocean and the coastal marine environment.

Case 1:21-cv-01131-TJK   Document 73   Filed 02/28/22   Page 39 of 96
28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

39

**COUNT X**      *Defendant Pentony's Violation of Mass. General Laws Chap. 12 § 11I, the Massachusetts Civil Rights Act*

134.    Citizen Attorney General M.A.X. re-alleges his claims of fact and law asserted in paragraphs 1 – 133.

135.    The Massachusetts Civil Rights Act authorizes citizens to prosecute anyone in a court of law for injunctive and compensatory relief who uses threats and intimidation against him to coerce him from enjoying his constitutional and statutory protected liberties and authority. The MCRA statute, 12 MGL § 11I, reads as follows —

> "Section 11I. Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court."

136.    The Defendant Pentony is engaging in First Amendment prohibited retaliatory conduct by Defendant Pentony that has been ongoing since 2018. The M.A.X. right to Free Speech and to petition the Courts of the United State is protected by the Petition Clause of the First Amendment. Owing to M.A.X. demanding the banning of VBR in US coastal waters and his many decades long repeated prosecutions of NMFS employees in federal courts for violation of environmental and civil rights laws, Pentony is now coercing M.A.X. from any further litigation of NMFS employees from his coercing NMFS employees to no speak or in any way communicate with M.A.X. despite these employees willingness and desire to do so. On or after 2018, Pentony in conspiracy with NOAA"s Samuel Rausch issued a gag order ("Gag Order") to NMFS employees in its northeast regional office and at the Northeast Fisheries Science Center in Woods Hole MA ordering them to no longer communicate with M.A.X. either verbally or through email etc.

137.    Since 2018, NMFS scientists and researchers now refuse to communicate with M.A.X. after receiving notice of the Gag Order from Pentony. Every time M.A.X attempts to email or otherwise communicate with willing scientists and researchers employed by NOAA, they either ghost him or politely inform him that they got Pentony's Gag Order and can no longer communicate with him. These employees tell M.A.X. that they live in fear of losing their government jobs or being sanctioned as employees if they speak with M.A.X.

138.    The Massachusetts Civil Rights Act allows citizens to prosecute in court any federal government employee for using threats and intimidation against the citizen that coerces him from the full enjoyment of his statutory and constitutional protected liberties, including Free Speech, the righty to petition the courts, the right to equal treatment under the law, the right to due process, and the right to free association. The Gag Order deliberate acts to coerce M.A.X. from enjoying his ability to prosecute NMFS employees in court. Pentony directly told M.A.X. during a phone and in an email that if he chooses to sue NMFS he will not be allowed to speak with NMFS employees. The Gag Order is now permanent. Since Pentony considers M.A.X. a constant threat to sue NMFS, the Gag Order is permanent.

139.    The Gag Order's intent includes stopping M.A.X. communicating with NOAA "whistle blowers" and to coerce him from getting NOAA documents and scientific data to intimidate him from being able to petition the government to ban VBR in US coastal waters.

28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

41

## PRAYER FOR RELIEF

I.      For a Declaratory Judgment that the ESA Section 9 take prohibitions prohibit the government licensing of and/or any individual's deployment of fishing gear utilizing vertical buoy ropes into coastal waters designated under the ESA as critical habitat for the Northern Black Whale off the northeastern US coast.

IIA.    For a Declaratory Judgment that NOAA is now in continuous violation of its mandatory and non-discretionary duties under ESA Section 7(a) by delimiting its superintendent authority for the ESA by delegating it to NMFS without NOAA first having conducted an internal ESA Section 7 review to determine such an action's possible adverse impact on ESA Listed Species.

IIB.    For an Order enjoining NOAA from further delegating its ESA superintendent authority to NMFS, enjoining NMFS from further conducting ESA Section 7 consultations, and to not have NOAA delegate its authority to any other of its other infra-agencies until it has first conducted the appropriate ESA Section 7 internal consultation prior to such possible action.

IIIA.   For an Order enjoining Defendant Pentony from any further attempt to coerce or intimidate any NOAA/NMFS employee from communicating directly with the Plaintiff.

IIIB.   For an Order enjoining Arthur Sawyer from deploying gillnet and/or pot fishing gear using vertical buoy ropes in US coastal waters off the Massachusetts coast.

IV.     For an Order to enjoin NMFS from enforcing its ALWTRP against M.A.X. or any other state licensed fisher and to enjoin Davenport/DOW/Knowlton/NEA and Sawyer/MLA from serving on the NMFS' ALWTRT.

V.      For an order, enjoining NMFS from further licensing and/or requiring any individual to use vertical buoy ropes on pot or gillnet fishing gear to be deployed in ESA designated critical habitat for the Northern Black Whale off the northeast US coast.

VI.     For an order requiring NOAA to develop and implement an effective, pro-active program to recover Northern Black Whale species including taking steps to immediately increase the species annual rate of birth in order to achieve in each successive year an increase in the size of the species population until it no longer needs to be designated as an ESA Listed Species.

VII.    For an award of $1,000,000 in compensatory and punitive damages against each of these Defendants; Pentony, ASMFC, Sawyer, Davenport, Knowlton, the New England Aquarium and the Defenders of Wildlife.

VIII.   For an award of the M. A. X.'s direct costs of his prosecution against the Defendants

IX.     For any further relief that the Court deems appropriate

 BY:

      /s/  Richard Maximus Strahan
      _____
      Richard Maximus Strahan as Man Against Xtinction
      esistoo@yahoo.com

      *Pro Se and Proud!*

### VERIFICATION OF THE COMPLAINT

I Richard Maximus Strahan verify under the pains and penalties of perjury that all the facts alleged in the above complaint are known to the best of my ability to be true. Signed under the pains and penalties of perjury this 28th Day in the month of February 2022

    /s/ Richard Maximus Strahan
    _____

    Richard Maximus Strahan
    Man Against Xtinction

_____

### CERTIFICATE OF SERVICE

_____

I hereby certify that a copy of the above document was served on the current Defendants VIA the ECF filing system this same day.

/s/  Richard Maximus Strahan
_____

Richard Maximus Strahan

28 February 2028 Typographic Corrected Complaint in *Strahan v. Pentony*, 1:21-cv-01131-TJK

# APPENDIX

# Boston College Environmental Affairs Law Review

Volume 36 j Issue 2                                                    Article 7

1-1-2009

# A New Paradigm for Conservation of Great Whales in the Urban Sea of the United States --Species in Need of a "Green Night"

Richard Max Strahan

Follow this and additional works at:

🌀 http://lawdigitalcommons.bc.edu/ealr Part of the Admiralty Commons l and the Environmental Law Commons

Recommended Citation

Richard Max Strahan1 *A New Paradigm for Conservation of Great Whales in the Urban Sea of the UnitedStates -- Species in Need of a "Green Night"* l 36 B.C. Envtl. Aff. L. Rev. 431 (2009) l http://lawdigitalcommons.bc.edu/ealr/vol36/iss2/7

This Symposium Article is brought to you for free and open access by the Law Journals at Digital Commons @ Boston College Law School. It has beenaccepted for inclusion in Boston College Environmental Affairs Law Review by an authorized administrator of Digital Commons @ Boston College Law School. For more information1 please contact nick.szydlowski@bc.edu.

# A NEW PARADIGM FOR CONSERVATION OF GREAT WHALES IN THE URBAN SEA OF THE UNITED STATES—SPECIES IN NEED OF A "GREEN KNIGHT"

### Richard Max Strahan*

Abstract: The great whales of the North Atlantic live, breed, and are now being injured and killed in the "Urban Sea" —a growing feature of the United States coastline resulting from coastal development. The primary threats to great whales are anthropogenic: vessel strikes and entangle- ment in commercial fishing gear. Despite their popularity as cultural icons, and federal and state protective regulations on the books, endan- gered whales increasingly suffer collateral damage from coastal com- merce. Ample law and technology exist to eliminate these problems. Rather than advancing the protection of whales, however, government agencies and some nonprofit organizations have aggravated the problem through their lack of meaningful action. This essay examines systemic reasons why harmful entanglements in commercial fishing gear continue to occur and are likely to go on unabated into the future. The essay then proposes a paradigm shift for approaching these problems that will pro- tect whales and will also benefit other wildlife in the ocean and its coastalUrban Sea.

---

   * Founder and chief science officer of Whale Safe USA, a citizen organization that aims to protect the ocean environment by encouraging state and federal governments to establish a "whale safe" environmental review standard for their licensing and regulating of commercial and industrial activities that occur in the marine environment or affect it— including commercial fishing and commercial whale watch tourism. The author has litigated a number of marine mammal protection lawsuits as a non-attorney plaintiff pro se. See Strahan v. Holmes, 595 F. Supp. 2d 161 (D. Mass. 2009); Man Against Extinction v. Hall, No. C 08-01488 SI, 2008 WL 3549197 (N.D. Cal. Aug. 13, 2008); Strahan v. Pritchard, 473 F. Supp. 2d 230 (D. Mass. 2007); Strahan v. Linnon, 967 F. Supp. 581 (D. Mass. 1997), aff'd, 187 F.3d 623 (1st Cir. 1998); Strahan v. Coxe, 939 F. Supp. 963 (D. Mass. 1996), aff'd, 127 F.3d 155 (1st Cir. 1997); Bays' Legal Fund v. Browner, 828 F. Supp. 102 (D. Mass. 1993).

## Introduction

The status of the great whales[1] in law and biology makes it fitting to describe them as "Twenty-Ton Canaries." Like the small, sensitive birds that warned miners of lethal odorless gases in the coal mines of the 19th century, the great whales in effect serve a utilitarian function, warning the public of imminent environmental dangers in the coastal environment. Today, most deaths and injuries of great whales are caused by humans, and occur in two settings—the diminishing killing of whales by a very few nations' whaling fleets,[2] and the dramatically increasing harms collateral to the growing development and industri- alization of the coastal marine environment of the United States and other nations.[3]

Today the number of great whales killed by Japan's small hunting fleet is dwarfed by the collateral killing of these whales along the coast- line of the United States from commercial and industrial activity. Coastal marine fisheries in the United States and Canada routinely kill and in- jure great whales by entangling them in commercial fishing gear—the

---

[1] The term "great whales" typically refers to the baleen whales and the sperm whale. John Bannister, Great Whales 3 (2008). The North Atlantic right whale (*Eubalaena gla- cialis*), the southern right whale (*Eubalaena australis*), the North Pacific right whale (*Eubalaena japonica*), the humpback whale (*Megaptera novaeangliae*), the fin whale (*Balaenop- tera physalus*), the sei whale (*Balaenoptera borealis*), the sperm whale (*Physeter catodon*), and the blue whale (*Balaenoptera musculus*) are listed as protected species under the federal Endan- gered Species Act. *See* Endangered and Threatened Wildlife, 50 C.F.R. § 17.11 (2008). In 2008 the National Marine Fisheries Service divided the previously listed single species known as the northern right whale (*Eubalaena glacialis*) into two separate species, the North Atlantic right whale (*Eubalaena glacialis*) and the North Pacific right whale (*Eubalaena japonica*). En- dangered Status for North Pacific and North Atlantic Right Whales, 73 Fed. Reg. 12,024 (March 6, 2008). The author has disputed the validity of this division in a pending notice of intent to sue. This essay, however, employs the currently official nomenclature.

[2] Currently, the minke whale is the main species of whale commercially hunted. *See* The Mammal Society, Fact Sheet: The Minke Whale *Balaenoptera acutorostrata*, http://www. abdn.ac.uk/mammal/minke.shtml (last visited Apr. 27, 2009). The great whales are gener- ally not commercially hunted, although Iceland and Japan hunt fin whales, and Japan has proposed hunting humpback whales. *See* Richard Black, *Iceland Sets Major Whaling Quota*, BBC News, Jan 27, 2009, http://news.bbc.co.uk/2/hi/science/nature/7854705.stm; *Japan Drops Humpback Whale Hunt*, BBC News, Dec. 21, 2007, http://news.bbc.co.uk/2/hi/asia- pacific/7155255.stm. Additionally, NMFS allows Alaskan Eskimos to hunt up to seventy-five bowhead whales under the aboriginal subsistence exemption of the International Whaling Commission. Aboriginal Subsistence Whaling, 50 C.F.R. § 230.4 (2008); Aboriginal Subsis- tence Whaling Quotas, 74 Fed. Reg. 10,035, 10,035–36 (Mar. 9, 2009).

[3] *See* Allison H. Glass et al., U.S. Dep't of Commerce, Mortality and Serious In- jury Determinations for Baleen Whale Stocks Along the United States Eastern Seaboard and Adjacent Canadian Maritimes, 2002–2006, at iv, 3–5 (2008).

primary focus of this essay.4 Additionally, ships traversing the coastal seas regularly strike great whales.5 These impacts on great whales from coastal industrialization violate state and federal laws meant to protect them from these direct and collateral threats. This essay asserts that these killings and injuries continue—and are on the increase—because of a systemic failure of the prevailing paradigm of current law that manages and nominally offers protection to the great whales and their coastal marine habitat. It is the opinion of the author that these harms are to a large extent preventable and that the fact that they continue offers an opportunity to evaluate the effectiveness of the fundamental social and legal paradigm currently employed to protect the environment and great whales from the adverse affects of human activity.6

The waters off the northeast coast of the United States have been referred to as part of the Urban Sea.7 The development impacts of the great coastal cities do not stop at the docks of their ports but continue out into the ocean. The Urban Sea reflects the commerce of the East Coast and the huge volume of shipping flowing through the great ports of New York, Philadelphia, and Boston. It is impacted by pollution and detritus flowing from inland and port cities and cast off by ships at sea. Its waters receive air pollution from inland industry and the smokestack emissions of ships. It is infused with noise reverberating out from vessels and Navy sonar.8 The coastal sea is also laced with thousands of installations of fishing gear from fishing fleets, all of which can kill great whales, and some of which are never retrieved by fishermen but remain as derelict "ghost gear" drifting with the currents, continuing to kill without purpose. Conditions in the Urban Sea have deteriorated to the

4 *See* Jamison Smith et al., Nat'l Marine Fisheries Service, Large Whale Entanglement and Ship Strike Report 2005, at 2–4, 6 (2008), *available at* http://www.nero.noaa.gov/whaletrp/plan/disent/2005%20Large%20Whale%20Entanglement%20and%20Ship strike%20Report.pdf.

5 *See id.* at 7; David Laist et al., *Collisions Between Ships and Whales*, 17 Marine Mammal Sci. 35, 35–36, 58–59 (2001).

6 *See* James E. Scarff, *The International Management of Whales, Dolphins and Porpoises: An Interdisciplinary Assessment* (pt. 2), 6 Ecology L.Q. 571, 597–98 (1977).

7 *See generally* Lee E. Koppelman et al., The Urban Sea: Long Island Sound (1976) (discussing the commercial development of Long Island Sound as "a microcosm of national—even global—situations"). The Urban Sea is the area of the ocean starting at the coastline and spanning outwards to about 100–200 miles off the coast. It is an artificial entity manufactured by the industrialization of the coastal seas of the United States.

8 *See* Brandon Southall et al., Addressing the Effects of Human-Generated Sound on Marine Life: An Integrated Research Plan for U.S. Federal Agencies 13–14 (2009); *see* Robin Kundis Craig, *Beyond* Winter v. NRDC*: A Decade of Litigating the Navy's Active SONAR Around the Environmental Exemptions*, 36 B.C. Envtl. Aff. L. Rev. 353, 353–54 (2009).

*Environmental Affairs* [Vol. 36:431

point that great whales can no longer survive in these urbanized coastal waters without active protection.

The great whales breed, feed, migrate, and live in the coastal waters of the Urban Sea for a majority of their life spans.9 Several coastal states—like Massachusetts—list them as native resident species of their states and protect them under state endangered species acts.10 The federal government has designated Cape Cod Bay and other coastal areas as essential protected habitat for the North Atlantic right whale.11 Humpback whales breed and feed just twenty miles from downtown Boston on Stellwagen Bank.12 The proximity of great whale habitat to major metropolitan areas makes the commercial whale-watching industry possible.13 It also subjects these wild animals to the adverse impacts of the urban environment.

Great whale populations in the North Atlantic are still seriously endangered despite the fact that they have not been hunted for decades; have few natural predators;14 and do not seem susceptible to lethal pandemic diseases like measles or distemper,15 although toxins produced from algal blooms have been linked to incidents of mass killings of great whales.16 It is the collateral destruction of individual whales and their marine habitat caused by the consequences of human commercial and industrial development that must now be seen as the likely cause of future whale extinctions.17 The whales are frequently injured and killed by human activity in the Urban Sea and these casualties occur in numbers and rates that threaten the whales' continued

---

9 Like birds need trees, the great whales require coastal habitat in the Urban Sea for their survival as species.

10 321 Mass. Code Regs. 10.90 (2009) (Listing the great whales as protected species).

11 Critical Habitat for Northern Right Whales, 50 C.F.R. § 226.203 (2008).

12 Stellwagen Bank National Marine Sanctuary, Marine Life, http://stellwagen.noaa.gov/about/keyresources.html (last visited Apr. 27, 2009).

13 *See* Pinnacle-travel.org, Whale Watching, http://whale-watching.pinnacle-travel.org/history.htm (last visited Apr. 27, 2009).

14 *See* Whale Trust, Population Status: How Many Humpback Whales Are There in the North Pacific?, http://www.whaletrust.org/whales/whale_conservation.html (last visited Apr. 27, 2009).

15 There are, however, reports that raise these concerns as well. *See* V.S. Hinshaw et al., *Characterization of Two Influenza A Viruses from a Pilot Whale*, 58 J. Virol. 655, 655 (1986).

16 Joseph R. Geraci, *Humpback Whales (*Megaptera novaangliae*) Fatally Poisoned by Dinoflagellate Toxin*, 46 Can. J. Fisheries & Aquatic Sci. 1895, 1895–96 (1989); Diane Dumanoski, *Red Tide-Laden Mackerel Believed Cause of Humpback Whale Deaths*, Boston Globe, Dec. 20, 1987, at 29, 42.

17 *See* Richard Merrick et al., *Endangered Species and Populations, in* Encyclopedia of Marine Mammals 368, 373 (William F. Perrin et al. eds., 2d ed. 2008).

survival by frustrating the capacity of species populations to regain and maintain stable, sustainable, healthy population levels.18

The continued killings may critically deplete their small current numbers and precipitate extinction of species long after commercial whale hunting has ended.19 Great whales possess problematic biological parameters for survival compounded by their depleted numbers—specifically, great whales are long-lived, slow to reproduce, and incapable of quick population recoveries.20 This is why the historical cessation of hunting right and humpback whales has not resulted in a rapid recovery of species populations.21 As this "small-population" problem demonstrates, so long as their numbers remain low, whales remain vulnerable to extinction.22

The ruthless hunting of great whales caused the extinction of at least one population.23 Right whales were recognized as being so close to extinction that an international treaty has totally banned their hunting since 1931.24 Whaling in general became a regulated activity in 1945 under an international treaty signed by all nations then whaling.25 However, that treaty's intent was essentially commercial, designed to prevent over-hunting to ensure that the whale-hunting industry could survive over time.26 American and Canadian commercial whaling died out primarily due to public sentiment and a lack of commercial inter- est, not due to law or a lack of whales.27 In the early 1970s, Congress

---

18 *See* Hal Caswell et al., *Declining Survival Probability Threatens the North Atlantic Right Whale*, 96 Proc. Nat'l Acad. Sci. 3308, 3312–13 (1999).

19 *See* Lonny Lippsett, *Diving into the Right Whale Gene Pool*, Oceanus, Vol. 44, No. 3, 2005 at 18, *available at* http://www.whoi.edu/cms/files/kjoyce/2006/1/Oceanus-whale-DNA_7086.pdf. Studies suggest "the low level of genetic variation in the small North Atlantic right whale population" contributes to their low reproduction rate. *Id.*

20 *Id.*

21 *Id.*

22 *See* Anthony Ronald Sinclair et al., Wildlife Ecology, Conservation, and Management 312 (2d ed. 2006). When wildlife populations go below a certain size they lose their ability to adapt to environmental stress and face an enhanced risk of extinction from this fact alone. *See id.*

23 *See* James David Darling & Jim Darling, Gray Whales 24 (1999). The Atlantic gray whale was possibly hunted to extinction by the end of the 17th century. *Id.*

24 Convention for the Regulation of Whaling art. 4, Sept. 24, 1931, 49 Stat. 3079, 155 L.N.T.S 351. Japan did not sign on to this treaty. P. van Heijnsbergen, International Legal Protection of Wild Flora and Fauna 14–15 (1997).

25 International Convention for the Regulation of Whaling, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 72.

26 Steinar Andresen, *The Effectiveness of the International Whaling Commission*, 46 Arctic 108, 109 (1993).

27 *See* Eric Jay Dolin, Leviathan 353–69 (2007).

passed two relatively stringent statutes that protect whales: the Marine Mammal Protection Act and the Endangered Species Act.28

That great whales are being killed in the United States and Canadian Urban Sea may seem odd, because they enjoy such strong public support as well as full protection as endangered species under the law. Since the time of *Moby Dick*, whale conservation in the United States and Europe has enjoyed both political and emotional public support.29 In part because of their massive size, they are among the most charis- matic of wildlife, celebrity species that the public will never again allow to be hunted in the United States or Canada.30 Despite the charismatic status of great whales, the threats against them posed by the Urban Sea have resulted in little public outcry—in great measure because, in this author's opinion, insufficient information about these threats has reached the public.

This is of interest because sympathetic public pressure is a necessary factor to prompt government agencies to manage marine commerce in order to protect the great whales' use of coastal marine habitat. This author believes that lack of public awareness prevents criticism of commercial fishermen's role in whale entanglements.31 This lack of public alarm facilitates commercial interests' ability to avoid substantial restraints on their activities by government agencies or from private lawsuits. Government agencies also do not face enough political pressure from non-profit groups or the scientific community to change the status quo. As a result, state and federal governments have little interest in stopping the collateral killing and injuring of great whales and tend to avoid significant regulation of commercial fishing designed to eliminate whale entanglements.32 For example, neither federal nor state wildlife agencies, as a matter of policy, prosecute individuals who en-

---

28 Marine Mammal Protection Act, 16 U.S.C. §§ 1361–1423h (2006); Endangered Species Act, 16 U.S.C. §§ 1531–1544 (2006).

29 *See, e.g.*, Dolin, *supra* note 27, at 231–32 (describing the letter from "a Polar Whale" in the Honolulu Friend newspaper letters section).

30 On the other hand, even the governments of New Zealand and Australia are mili-tant about stopping Japanese whaling. *See Australia Warns Japan Over Whales*, BBC News, May 24, 2005, http://news.bbc.co.uk/2/hi/asia-pacific/4574451.stm; Stephanie Kennedy, *Australia Pressures IWC on Japanese Whaling*, ABC News, Mar. 7, 2008, http://www.abc.net.au/news/stories/2008/03/07/2182722.htm.

31 There is literature available that documents the hazards to whales but it is mostly found in scientific publications rather than major media outlets. *See, e.g.*, Scott D. Kraus et al., *North Atlantic Right Whales in Crisis*, 309 Science 561, 561 (2005) (describing the effects of fishing gear entanglement on right whales).

32 Outside of the North Atlantic right whales, the author is aware of no extensive ongoing state or federal recovery efforts for whales.

tangle whales in fishing gear or strike whales with a ship.[33] This state of affairs deserves analysis and explanation.

Functioning as the coal miner's canary, the great whales in the North Atlantic Urban Sea warn not only of the escalating destruction of the coastal seas, but of the inability of the current environmental protection regime of the United States to meaningfully mitigate or prevent the killing—if not the extinction—of these celebrity species of wildlife. As a focal case in point, Part I of this essay addresses one of the major threats to the survival and welfare of North Atlantic great whales—the distressing and illuminating problem of injuries and death attributable to entanglement in commercial fishing gear. Part II then undertakes a detailed review of legal protections for great whales under United States statutes and regulations, and international treaties in which this nation participates. Part III sets out the author's observations of delin- quencies of omission and commission by government agencies, non- profit organizations, and researchers, with regard to threats  facing great whales and also offers some possible explanations. Part IV offers potential solutions in light of this essay's analysis.

## I.  Hazards to Great Whales: Entanglement by Commercial Fishing Gear in the Urban Sea

### A.  *Entanglement Basics: Threats Posed by Current Commercial Fishing Practices*

One of the two main anthropogenic threats to great whales in the Urban Sea is their injurious entanglement in commercial fishing gear.[34] In large part because of the practices of its commercial fishing industry over the last forty years, the United States contributes significantly to this threat to great whales—despite theoretically stringent statutory protection.[35]

---

[33] *See* Press Release, Pub. Employees for Envtl. Responsibility, Whale Prots. Rarely En- forced ( July 1, 2004), http://www.peer.org/news/print_detail.php?row_id=380.

[34] Kraus et al., *supra* note 31, at 561; Andrew J. Read, *The Looming Crisis: Interactions Be- tween Marine Mammals and Fisheries*, 89 J. Mammalogy 541, 541, 543 (2008). The other threat is ship strikes. *See* Smith et al., *supra* note 4, at 2–3; Laist et al., *supra* note 5, at 35– 37.

[35] *See* Andrew J. Read et al., *Bycatch of Marine Mammals in U.S. and Global Fisheries*, 20 Conservation Biology 163, 164 (2006).

*Environmental Affairs*                 [Vol. 36:431

Great whales are routinely caught and entangled by commercial fishing gear.36 A significant number of the known anthropogenic mortalities and injuries of great whales in the Urban Sea come from entanglement in such gear.37 Great whales get caught up in ropes (lines) and nets used in the coastal fishing industry.38 Ropes suspended in the water column have a surprising ability to ensnare, wrap around, and form cinch knots (that is, entangle) upon just about any large moving object that comes in contact with them.39 The actual mechanics of a whale's entanglement in fishing ropes—particularly involving commercial pot gear and gill nets—is, in the author's opinion, relatively simple to appreciate and to prevent. The defining task in managing commercial fisheries so as to prevent whale entanglement is eliminating the possibility of a whale making physical contact with fishing gear.40



Figure 1: Typical lobster pot gear deployment in U.S. coastal waters. Chart courtesy of Boston College Environmental Law Society, 2008.

---

36 *See id.* at 167. Ten to thirty percent of North Atlantic right whales and Gulf of Maine humpback whales become entangled each year. *Id.; see also* Amanda Johnson et al., *Fishing Gear Involved in Entanglements of Right and Humpback Whales*, 21 Marine Mammal Sci. 635, 635–36 (2005); Kraus et al., *supra* note 31, at 561.

37 *See* Johnson et al., *supra* note 36, at 636.

38 *Id.* at 640–41.

39 The lines used in the coastal fixed gear fishery are generally made of plastic polymers—polypropylene, polyester and the like. *See* Johnson et al., *supra* note 36, at 638.

40 *See* Read, *supra* note 34, at 543.

Fixed fishing gear is the type of fishing equipment that causes the greatest number of recorded marine mammal entanglements in the Urban Sea.41 Fixed gear is anchored in position and tended to by fisherman every few days.42 Fixed gear consists of two kinds of fishing gear: (1) gear using traps (also called pots) tied together in a string (a trawl) that is attached to vertically suspended ropes (vertical buoy lines or VBL) from floating buoys on the sea surface; and (2) sink gill nets that resemble volleyball nets anchored to the sea floor (gill nets).43

The fishery for American lobster (*Homarus americanus*) is the most familiar fishery which uses pot gear. Its rectangular box-like wire traps are baited and have entrance holes, but only a small exit for undersized crustaceans.44 Intensively deployed on the coastal ocean floor, these and similar forms of traps catch fish and crustaceans.45 The rope that runs horizontally between the adjacent linked pots in a trawl is called a ground-line; if buoyant, it sometimes floats in an upward curve between the traps.46 The ropes that extend downward from the buoys to the end pots in the trawls are the vertical buoy lines, and are subsequently used to retrieve the trawls of pots.47 The fishery for American lobsters extends along the Atlantic coast of the United States and Canada from the Bay of Fundy to the Carolinas.

The scale of the threat posed by lobster-set vertical buoy lines is illustrated by the placement of fixed gear at the top of Cape Cod Bay in relation to sightings of North Atlantic Right Whales. To enter Cape Cod Bay, one of their major historical habitats, right whales must pass through a gauntlet of vertical buoy lines anchored to thousands of lobster pot trawls. Evidence suggests that great whales primarily become entangled in the vertical rope lines that stretch from gear on the ocean floor to surface-floating buoys.48 When an area becomes known as a hot

---

41 *See* Johnson et al., *supra* note 36, at 636.

42 Each season, a typical lobster pot fisherman may deploy as many as 800 traps configured as trawls, each consisting of twenty or fewer traps. There are two vertical buoy lines per trawl. The fishing gear remains in the water continuously for the duration of the season, which can last up to eight months or more.

43 *See* Johnson et al., *supra* note 36, at 636–37.

44 *See* Pots, FAO Fisheries Glossary, *available at* http://www.fao.org/fi/glossary/default. asp (click "Search for Term" hyperlink; then search "Pots").

45 *See id.*

46 Johnson et al., *supra* note 36, at 638 & fig.1.

47 *Id.*

48 *See id.* at 643 ("Fifty-six percent of the entanglements for [North Atlantic right whales and humpback whales] involved buoy line "). The author goes on to argue, however, that "[w]hether buoy and surface system lines represent more of an entanglement risk than groundline is currently difficult to determine." *Id.*

spot for lobsters or prey fish, fishermen deploy thousands of traps—with attendant buoys and vertical lines—into a limited expanse of coastal waters, creating a rope forest.



Figure 2. Lobster trap sets and right whale sightings, Cape Cod Bay. In this chart, each dot represents a sighting of a North Atlantic right whale in Cape Cod Bay since 1988 (the solid dark area is the land area of Cape Cod and adjacent mainland). The lined quadrilateral zones indicate the locations of just three lobster pot fields where thousands of lobster gear trawls are annually deployed, each set typically with one vertical buoy line attached at either end. Chart created by Jonathan Sege, Boston College Geophysics GIS Lab, 2008.

Great whales can get entangled just from running into this gear as they swim along. As a whale makes physical contact with a vertical buoy line by running into it, the line may wrap itself around a whale's flippers, its tail, its body, and/or even through its mouth, and then set on itself and knot up. Repeated exposures to potentially fatal entanglement are a routine event for a majority of individual great whales in the North Atlantic Urban Sea.[49] It appears that, once entangled, some

---

49 *See* Read et al., *supra* note 35, at 167 ("50% to more than 70% of animals in some populations (Gulf of Maine humpbacks and North Atlantic right whales, respectively) have been entangled at least once in their lives ").

whales are able to shed the gear.[50] In other entanglement episodes, owing to the whales' large size, they can break away from some of the fishing gear with only the vertical lines wrapped around them. At other times they carry larger amounts of fishing gear when they break away from an entanglement site. Severe entanglement proceeds over time to constrict, cut, scar, or otherwise injure them, or worse.[51]

Fixed sink gill nets also entangle whales.[52] Gill nets are widely used by the commercial fishing industry for harvesting ground fish, the species of commercial fish that customarily live on or near the ocean floor— principally haddock, flounder, cod, skate, and fluke. Such nets also have vertical buoy lines that can entangle whales.[53] Gill nets unfor-tunately do not discriminate in what they kill. They catch and kill many species of fish and wildlife that are not targets of the licensed fishery— so-called bycatch—including seals, dolphins, turtles, and other marine mammals besides whales.[54] Gill nets can be aptly described as a "wall ofdeath." Nets can become transient killers when they break loose and drift randomly around bays and oceans as derelict "ghost nets," holding entrapped and decomposing sea creatures, sometimes for years, until the nets finally disintegrate.[55]

Eyewitness accounts of entanglements are rare, despite years of researchers observing these whales.[56] This does not mean that entanglement is a rare event, however. Further compelling evidence for a high rate of entanglement comes from reports assessing rope-scarring on whales, the origin of which is overwhelmingly likely to have been caused by entanglement in fishing gear.[57] Over seventy-five percent of

---

[50] *See* Johnson et al., *supra* note 36, at 642.

[51] *See* Michael J. Moore et al., Fatally Entangled Right Whales Can Die Extremely Slowly, (Sept. 18–21, 2006) (paper presented at OCEANS'06 MTS-IEEE Conference, Boston, MA), *available at* https://darchive.mblwhoilibrary.org/bitstream/1912/1505/1/ Moore%20et% 20al%20IEEE%20Entanglements%202006060330-71.pdf.

[52] *See* Johnson et al., *supra* note 36, at 636.

[53] The gill net is intended to be a simple killing machine, catching any fish swimming through the water. When the head of a fish pushes through any of the individual openings in the invisible monofilament net, a nylon loop cinches around the gills behind the head. The caught fish is held in place with impaired gill breathing until it literally drowns.

[54] *See* Read, *supra* note 34, at 542.

[55] A ghost net can drift aimlessly for more than a dozen years before it starts to disin-tegrate or becomes so balled-up that it can no longer kill. *See, e.g., Derelict Net Entangled, Killed 3,500 Animals in 15 Years*, SanJuanJournal.com, June 11, 2008, http://www.pnwlocal news.com/sanjuans/jsj/news/19785739.html.

[56] *See* Mason Weinrich, *Behavior of a Humpback Whale (*Megaptera Novaeangliae*) Upon Entanglement in a Gill Net*, 15 Marine Mammal Sci. 559, 559–61 (1999).

[57] *See, e.g.*, Amy Knowlton et al., Analysis of Scarring on North Atlantic Right Whales (*Eubalaena glacialis*): Monitoring Rates of Entanglement Interaction: 1980–2002 11 (Feb.

North Atlantic right whales evidence scarring from such entanglement in fishing gear,58 as do approximately half of humpback whales.59 An assessment of the problem from field reports leaves no doubt that entanglement is a routine and dangerous phenomenon. As a recent re- port noted: "Entanglement in fishing gear is a significant cause of in- jury and mortality to many marine mammal  populations throughout the world. Large whale populations along the U.S. east coast remain susceptible to entanglement, despite management efforts to reduce overfishing of lobster and groundfish species."60 Entanglement in fixed fishing gear inflicts significant mortality and serious injury on hump- back whales61 and North Atlantic right whales,62 threatening the sur- vival of these endangered species.

As noted above, vertical buoy lines are involved in the majority of recorded fixed-gear entanglements of whales.63 There are an abun- dance of reports from the field of injured, dead, or disabled great whales entangled only in vertical buoy lines and attached buoys, often just a single line. On the other hand, the author is not aware of any great whale that has ever been sighted entangled solely in ground-line. When whales are observed dragging pots and other parts of pot gear, including ground-lines in these entanglements, the ground-lines  are tied to vertical lines. Right whales in particular spend much of their lives swimming at or near the surface. Ground-lines hug or hover very near the seafloor. Great whales seldom dive to the seafloor and, when they do, appear to make vertical descents and ascents, not the travers- ing lateral movement that would increase exposure to ground-line. In addition, the ground-lines' lateral orientation with two ends weighted down  by attached traps creates a geometry that tends to limit entan-

---

2005) (unpublished report to the National Marine Fisheries Service) (on file with author); Jooke Robbins & David K. Mattila, Ctr. for Coastal Studs., Monitoring Entanglements of Humpback Whales (*Megaptera novaeangliae*) in the Gulf of Maine on the Basis of Caudal Peduncle Scarring (2001) (unpublished report to the 53rd Scientific Committee Meeting of the International Whaling Commission, Hammersmith, London), *available at* http://www.coastalstudies.org/what-we-do/whale-rescue/scar-study.htm. Many whales are seen annually with fresh surface scarring caused by fishing gear entanglement. *See id.*

58 Knowlton et al., *supra* note 57, at 11.

59 Robbins & Mattila, *supra* note 57.

60 Johnson et al., *supra* note 36, at 636.

61 *Id.* "[A] scar-based study of Gulf of Maine humpback whale entanglement rates indi- cated that more than half of the population had experienced a previous entanglement, and 8%–25% received new injuries each year." *Id.*

62 *Id.* "Mortality from entanglements in fishing gear, in particular fixed gear, is a factor inhibiting the recovery of the critically endangered North Atlantic right whale (*Eubalaena glacialis*)." *Id.*

63 *See id.* at 640–41.

glement opportunity, and therefore risk. For a number of reasons based on physics and behavior, therefore, ground-line participation in entanglements thus appears to the author to be at most marginal compared to the initial and continuing entanglement of whales caused by vertical buoy lines. When the National Marine Fisheries Service(NMFS) was asked via subpoena to produce any extant records of great whales becoming initially entangled in ground-lines rather than in ver- tical lines, the agency responded to the court in writing that they "ha[d] no such records."64

Fishing gear, and particularly vertical buoy lines, constantly pose a significant risk to entangle great whales whenever the two meet in close encounters.65 Regulations that are reasonable—and enforced—could almost entirely eliminate this threat.66 Otherwise the consequences will be to continue to expose endangered great whales to risk of extinction because reproducing numbers and the gene pool are already so limited.67

This author believes NMFS resists regulating, banning, or requiring alternatives to conventional vertical buoy lines.68 As noted *infra*, the author has observed a distinct aversion to requiring re-engineering of vertical lines to make them "whale-safe." Instead, NMFS chooses to issue a simple mandate for sinking ground-lines as a symbolic act to address entanglement.69 Given the questionable magnitude of the entanglement risk posed by ground-lines, this token regulatory act can be characterized as a political feint in deference to the industry that side-

---

64 Subpoena issued in Strahan v. Holmes, 595 F. Supp. 2d 161 (D. Mass. 2009). When NMFS initially failed to comply, a contempt proceeding was brought by the plaintiff against it. After the court ordered its compliance, NMFS's attorney informed the court on the record that NMFS had no records of ground-line ever on its own initiating the entan- glement of a great whale. It is also possible that most ground-line found entangled on whales comes from gill nets, not lobster gear.

65 Johnson et al., *supra* note 36, at 644. "This analysis confirms that any line rising into the water column poses a significant entanglement risk for these two species." The author does also note, however, that groundline can also float up into the water column. *Id.* at 643.

66 *See* Kraus et al., *supra* note 31, at 562.

67 *See* Lippsett, *supra* note 19. The results are also horribly cruel in terms of animal welfare as these great mammals suffer serious injuries and long lingering painful deaths. *See* Moore et al., *supra* note 51.

68 *See* Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlan- tic Large Whale Take Reduction Plan Regulations, 72 Fed. Reg. 57,104, 57,104 (Oct. 5, 2007) (covering only weak link or breakaway buoys, not vertical buoy lines) (to be codified at 50 C.F.R. §§ 229.2, 229.3, 635.69(a)(3), 648.264(a)(6)(i)).

69 *See id.*

steps enforcement of the substantial commands of the Endangered Species Act (ESA).

### A. *Alternative Technologies and Commercial Fishing Practices That Reduce Risk of Entanglement*

Because feasible technology and methodology exist to substantially reduce—if not largely eliminate—the hazards of whale entanglement in vertical buoy lines, the official regulatory focus on ground-lines by NMFS appears to be politically driven. Effective regulation strategies would focus on whale-safe buoy lines and redesigning fishing seasons and zones to limit the time and placement of entangling gear.[70] A recent study comparing lobster fishing in the Canadian and American portions of the Gulf of Maine shows that a large reduction of fishing effort would greatly reduce the entanglement risk posed by the fishery while reducing the total lobster catch only trivially.[71] This also results in a substantial lessening of actual net cost per pound of catch.[72] The straightforward regulatory logic and simplicity of requiring whale-safe vertical lines, moreover, is obvious. Making vertical buoy lines significantly more whale-safe does not require sophisticated electronic trap-retrieval devices or remote-triggered buoy systems that pop up from the ocean floor. Stiffened, less-entangling ropes and other simple substantial improvements could be readily developed.[73] The failure of NMFS to require whale-safe ropes for commercial fishing gear is not based on a failure of available technology.

---

[70] Kraus et al., *supra* note 31, at 562.

[71] *See* Ransom A. Myers et al., *Saving Endangered Whales at No Cost*, 17 Current Biology R10, R11 (2007). "If Maine restricted its fishing season to 6 months and reduced the number of traps by a factor of 10, the same amount of lobster could be landed, with greatly reduced risk to right whales and other species." *Id.*

[72] *Id.*

[73] Nonknottable rope designs have been developed by researchers at the Massachusetts Institute of Technology and could be quickly brought to commercial production if a regulatory mandate existed to create a market.

## II.  The Current Government and Private Regulatory Paradigm for Protection and Conservation of Great Whales

### A.  *The Federal and State Regulatory Scheme for Fixed Gear Fisheries*

#### 1.  Regulation of Marine Commercial Fisheries in General

The marine fisheries regulatory systems adopted by both the federal government and coastal states share basic key features. State and local marine fisheries agencies (as opposed to inland fisheries agencies, which focus upon conservation and noncommercial utilization) are designed and established to regulate and promote the commercial marine fishing industry.[74] These agencies are mandated by statute to assist the private commercial fishing industry, and in practice seem demonstrably to have far less concern for serving public interests like animal welfare and conservation.[75] The fishing agencies usually are directed by a commission whose membership, by explicit statutory mandate, is dominated by members who are either commercial fishermen or are otherwise associated with the commercial fishing industry. The result of the private commercial orientation of these agencies is that the fishing industry essentially regulates itself. At the federal level, moreover, state marine fishing agencies play a major role on the commissions governing the federal fisheries regulatory scheme and the National Marine Fisheries Service (NMFS).[76] Environmental impact review laws have a tendency to limit the autonomy of these agencies as well as the fishing industry. In the case of state agencies, as a matter of political realities rather than by statutory exemption, regulation of marine fisheries is

---

[74] *See* Fisheries Conservation and Management Act of 1976, 16 U.S.C. § 1801 (2006); Atlantic Coastal Fisheries Cooperative Management Act 16 U. S. C. § 5101(a) (2006).

[75] *See* 16 U. S. C. § 1801(a)(6): "A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." These statutes show little concern for any adverse impact of fishing on the environment or any need to make fishing environmentally safe.

[76] Pat Murray, Coastal Conservation Association Vice President & Director of Conservation, Federal Fisheries Management 101 ( Jan./Feb. 2008), http://www.joincca.org/TIDE/101.html. This "bottom up" state-federal regulation of coastal fisheries came from the need for state fisheries to attempt to minimize federal mandates on state fisheries. *See* Daniel B. Rodriguez, *The Role of Legal Innovation in Ecosystem Management: Perspectives from American Local Government Law*, 24 Ecology L.Q. 745, 749 (1997).

*Environmental Affairs*                  [Vol. 36:431

historically not subjected to the mandates of state environmental review laws.77

## 2.  Federal Fishing Industry

NMFS is the federal fishing agency.78 NMFS issues regulations to implement fisheries management plans and has enforcement authority in regard to fisheries regulations. It manages marine commercial fisheries principally under the terms of three federal statutes: (1) the Magnuson-Stevens Fisheries Management Conservation Act; (2) the Sustainable Fisheries Act; and (3) the Atlantic Coastal Fisheries Management Act.

The Magnuson-Stevens Fisheries Management Conservation Act (FMCA) regulates commercial fishing off the coast of the United States in the Urban Sea.79 The FMCA is the core law that defines NMFS's purpose as an agency and lays out its duties.80 The FMCA regulates the taking of fish populations or stocks within the Exclusive Economic Zone (EEZ) off the U.S. coast.81 It does this by establishing regional Fisheries Management Councils (FMCs) to develop Fisheries Management Plans (FMPs) for specific commercial fisheries.82 FMC members are required to be from state fishing agencies, the fishing industry, or regulated fishermen.83 In 2007, Congress reauthorized the FMCA with modifications.84

77 A case in point is the historical refusal of the Massachusetts Executive Office of Energy and Environmental Affairs (EOEEA) to review the licensing of commercial fishing for its impact on the environment under the Massachusetts Environmental Protection Act (MEPA).

78 Reorganization Plan No. 4 of 1970, 3 C.F.R. 1075 (1970), *reprinted as amended in* 5 U.S.C. app. at 648–50 (2006), *and in* 84 Stat. 2090–93 (1970). NMFS was established by Reorganization Plan No. 4 of 1970 which transferred the responsibilities of the former Department of Interior's Bureau of Commercial Fisheries to it. *Id.*

79 *See* Fisheries Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331 (codified as amended at 16 U.S.C. §§ 1801–1884, 1891–1891d (2006)).

80 NOAA Fisheries Feature: Magnuson-Stevens Fishery Conservation and Management Act Reauthorized, http://www.nmfs.noaa.gov/msa2007/details.html (last visited Apr. 27, 2009).

81 16 U.S.C. § 1811(a). "As a steward, NOAA Fisheries Service conserves, protects, and manages *living marine resources* in a way that ensures their continuation as functioning components of marine ecosystems, affords economic opportunities, and enhances the quality of life for the American public." Nat'l Oceanic & Atmospheric Admin. Fisheries Serv., http://www.nmfs.noaa.gov (last visited Apr. 27, 2009) (emphasis added).

82 *See* 16 U.S.C. §§ 1851–1853.

83 *See* 16 U.S.C. § 1852(b)–(c).

84 Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109–479, 120 Stat. 3575 (2007).

In 1995 Congress passed the Sustainable Fisheries Act (SFA)85 establishing a mandate that marine fisheries be managed to ensure that they are sustainable and to assist in the recovery of depleted fisheries.86 This Act is considered a part of the FMCA.87

The Atlantic Coastal Fisheries Cooperative Management Act (ACFCMA)88 establishes an Atlantic States Marine Fisheries Commission (ASMFC) in which each member state is represented by three commissioners along with a representative from NMFS.89 The American lobster fishery is currently managed under the terms of a voluntary compact of fifteen Atlantic coastal states (from Maine to Florida) organized under NMFS federal oversight pursuant to the ACFCMA.90 Currently, NMFS has agreed to let the ASMFC and its member coastal states develop a uniform fisheries management plan for the American lobster fishery for these coastal state waters and for federal waters as well.91 NMFS then implements this plan under its federal management authority after a simple review.92 Individual states also may issue complementary public laws beyond the agreed upon base regulations.93 Gill nets, too, are a focus of the cooperative regulatory management by coastal states and NMFS pursuant to the ACFCMA, along with regula- tion of moving purse-seine techniques in modern otter trawl fishing.

---

85 Pub. L. No. 104–297, 110 Stat. 3559 (1996) (codified in scattered sections of 16 U.S.C.). *See generally* Nat'l Oceanic & Atmospheric Admin. Fisheries, Office of Sustainable Fisheries, Sustainable Fisheries Act, http://www.nmfs.noaa.gov/sfa/ (last visited Apr. 4, 2009) (providing information associated with the implementation of the Sustainable Fisheries Act).

86 Nat'l Marine Fisheries Serv., U.S. Dep't of Commerce, Implementing the Sustainable Fisheries Act: Achievements from 1996 to the Present 2 (2003), *available at* http://www.nmfs.noaa.gov/sfa/SFA-Report-FINAL7_1.pdf.

87 *See id.*

88 Pub. L. No. 103-206, 107 Stat. 2447 (1993) (codified as amended at 16 U.S.C. §§ 5101–5108(2006)).

89 16 U.S.C. § 5102(3) (2006); Nat'l Oceanic & Atmospheric Admin. Fisheries, Office of Sustainable Fisheries, State-Federal Fisheries: The Atlantic Coastal Fisheries Cooperative Management Act, http://www.nmfs.noaa.gov/sfa/state_federal/State-Federal-WEB/acfcmafs.htm (last visited Apr. 27, 2009).

90 16 U.S.C. § 5101(4); Nat'l Oceanic & Atmospheric Admin. Fisheries, State-Federal Fisheries: Regulatory Activities, http://www.nmfs.noaa.gov/sfa/state_federal/regulatory_activities.htm (last visited Apr. 27, 2009).

91 *See* 16 U.S.C. § 5104(a); Atlantic Coastal Fisheries Cooperative Management, 50 C.F.R. pt. 697 (2008); State-Federal Fisheries: The Atlantic Coastal Fisheries Cooperative Management Act, *supra* note 89.

92 16 U.S.C. § 5103(a); State-Federal Fisheries: The Atlantic Coastal Fisheries Cooperative Management Act, *supra* note 89.

93 50 C.F.R. § 697.3(c) (2008).

*Environmental Affairs*                         [Vol. 36:431

### 3.  Coastal States Fishing Industry

Typical of state marine fisheries is the Massachusetts Division of Marine Fisheries (MDMF) that is overseen by the independent Massachusetts Marine Fisheries Advisory Commission (MMFAC).[94] The members of the MMFAC are appointed by the governor and must be commercial fishermen, sport fishermen, or members of the marine fisheries industry.[95] Interestingly, Massachusetts statutes include whales within the definition of "fish."[96] The MMFAC is vested with the sole authority to approve regulations proposed by the MDMF concerning the "manner of taking fish" and fishing gear itself.[97] This is thus a typical state arrangement by which the commercial fishing industry in effect regulates itself. The MMFAC is usually chaired by leaders of commercial fishing lobby groups.[98]

The failure of state fishing agencies to adequately protect the public interest has on occasion caused various ocean user groups to seek protection for marine wildlife from the impact of commercial fishing. In 1994, Florida sports fishermen successfully promoted a measure to ban gill nets in Florida through a ballot referendum initiative approved by the voters.[99] This led to a constitutional provision banning gill nets and other entangling nets from being used in Florida coastal waters, and was joined by similar bans in other states.[100] The Florida law was challenged in court and was eventually upheld by the Florida District Court of Appeal for the First District.[101]

---

[94] Mass. Gen. Laws ch. 130, § 1B (2006); Mass. Div. of Marine Fisheries, Marine Fisheries Commission, http://www.mass.gov/dfwele/dmf/marinefisheriesnotices/mfcmeetings.htm#marincom (last visited Apr. 27, 2009).

[95] *See* Mass. Div. of Marine Fisheries, *supra* note 94.

[96] Mass. Gen. Laws ch. 130, § 1 (2006) (defining "[f]ish" as "any animal life inhabiting the ocean or its connecting waters including any crustacean or marine fish, whether free swimming or free moving, and any shellfish or sea worms, whether or not imbedded in the soil").

[97] Mass. Gen. Laws ch. 130, § 17A(1) (2006).

[98] The current MFAC Vice-Chairman is Bill Adler, Executive Director of the Massachusetts Lobstermen's Association. *See* Marine Fisheries Commission, *supra* note 94.

[99] *See* Alexandra M. Renard, *Will Florida's New Net Ban Sink or Swim?: Exploring the Constitutional Challenges to State Marine Fishery Restrictions*, 10 J. Land Use & Envtl. L. 273, 273–75 (1995).

[100] Fla. Const. art. X, § 16(b)(1) (stating "[n]o gill nets or other entangling nets shall be used in any Florida waters"); Renard, *supra* note 99, at 275 & n.7.

[101] Fla. Marine Fisheries Comm'n v. Pringle, 736 So. 2d 17, 23–24 (Fla. Dist. Ct. App. 1999).

4. Effects and Causes of the Current Regulatory Framework

The standard regulatory provisions affecting coastal fisheries focus in one form or other upon catch limitations.102 Limitations of catch have long been criticized as so permissive that they have allowed the destruction of many commercial species.103 Even where excessive catch rates clearly threaten the reproduction of future harvestable populations, short-term pressures from the commercial industry regularly override scientific warnings.104

The political forces behind commercial fishing come from a combination of an appealing public image and highly focused financial and lobbying efforts from the large commercial players. The characteristic political image typically is the small family fishing boat, and the need to save fishing families from economic disaster and harsh government regulation. The substantive political force comes from, and benefit accrues to, the large fishing companies that dominate the market. The result of the erosion of agency authority to conserve fisheries is that maximum sustainable yield has not been a possibility for decades.105 In this author's opinion, if fishing agencies find it impracticable to enforce statutory mandates and adopt regulations directed at achieving maximum sustainable long-term harvests—which support the true long-term interests of the industry and society—it is understandable that they have low motivation to enforce federal and state regulatory structures for protecting great whales from adverse industry-caused impacts.

B. *Whale Conservation Laws: Federal and State*

Starting with the Whaling Convention Act (WCA) of 1949, whales have been subject to conservation and management laws in the United States.106 But it is important to note that these laws generally construed whales to be a "living marine resource" in terms applied to harvestable fish, and their conservation was intended at least originally to serve the

---

102 *See, e.g.*, 50 C.F.R. § 648.200–01 (2008).

103 *See* Christopher Costello et al., *Can Catch Shares Prevent Fisheries Collapse?*, 321 Science 1678, 1678 (2008).

104 *See id.*

105 Maximum sustainable yield (MSY) is a management ideal and norm that on its terms defines a laudable sustainability objective: maintaining the maximum level of catch of a fish population in a year that can then be fully replaced by simple reproduction and growth each year. *See* 50 C.F.R. § 600.310(c)(1) (2008). Under current conditions fish populations cannot support anything approaching MSY.

106 *See* Jordan Curnutt, Animals and the Law: A SourceBook 351 (2001) (discussing the International Convention for the Regulation of Whaling).

purpose of ensuring future supplies for commercial whale harvesting.107 Even today the great whales are for all intents and purposes legally lumped together with fish. As noted *supra*, whales are defined as fish by Massachusetts statute and, like fish, are protected under fisheries' living resource rules.108 The protection of great whales is thus assigned to fisheries agencies internally committed to supporting and encouraging the commercial catch, a classic problem of foxes guarding the chicken coop.

### 1. Whaling Convention Act

Protection for great whales was first specifically legislated in modern times by the International Convention for the Regulation of Whaling (1946), signed by all the whaling nations, establishing the International Whaling Commission (IWC).109 The Whaling Convention Act (WCA) was adopted by Congress in 1949 to implement the treaty.110 The original motivation for the IWC was utilitarian: to preserve whales for future commercial harvesting: for whaling.111 The duality of intent—on one hand to "protect" the whales and on the other hand to ensure the opportunity for commercial harvest of whales—has often been cited as a problematic conflict in the managed exploitation of natural resources.112 This purpose of management was the unabated practice of the IWC for the three decades following the WCA adoption.113 Reflective of this, the Department of the Interior assigned management responsibilities under the WCA to the Bureau of Commercial Fisheries (BCF). As its name implied, the BCF was designed to encourage the commercial fishing industry, and did little or nothing to change its practices in order to meet mandates imposed on it to con- serve threatened marine mammals.

---

107 *Id.* at 351–52 (discussing the International Convention for the Regulation of Whaling).

108 *See* Mass. Gen. Laws ch. 130, § 1 (2006).

109 International Convention for the Regulation of Whaling, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 72.

110 The Whaling Convention Act of 1949, Pub. L. No. 81-676, 64 Stat. 421 (1950) (codified as amended at 16 U.S.C. §§ 916–916*l* (2006)).

111 Andresen, *supra* note 26, at 109.

112 *Id.* "The duality of purposes reflected in the 1946 Convention, conservation of the living resource and the 'development' of the industry that exploits it, resulted in a long history of decisions sacrificing the former objective for the attainment of the latter." Michael J. Bean, The Evolution of National Wildlife Law 263 (1983).

113 *See* Andresen, *supra* note 111, at 109–10.

Predictably, whale populations continued to crash from over-exploitation.[114] In 1972, the United States signed on to the United Nations Conference on the Human Environment (the Stockholm Declaration) that called for a ten-year moratorium on hunting of great whales.[115] The IWC voted a ten-year moratorium on whaling into effect in 1982 to begin in 1986.[116] Japan refused to comply with the moratorium at first, but eventually brokered a deal with the United States to support the moratorium starting in 1988 in exchange for non-enforcement of potential sanctions imposed against its other fisheries.[117]

## 2. The Endangered Species Conservation Act of 1969

The great whales were first listed as endangered species pursuant to the Endangered Species Conservation Act of 1969.[118] This 1969 precursor to the ESA, however, had little or no enforceable federal protections for the species that were listed as endangered.[119]

## 3. Reorganization Plan No. 4 of 1970 and the Formation of the National Oceanic and Atmospheric Administration

Reorganization Plan No. 4 of 1970 (RPN-4) created the National Oceanic and Atmospheric Administration (NOAA).[120] It also transferred all duties and staff from the BCF—including whaling management responsibility—to the Commerce Department, which delegated it to NOAA.[121] NMFS was created as the agency within NOAA into which

---

[114] *See id.*

[115] U.N. Conference on the Human Environment, June 5–16, 1972, *Declaration of the U.N. Conference on the Human Environment*, U.N. Doc A/CONF.48/14 (June 16, 1972).

[116] **Curnutt**, *supra* note 106, at 352.

[117] *See* Japan Whaling Ass'n v. Cetacean Soc'y, 478 U.S. 221, 227–28 fn.1 (1986).

[118] Endangered Species Conservation Act of 1969, Pub. L. No. 91-135, § 1(c), 83 Stat. 275 (codified as amended in scattered sections of 16 U.S.C.) (granting to Secretary of the Interior the power to list endangered species); *see* List of Endangered Foreign Fish and Wildlife, 35 Fed. Reg. 18,319, 18,320 (Dec. 2, 1970) (codified as amended at 50 C.F.R. § 17.11(2008)).

[119] Sections 2 and 4 provide for listing of endangered species but do not provide for protective measures beyond habitat conservation. *See* Endangered Species Conservation Act of 1969 §§ 2, 4. Furthermore, the Act authorized penalties in the form of fines of up to $5000 or imprisonment for not more than one year. *See id.* § 4(b).

[120] Reorganization Plan No. 4 of 1970 § 2, 3 C.F.R. § 1075 (1966–1970), *reprinted as amended in* 5 U.S.C. app. at 648–50 (2006), *and in* 84 Stat. 2090 (1970).

[121] *See id.* at § 1(a), *reprinted in* 84 Stat. at 2090.

the former BCF was folded.122 The current core duty of NMFS is to promote, license, and regulate commercial fishing under the Fisheries Management and Conservation Act mandated by law to strive to obtain Maximum Sustainable Yields (MSY) of harvested fish.123

There was no mandate under RPN-4 to assign management authority for whales to NMFS. RPN-4 only directed that BCF duties were to be placed with the broad umbrella agency, NOAA, and not specifi- cally to the fishing agency, NMFS.124 NOAA was and remains free to assign the responsibility for conserving and protecting great whales to any of its sub-agencies. This author believes responsibility for whale conservation could have been assigned to far better alternate agencies, like NOAA's National Ocean Service. The decision to place whales with NMFS reflects the concept by which whales are construed as "fish" and "living marine resources" under federal law. Even though this transfer was made before the adoption of the Marine Mammal Protection Act (MMPA)125 and the Endangered Species Act (ESA),126 it defined the subsequent core status of whales under federal law as that of exploit- able resources even under the MMPA and ESA.

### 4. The Marine Mammal Protection Act of 1972

The 1940s regulatory approach—justifying conservation measures for whales in order to enable a sustained future commercial harvest of whales—was similarly echoed in a subsequent major piece of statutory protection for whales, the Marine Mammal Protection Act of 1972 (MMPA).127 The MMPA declared a moratorium on the harvesting of marine mammals in order to build up their remaining depleted popu- lations.128 This moratorium was to be enforced within the nation's 200- mile EEZ.129 The text of the MMPA expresses concerns about the harming of marine mammals by the commercial fishing industry, but its provisions are quite lenient toward fishermen and explicitly limit the

---

122 John A. Guinan & Ralph E. Curtis, Nat'l Oceanic & Atmospheric Admin., A Century of Conservation (Apr. 1971), *available at* http://www.nefsc.noaa.gov/history/stories/century.html.

123 *See id.*; Nat'l Oceanic & Atmospheric Admin., About National Marine Fisheries Ser- vice, http://www.nmfs.noaa.gov/aboutus.htm (last visited Apr. 1, 2009).

124 *See* Reorganization Plan No. 4 of 1970, at § 1(d), *reprinted in* 84 Stat. at 2090.

125 16 U.S.C. §§ 1361–1423h (2006).

126 16 U.S.C. §§ 1531–1544 (2006).

127 *See* 16 U.S.C. § 1361.

128 *See id.* § 1371.

129 *Id.* § 1362(15)(B).

protection of whales from incidental takings from commercial fishing.130

The MMPA designated NOAA as its defined oversight agency, and NOAA assigned this responsibility to NMFS, perpetuating the con- flicted status of whales.131 American fishermen generally do not hunt whales or other marine mammals, but do recognize MMPA protections as a serious potential limitation upon commercial fishing.132 Minimiz- ing the MMPA's constraints on commercial fishing appears to have en- couraged a de facto operating policy of NMFS to treat collateral entan- glement of great whales as a problem, but not as an object of enforced prohibitions under the MMPA.133

Sections 117 and 118 of the MMPA's 1994 amendments adopted a detailed regime for dealing with the problem of marine mammal en- tanglement and entrapment by commercial fishing practices.134 They set as a goal that NMFS eliminate the entanglement problem by April 2001.135 Section 117 of the MMPA requires that NMFS annually assess and produce a stock assessment report (SAR) on known incidents of killings and serious injury to specific populations of marine mammals from entanglement.136 Section 118 requires that NMFS publish an an- nual list of fisheries (LOF) categorizing fisheries that cause entangle- ments into one of three named categories based on the incidents of killing and serious injury (IKSI) inflicted on a marine mammal popula-

---

130 *See id.* § 1371; *see also* Eugene H. Buck, CRS Report for Congress: Marine Mam- mal Protection Act Amendments of 1994, 94-751 ENR (1994), *available at* http://ncse online.org/NLE/CRSreports/Biodiversity/biodv-11.cfm (implying that the 1994 Amend- ments to the to the MMPA exempt commercial fishermen from the purview of the statute by implicitly characterizing fishing gear entanglements as incidental takings).

131 *See* 16 U.S.C. § 1362(12)(A)(i).

132 *See id.* § 1371(a)(2) (noting that permits can be obtained for incidental takings of marine mammals in the course of commercial fishing); *see also* Philippe Sands, Princi- ples of International Environmental Law 954 (2d ed. 2003) (highlighting the impact that the MMPA has on the tuna fishing industry).

133 *See* 16 U.S.C. § 1371(a)(2) (indicating incidental takings can be permitted under section 1374 of the Act). *But see* George A. Feldhammer et al., Wild Mammals of North America: Biology, Management, and Conservation 442 (2d ed. 2003) (noting that the NMFS is under pressure to reduce takings of whales due to ship strikes and entan- glements and thus has proposed regulations known as recovery plans to ensure the sur- vival and success of whales).

134 *See* Marine Mammal Protection Act Amendments of 1994, Pub. L. No 103-238, secs. 10–11, 108 Stat. 532, 543–57 (codified as amended at 16 U.S.C. §§ 1386–1387) (adding sections 117 and 118 to the MMPA).

135 *See* 16 U.S.C. § 1387(b)(1).

136 *See id.* § 1386.

tion by entanglements.137 This category scheme also incorporates Take Reduction Plans (TRP) that have the goal of reducing incidental kill- ings and serious injuries below the potential biological removal (PBR) level set for the stock pursuant to Section 117.138 Fixed gear fisheries in the northeastern U.S. have been designated as Category I fisheries and thus the highest risk of IKSI to great whales.139 To assist NMFS, section 118 allows the Secretary of Commerce, acting through a relevant office, to designate a Take Reduction Team (TRT) as an advisory group assist- ing in the preparation of a TRP to specify how reduction in entangle- ments shall be achieved.140 Emergency regulations to implement the TRP were to be promulgated as soon as feasible.141

This author believes the 1994 MMPA amendments eliminated in- centives for the commercial fishing industry to come up with ways to eliminate bycatch of whales on its own, instead passing the political burden of the bycatch problem to NMFS. In place of the lost prohibi- tions, NMFS set out the detailed regime, described *supra*, aimed at re- ducing serious entanglements to near zero by April 2001. Obviously, NMFS has failed to meet this mandate, as whale entanglements did not stop in 2001, and have at times exceeded 2001 levels.142 Unsurprisingly, there is a correlation between assigning sole responsibility to the NMFS for whale entanglements and a number of takes that exceeds the PBR.143

---

137 *See id.* § 1387(d)(4); *see also* Authorization for Commercial Fisheries Under the Ma- rine Mammal Protection Act of 1972, 50 C.F.R. § 229.2 (2008) (defining the categories of fisheries under the Act).

138 *See* § 1386(f); 50 C.F.R. § 229.2. The potential biological removal level is defined in the Code of Federal Regulations as "the maximum number of animals, not including natu- ral mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 50 C.F.R. § 229.2. Further, "[t]he potential biological removal level is the product of the following factors: (1) The minimum population estimate of the stock; (2) One-half the maximum theoretical or es- timated net productivity rate of the stock at a small population size; and (3) A recovery factor of between 0.1 and 1.0." *Id.*

139 *See* List of Fisheries for 2009, 73 Fed. Reg. 73,032, 73,066 (Dec. 1, 2008) (to be codi- fied at 50 C.F.R. pt. 229).

140 *See* 16 U.S.C. § 1387(f).

141 50 C.F.R. § 229.9(a)(2).

142 *See* Misty Nelson et al., Northeast Fisheries Sci. Ctr. Reference Doc. 07-05, Mortality and Serious Injury Determinations for Baleen Whale Stocks Along the United States Eastern Seaboard and Adjacent Canadian Maritimes, 2001–2005, 7 tbl.1 (2007), *available at* http://www.nefsc.noaa.gov/nefsc/publications/crd/crd0705/crd 0705.pdf.

143 *See* Andrew J. Read & Paul R. Wade, *Review: Status of Marine Mammals in the United States*, 14 Conservation Biology 929, 931–33 (2000).

5. The Pelly Amendment to the Fishermen's Protective Act of 1967 and the 1979 Packwood Amendment to the Fisheries Management and Conservation Act

These acts, often referred to together as "Pelly-Packwood," imposed a "restriction on importation of fishery or wildlife products from countries which violate international fishery or endangered or threatened species programs."144 The Supreme Court ruling in *Japanese Whaling Association v. American Cetacean Society*, however, allowed the executive branch broad discretion in deciding whether to trigger such trade restrictions, further undercutting citizen attempts to compel the imposition of authorized sanctions.145

6. The Marine Mammal Commission

The Marine Mammal Commission (MMC) is an independent federal commission established by statute146 to be the federal government's main advisor on marine mammal issues, and in the author's opinion is the agency that should be assigned the federal management role for great whales in any future redesign of whale conservation policy. The MMC's enabling statute requires that its commissioners must be persons "who are not in a position to profit from the taking of ma- rine mammals," recognizing the inherent compromising influence of vested interests in the field.147 The MMC has compiled an impressive record in assuming leadership for government action on the conserva- tion of marine mammals, having recommended significant conserva- tion actions for marine mammals, but it has been delegated no substan-tive regulatory powers.148

7. The Endangered Species Act of 1973

The Endangered Species Act of 1973 (ESA) replaced and built sig-nificantly on Congress's original endangered species legislation.149 Two

---

144 22 U.S.C. § 1978 (2006).

145 *See* 478 U.S. 221, 231–41 (1986) (noting that as long as the Secretary's interpreta- tion and application of the Pelly-Packwood Amendments were reasonable, they would receive deference from the courts).

146 Marine Mammal Commission, 16 U.S.C. §§ 1401–1407 (2006).

147 *See id.* § 1401(b)(1).

148 *See id.* § 1402(a); *see also* Marine Mammal Commission, Annual Reports, http://www.mmc.gov/reports/annual/ (last visited Apr. 27, 2009).

149 *See* U.S. Fish and Wildlife Service, Endangered Species Program, History and Evo-lution of the Endangered Species Act of 1973 (2008), http://www.fws.gov/endangered/esasum.html (last visited Apr. 27, 2009).

*Environmental Affairs* [Vol. 36:431

improvements to the original 1966 legislation and the 1969 amendments were sections 7 and 9 of the ESA.150 Section 7 of the Act provides that, absent an exemption from the Secretary of the Interior, all "Federal agenc[ies] shall . . . insure that any [authorized] action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modifica- tion of habitat of such species    "151 Further, section 9 of the ESA "applied broad 'take' prohibitions to all endangered animal species and allowed the prohibitions to apply to threatened animal species by special regulation."152

There are serious problems with the functionality of the improved ESA, however, in that it does not effectively establish an agency to oversee implementation of section 7 reviews, to enforce section 9 prohibitions, and otherwise oversee compliance by other government agencies with mandatory and nondiscretionary ESA duties. These statutory functions are largely left to the vagaries of citizen enforcement.153

Section 9 also suffers from not including an explicitly stated prohibition against individuals conducting "activities" that take endangered wildlife, as well as on such activities themselves.154 Based on the wording of the ESA text and existing case law, section 9 prohibitions clearly apply when a person engages in an activity that actually causes a prohibited taking.155 Unfortunately, section 9 does not prohibit a fisherman's actual deployment of types of fishing gear known to entangle whales (for example, fixed gear) in the absence of a specific entanglement.156 The current need under section 9 jurisprudence to prove that each person out of thousands doing the same thing will "actually" on his own kill an animal—whether it be a lumberman cutting trees where endangered birds live or a fisherman using vertical buoy lines in Cape Cod Bay—in order to enforce section 9 prohibitions against him personally is enough to block the effective injunctive protection of great whales at the present time.157

---

150 *See id.*
151 16 U.S.C. § 1536(a)(2) (2006).
152 U.S. Fish and Wildlife Service, *supra* note 149; *see* 16 U.S.C. § 1538(a), (g).
153 *See* 16 U.S.C. § 1540(g).
154 *See id.* § 1538.
155 *See id.*
156 *See id.*; *see also* Am. Bald Eagle v. Bhatti, 9 F.3d 163, 165–67 (1st Cir. 1993) (indicating that takings must be intentional or cause actual harm); 50 C.F.R. § 17.3 (2007) (defining the term "taking" in the context of the ESA).
157 *See* 16 U.S.C. § 1538; Am. Bald Eagle, 9 F.3d at 163; 50 C.F.R. § 17.3.

8.  International Convention for the Prevention of Pollution from Ships: MARPOL 73/78.

The MARPOL Convention was incorporated into U.S. law by the federal Act to Prevent Pollution from Ships (APPS).158 The statute defined derelict fishing gear as "pollution" and bans it.159

9.  State Conservation Programs for Whales

Currently, there is a lack of cooperation between states and the federal government regarding endangered species and state participation generally.160 Some states have adopted their own endangered species acts.161 However, such state laws can be preempted by the federal ESA if they are determined to be more lax than the federal law.162 States, like the federal government, often divide wildlife agencies into land-based and marine-based agencies. State marine fisheries agencies historically focused only on commercial fishing, disregarding protections for whales, marine mammals, and sea birds as a job for the land-based wildlife state agencies assigned the role of protecting all state wildlife as protected species. However—perhaps because entanglements of endangered marine mammals now are recognized as posing an increasing potential for limitations upon commercial fishing—there is a current move for state marine fishing agencies to take over endangered species jurisdiction as applied to endangered marine wildlife, contradicting the terms of relevant state statutes.163

158 Act to Prevent Pollution from Ships, 33 U.S.C. §§ 1901–1915 (2006); *see also* Bruce S. Manheim, *Annex V of the MARPOL Convention: Will It Stop Marine Plastic Pollution?*, 1 Geo. Int'l Envtl. L. Rev. 71, 72 (1988).

159 *See* Comm. on the Effectiveness of Int'l and Nat'l Measures to Prevent and Reduce Marine Debris and Its Impacts, Nat'l Research Council of the Nat'l Acads., Tackling Marine Debris in the 21st Century 90 (2008).

160 *See* Robert L. Fischman & Jaelith Hall-Rivera, *A Lesson for Conservation from Pollution Control Law: Cooperative Federalism for Recovery Under the Endangered Species Act*, 27 Colum. J. Envtl. L. 45, 78–81 (2002); James M. Taylor, *Governors Call for Endangered Species Act Reform*, Env't & Climate News, May 1, 2004, http://www.heartland.org/policybot/results/14867/Governors_Call_for_Endangered_Species_Act_Reform.html.

161 *See, e.g.*, The Massachusetts Endangered Species Act, Mass. Gen. Laws ch. 131A (2006).

162 *See* Fischman & Hall-Rivera, *supra* note 160, at 80.

163 In 1993 the MDMF forced the Massachusetts Division of Fish and Wildlife, the proper endangered species agency, to sign a memorandum of understanding ceding man- agement and lead agency responsibility for whales in state waters to it. The MDFW and its Natural Heritage and Endangered Species Program (NHESP) are imbued by the Massa- chusetts Endangered Species Act (MESA) with responsibility for all state protected endan- gered species—including whales. Because of the 1993 MOU, great whales in Massachusetts

*Environmental Affairs* [Vol. 36:431

### C. *The Entanglement Problem—Regulatory Efforts by Fishing Agencies*

Prior to the 1994 amendments to the MMPA, NMFS and state marine fishing agencies largely ignored the problem of the entanglement of great whales in fishing gear. To a substantial extent, NMFS also tended to ignore the ESA in regards to endangered great whales until lawsuits coerced it to do otherwise.164 At present, there is no currently active NMFS-appointed ESA recovery team for any endangered spe- cies— including the great whale species—and no significantly funded recovery program, except for the North Atlantic right whale recovery program. NMFS prefers to address protection for great whales under the more lenient terms of the MMPA, which treats marine mammals as a "living resource" to be managed like fish stocks, is industry-tolerant, does not directly prohibit entanglement of great whales, and does not allow citizen enforcement of its rules.165

### 1. Federal Regulation of Fisheries to Reduce Entanglement

Federal and state regulatory attention to the great whale entanglement problem of can be attributed to two linked elements: (1) the passage of the 1994 amendments to the MMPA, which at least adverted to the problem; and (2) the commencement of two citizen lawsuits: one against the United States Coast Guard and NMFS—*Strahan v. Linnon*166—and the other against the Massachusetts Division of Marine Fisheries (MDMF)—*Strahan v. Coxe*.167 The lawsuits were precipitated by the failure of NMFS to take appropriate actions to assemble the re- quired MMPA Take Reduction Team (TRT) for the great whales or

---

coastal waters were effectively removed from any protection by MESA. The author is aware of no provision of the MESA or law that supports the 1993 MOU. It remains in effect to the present day.

164 The list of private action ESA and MMPA enforcement cases for whales is large. *See, e.g.,* Defenders of Wildlife v. Gutierrez, 532 F.3d 913 (D.C. Cir. 2008); Natural Res. Def. Council, Inc. v. Winter, 518 F.3d 658 (9th Cir. 2008); Vill. of False Pass v. Clark, 733 F.2d 605 (9th Cir. 1984); Ocean Mammal Inst. v. Gates, 546 F. Supp. 2d 960 (D. Haw. 2008); Natural Res. Def. Council, Inc. v. Evans, 232 F. Supp. 2d 1003 (N.D. Cal. 2002).

165 Unlike most environmental statutes, the MMPA does not include a citizen standing enforcement provision. 16 U.S.C. § 1377 (stating "[e]xcept as otherwise provided in this subchapter, the Secretary shall enforce the provisions of this subchapter"); Strahan v. Coxe, 127 F.3d 155, 160 (1st Cir. 1997).

166 967 F. Supp. 581 (D. Mass. 1997); *see also* Amber Shell Ward, Casenote, Strahan v. Linnon*: A Missed Opportunity for Testing the Use of Section 7(a)(1) as an Action-Forcing Provision*, 4 Ocean & Coastal L.J. 311 (1999).

167 Strahan v. Coxe, 127 F.3d 155, 160 (1st Cir. 1997); *see also* Susan Gray, Recent De- velopment, Strahan v. Coxe*: Massachusetts's Issuance of Commercial Fishing Permits Constitutes a Violation of the Endangered Species Act*, 6 U. Balt. J. Envtl. L. 260 (1997–1998).

make the necessary formal List of Fisheries (LOF) determinations required by the MMPA's 1994 amendments.

*Linnon* addressed incidents of Coast Guard boats killing and injuring right whales,168 and prompted NMFS to establish a Large Whale TRT.169 The suit also prompted NMFS to agree to classify inshore and offshore lobster fisheries as Category I in its first published LOF.170 The *Linnon* suit also led NMFS to adopt of a rule requiring a 500-yard distance separation between whales and boats.171

In 1999, NMFS adopted its first version of its Atlantic Large Whale Take Reduction Plan (ALWTRP) for the great whales in the United States Urban Sea of the North Atlantic.172 The 1999 ALWTRP stated its long-term goal was to reduce entanglement-related injuries and mor- talities to right, fin, humpback, sei, and minke whales.173 However, in practice, NMFS focused its efforts almost exclusively on the right whale,in effect creating, in this author's opinion, a non-statutory requirement that a species be facing imminent extinction in order to be the benefi- ciary of any government efforts to stop their killing in fishing gear or byship strikes.174

Further entanglements after the publication of the 1999 ALWTRP prompted NMFS to mandate gear modifications, such as the use of weak-link buoy lines, as well as seasonal area restrictions.175 These measures subsequently proved to be ineffective.176 This author main- tains that the required break-away link technology had never beentested in the field and the required seasonal area restrictions also of- fered no proven track record for anyone to expect it to work. Other vertical buoy line mitigation proposals calling for electronically re-

---

168 967 F. Supp. at 589.

169 *Id.*

170 *Id.*

171 *Id.*; North Atlantic Right Whale Protection, 62 Fed. Reg. 6729 (Feb. 13, 1997) (codified at 50 C.F.R. pts. 217, 222).

172 *See* Taking of Marine Mammals Incidental to Commercial Fishing Operations; At- lantic Large Whale Take Reduction Plan Regulations, 64 Fed. Reg. 7529 (Feb. 16, 1999) (codified at 50 C.F.R. pt. 229).

173 *Id.* at 7531.

174 For example, the 1999 ALWTRP only requires gear marking of lobster and gillnet gear in "right whale critical habitat, in the southeast observer area and on Stellwagen Bank and Jeffreys Ledge in the Gulf of Maine." *Id.* at 7533.

175 Atlantic Large Whale Take Reduction Plan Regulations, 65 Fed. Reg. 80,368, 80,368, 80,374–75 (Dec. 21, 2001) (codified at 50 C.F.R. pt. 229).

176 The entanglement of a right whale in July 2001 in gear with the "weak link" modifi- cations spurred NMFS to propose further alterations. Atlantic Large Whale Take Reduc- tion Plan Regulations, 66 Fed. Reg. 49,896, 49,899 (Oct. 1, 2001).

leased buoy assemblies on the sea floor have yet to go beyond the wishful-thinking phase.177

In its 2007 amendment to its ALWTRP,178 NMFS did not explore other practical alternative approaches to resolving the vertical buoy line threat—stiffened vertical lines that cannot entangle, or substantial reduction in numbers or locations of deployment of fishing gear sets that would mitigate the threat.179 Instead, NMFS adopted a more lenient Massachusetts-type approach, directing that licensed fisheries use sinking ground-line as the sole means to reduce entanglement risk.180 NMFS also abandoned a useful previous requirement—the Dynamic Area Management (DAM) and Seasonal Area Management (SAM) policies181 that limited placement of fixed gear near some of the places where right whales are known to aggregate. The sole justification for the 2007 ALWTRP sinking ground-line requirement, beyond its simplicity of adoption, was a theory devoid of empirical evidence for its support—that nonsinking ground-line is the most significant source of right whale entanglement. NMFS asserted, despite a lack of evidence, that requiring widespread use of sinking ground-line would substantially reduce the threat to Right Whales of entanglement by lobster pot gear sufficiently to comply with the MMPA and ESA. The 2007 ALWTRP stated it would

---

177 Pop-up buoys are not commercially available and exist only as unproven experimental technology.

178 Atlantic Large Whale Take Reduction Plan Regulations, 72 Fed. Reg. 57,104, 57,105–06 (Oct. 5, 2007) (to be codified at 50 C.F.R. pts. 229, 635, 648). The 2007 amendment to the ALWTRP was advanced because of the continuing killing and injuring of right whales under the regime of the 2005 ALWTRP in Fixed Gear. *See id.* at 57,104.

179 *See id.* at 57,106 (only requiring weak links on buoy lines).

180 *See id.*

181 *Id.* at 57,105–06. Dynamic Area Management (DAM) is a management strategy to declare an emergency zone around a recent aggregation of right whales and to impose for a stated temporary period of time in the declared DAM area further restrictions on fixed fishing gear. Atlantic Large Whale Take Reduction Plan Regulations, 67 Fed. Reg. 1133, 1134–35 ( Jan. 9, 2002). *See generally* Phillip J. Clapham & Richard M. Pace, Northeast Fisheries Sci. Ctr. Reference Doc. 01-06, Defining Triggers for Temporary Area Closures to Protect Right Whales from Entanglements: Issues and Options (2001) (discussing triggers for DAM). Seasonal Area Management (SAM) is a management strategy to declare a seasonal zone around areas where aggregation of right whales are seasonally expected, and to impose for a stated period of time each year further restrictions on fixed fishing gear in the SAM area. Atlantic Large Whale Take Reduction Plan Regulations, 67 Fed. Reg. 1142, 1150 ( Jan. 9, 2002); *see* Richard L. Merrick et al., Northeast Fisheries Sci. Ctr. Reference Doc. 01-14, Identification of Seasonal Area Management Zones for North Atlantic Right Whale Conservation, at v (2001).

postpone consideration of the proven threat posed by vertical buoy lines to an indefinite "future date."182

NMFS's current de facto policy of refusing to enforce ESA section 9 prohibitions to prevent entanglements of great whales practically discourages the innovation and adoption of whale-safe fishing technology. NMFS has also chosen to oppose private enforcement actions against the industry and to assist fishermen in winning these lawsuits.183 De- spite the large number of incidents where whales have been injured or killed by vertical buoy lines and the fact that in many entanglement events the removed gear had tags on it identifying the owner, NMFS has never prosecuted a fisherman for an entanglement of a great whale under the ESA or MMPA. In 1997, the First Circuit Court of Appeals held in *Strahan v. Coxe* that entanglements are prohibited ESA tak- ings.184 In response, however, NMFS adopted a policy not to enforce the section 9 take prohibitions, instead treating whale entanglement as a regulatory problem to be handled under the agency's commercial fishing regulatory program. In so doing, NMFS's refusal to prosecute any fisherman whose fishing gear entangles endangered whales applies even when fishermen explicitly acknowledge that their gear entangled a specific whale.185 The author concludes that by its avoidance of prose-

---

182 Atlantic Large Whale Take Reduction Plan Regulations, 72 Fed. Reg. 57,104, 57,117 (Oct. 5, 2007) (to be codified at 50 C.F.R. pts. 229, 635, 648) ("[T]he DEIS includes a discussion of vertical lines. Specifically, the DEIS notes that further risk reduction to address risk associated with vertical line will occur through a future rulemaking action due to the need for additional information and discussions to develop comprehensive and effective management measures.").

183 NMFS refused to comply with—and sought to quash—all subpoenas that the au-thor served on it to reveal the names of commercial fishermen whose fishing gear entan- gled a great whale. The Center for Coastal Studies—who is contracted to perform great whale disentanglement—also refuses to reveal the identity of the fishermen who own the fishing gear that it removes from entangled great whales.

184 *See* Strahan v. Coxe, 939 F. Supp. 963, 984 (D. Mass. 1996); *see also* Strahan v. Holmes, No. 07-10359-NMG, slip op. at 7 (D. Mass. filed Jan. 30, 2009).

> Although the whale . . . was later disentangled from the gear stuck in its ba-leen, it was "taken captive" by Holmes's gear for at least some period of time. Therefore, the Court concludes that Holmes violated Section 9 of
> the ESA when the humpback whale became entangled, and hence "taken," in his lobster gear. The fact that the taking was accidental is irrelevant.

*Id. See also* Greenpeace Found. v. Mineta, 122 F. Supp. 2d 1123, 1136 (D. Haw. 2000) (find- ing accidental takes of monk seals to be takes, nonetheless).

185 For example, attorney Deirdre Casey from the civil enforcement section of NOAA's Office of General Counsel for Enforcement and Litigation (GCEL) in Gloucester, MA stated in 2008 that fishermen should not be prosecuted for entangling whales because they are under license by NMFS and a whale entanglement is incidental to NMFS's licensing

cutions, NMFS has simply chosen to ignore the ESA statutory prohibitions and its statutory responsibilities to enforce them.

NMFS has a specialized ESA office distinct from its MMPA office.186 NMFS, however, removed great whales from the jurisdiction of its internal ESA enforcement division and placed them exclusively under the jurisdiction of the office vested with the more lenient requirements of the MMPA, which refuses to prosecute fisherman under ESA section 9 for entangling great whales, or to require ESA compliance by state licensing agencies. The court in *Coxe* required Massachusetts to apply to NMFS for an incidental take permit (ITP) for the right whale.187 NMFS, however, has refused to process the resultant applica-tion and has yet to ask any state marine fishing agency to apply for an ITP for whales under section 10 of the ESA to manage fisheries incompliance with section 9's take prohibitions.

A recent example of such agency avoidance is NMFS's refusal to prosecute a fisherman who admitted to NMFS employees that he owned and had placed the fishing gear removed from an entangled humpback whale in August, 2006.188 The removed gear had his name and permit number on it. NMFS investigators declined, however, to refer the fisherman and the entanglement incident to its civil or crimi- nal enforcement offices for consideration of possible prosecution and

---

and regulating of their fishing. Telephone Interview with Deirdre Casey, Attorney in Office of General Counsel for Enforcement and Litigation, NOAA (Dec. 8, 2008).

186 *See* Office of Protected Fisheries, National Marine Fisheries Service, About the Of- fice of Protected Fisheries, http://www.nmfs.noaa.gov/pr/about (last visited Apr. 27, 2009). Sea turtles, for example, are handled by its ESA office, which has actively applied section 9 against a state fishery agency regarding turtle entanglement in state-licensed fishing gear. NMFS has issued an ESA section 10 incidental take permit—NMFS ITP #1325—to the state of North Carolina Division of Marine Fisheries for the entanglement of endangered species of sea turtles in the fishing trawls it licenses and regulates. *See* Issu- ance of Permits #1325 and 1348, 66 Fed. Reg. 51,023 (Oct. 5, 2001). As this article was going to press, the office of the U.S. Attorney in Boston brought criminal indictments for violating the MMPA against commercial gillnetters for entangling humpback whales in two separate incidents. *See* Complaint at 4–6, United States v. Eldridge, No. 09-10059 (D. Mass., Mar. 9, 2009); Complaint at 3–5, United States v. Jacques, No. 09-10066 (D. Mass., Mar. 11, 2009). These are the first such governmental prosecutions of fishermen under either the ESA or the MMPA in the Northeast, and may be unprecedented nationally as well.

187 *See* Strahan v. Coxe, 127 F.3d 155, 158 (1st Cir. 1997).

188 The author is the citizen advocate bringing the suit in question. *See* Strahan v. Holmes, 595 F. Supp. 2d 161 (D. Mass. 2009). On August 2, 2006, the entangled humpback whale was sighted in Cape Cod Bay off the Massachusetts coast. A disentanglement effort was commenced by an NGO—the Center for Coastal Studies—contracted by NMFS and the state fishing agency to do this work. Vertical buoy line and a single attached lobster pot were removed from the whale. *Id.* at 162–63.

assessment of a civil fine.189 NMFS also attempted to keep the name of the fisherman secret, which would effectively prevent citizen enforcement under the ESA citizen suit provision. When NMFS was subpoenaed to produce the records of this entanglement,190 it refused to produce any document with the name or permit number of the fisherman on it. On photographs of the entangling fishing gear supplied pursuant to subpoena, NMFS redacted the permit number to prevent identifica- tion. Eventually, a federal judge ordered NMFS under threat of con- tempt to supply nonredacted photos and the missing documents, and the withheld information was released.191 While this entanglement wasthe subject of an ESA citizen enforcement suit, the federal court ac- knowledged that the entanglement violated the law, but refused to issue an order to prevent future such entanglements of whales.192

NMFS has also failed to initiate any specific program to eliminate the risk of whale entanglements. Over the years, NMFS has undertaken only limited efforts to assess or encourage scientific development of nonentangling fishing gear, and funding has generally been awarded to research unlikely to lead to substantial changes in established industry practices. NMFS has in practice declined to impose restraints upon commercial fishing to meet the MMPA's 1994 amendments' 2001 goal of zero risk of death or serious injury to great whales from fishing gear. It has declined to state when it may actually issue a zero-risk standard.

Great whale entanglement is in effect treated by NMFS as a prob- lem of bycatch—the incidental catch of under-sized fish or species of fish neither intended nor licensed to be caught.193 NMFS applies its

---

189 Complaint at 22, Strahan v. Holmes, 595 F. Supp. 2d 161 (D. Mass. 2009) (No. 07-cv-10359-NMG).

190 The subpoena was issued pursuant to an ongoing ESA enforcement action in the U.S. District Court in Boston, MA against the Massachusetts state marine fishing agency. *See* Strahan v. Pritchard, 473 F. Supp. 2d 230, 237 (D. Mass. 2007).

191 The fisherman subsequently maintained that the fishing gear was not placed within the 3-mile boundary of Massachusetts's state jurisdiction, despite the disentanglement occurring within its jurisdictional boundary. *See id.* The "not in state waters" claim was then used by the court to find that the August 2006 entanglement could not be used by the plaintiff to prove that Massachusetts's licensing of lobster pot fishing causes whale entan- glements in violation of the ESA. *See id.* at 237–38.

192 Strahan v. Holmes, No. 07-10359-NMG, slip op. at 8–10 (D. Mass. filed Jan. 30, 2009).

193 *See* NOAA Fisheries Feature: What is Bycatch?, http://www.nmfs.noaa.gov/by_ catch/bycatch_whatis.htm (last visited Apr. 27, 2009). There are significant efforts under- way to reduce bycatch of all types. *See id.*

bycatch policy—in general, a "sustainable" bycatch is tolerated194—to great whales as it would to fish.195

The federal courts for their part have held that NMFS's FMCA regulations cannot be directly challenged under the Administrative Procedure Act for violations of MMPA and ESA mandatory duties, only under the citizen suit provision of the FMCA. Violations of MMPA and ESA duties thus at best result in collateral review. Federal courts to date will not enjoin federal fisheries regulations for failure to comply with the MMPA or ESA.196

NMFS has no internal research and engineering program to develop whale-safe fishing gear. It has funded several research projects by grants from the National Fish and Wildlife Fund, but this money has primarily gone to amateur inventors for attenuated ideas.197 Grant money is directed to proposals recommended for approval by commercial fishermen.198 The MDMF Right Whale Conservation Program is funded by NMFS through the ESA section 6 cooperative agreement program with state governments.199 NMFS does not engage in formal and directed engineering initiatives to produce whale-safe fishing gear. It does not fund dedicated university or corporate engineering projects to make fishing gear whale-safe. Absent enforcement of ESA section 9 prohibitions against fishermen whose gear entangles great whales, and absent significant state or federal funding of engineering solutions to

---

194 *See* Sustainable Fisheries Act, 16 U.S.C. §§ 1802(5), 1851(a)(9) (2006).

195 *See* 16 U.S.C. § 1387 (2006) (outlining the bycatch policy as it pertains to marine mammals); 16 U.S.C. § 1802(2) (defining "bycatch" to pertain to "fish"); 16 U.S.C. § 1802(12) (defining "fish" to be "all . . . forms of marine animal and plant life other than marine mammals").

196 *See, e.g.*, Turtle Island Restoration Network v. U.S. Dep't of Commerce, 438 F.3d 937, 946 (9th Cir. 2006) (citing Blue Water Fishermen's Ass'n v. Nat'l Marine Fisheries Serv., 158 F. Supp. 2d 118, 121–22 (D. Mass. 2001)). "[T]he NMFS implemented the rule pursuant to its authority over FMPs under the Magnuson-Stevens Act, *not the Endangered Species Act* [C]ouching the action in different statutory language 'is not a hook which can remove the prohibitions of the Magnuson-Stevens Act.'" *Blue Water Fishermen's Ass'n*, 158 F. Supp. 2d at 122 (quoting A.M.L. Int'l, Inc., v. Daley, No. 00-10241-EFH (D. Mass. May 18, 2000)). This means that ESA section 7 claims against fisheries management under the FMCA must be brought pursuant to the FMCA citizen-suit provision.

197 *See* Nat'l Marine Fisheries Serv., Strategic Plan for Fisheries Research 41 (1998) (stating that most of the "recent gear research has been accomplished through grants   [that] have gone to fishers, or to organizations such as states and universities, which carry out the research with the help and cooperation of the fishing industry").

198 *See id.*

199 *See* 16 U.S.C. § 1535(d) (2006); Mass. Div. of Marine Fisheries, Budgets, http://www.mass.gov/dfwele/dmf/information/budgets.htm (last visited Apr. 27, 2009). The funds from Congress are funneled directly through the National Fish and Wildlife Foundation—an entity established by Congress to distribute funds for wildlife management.

whale entanglement by fishing gear, there is, at best, limited private entrepreneurial motivation to develop whale-safe technology.

In 2007, the Marine Mammal Commission (MMC) sponsored a review of NMFS's program to reduce the risk of entanglement of great whales in fixed gear.200 The study was highly critical of NMFS's methods, and doubted their ability to reduce risk for whale entanglement. The report stated:

> Complicating efforts to resolve the entanglement issue is the fact that NMFS has a dual charge—on one hand to promote and manage fisheries and on the other to protect right whales and encourage their recovery. These often-conflicting man-dates are administered by separate programs within the agency. The role of the federal regional fishery management councils and the various state fishery management agencies indeveloping management plans complicates matters further. Toovercome these complications, the entanglement problem needs to be recognized as a fishery management crisis that re-quires decisive action at the highest levels of government. The extinction of the North Atlantic right whales would represent a fundamental failure in both fishery management and the conservation of protected resources in the United States.201

In 2007, the Government Accounting Office (GAO) did a study on NMFS's proposed 2007 ALWTRP and found it critically lacking in offering any reasonable expectation of possible success.202 Further, "its scientific stock assessments and entanglement reports . . . showed that—despite current regulatory measures—right and humpback whales are being seriously injured or killed by entanglements in commercial fishing gear at a rate that limits the species' ability to recover."203

---

200 Randall R. Reeves et al., Report of the North Atlantic Right Whale Pro-gram Review 3 (2007), *available at* http://www.mmc.gov/reports/workshop/pdf/rightwhale report.pdf.

201 *Id.* at 41.

202 U.S. Gov't Accountability Office, National Marine Fisheries Service: Im- proved Economic Analysis and Evaluation Strategies Needed for Proposed Changes to Atlantic Large Whale Protection Plan 7–8 (2007), *available at* http://www.gao.gov/ new.items/d07881.pdf. The report stated that "NMFS has not developed strategies for fully evaluating the effectiveness of the proposed regulatory changes," and that "NMFS has not yet developed a strategy for monitoring the level of industry compliance." *Id.*

203 *Id.* at 5. The report also found that "NMFS developed the specific proposed gear modifications [i.e., ground-line rules] based, in part, on a study of gear found on entangled right and humpback whales that indicated that *all* parts of commercial fishing gear

*Environmental Affairs*          [Vol. 36:431

2.  State Regulation of Fisheries to Reduce Entanglement

    In 1998 the Massachusetts Division of Marine Fisheries (MDMF) was forced to take measures to reduce the risk of right whale entanglement in state-licensed fishing gear as a result of an order issued in the *Strahan v. Coxe* decision. The court found that state fishing regulatory agencies—in that case the MDMF—are liable for violating the ESA section 9 take prohibitions as a result of great whales being entangled in the fishing gear they license and regulate. The court held that any entanglement is a violation of the ESA section 9 prohibitions.[204] The *Coxe* decision resulted in an order for the MDMF to form a "working group" to come up with a plan to reduce the risk of entanglement in licensed fishing gear. In order to "get out from under the order,"[205] the agency decided to impose entanglement prevention measures, and in so doing established a right whale conservation program (MDMF Right Whale Program) that continues to the present day.[206] The MDMF added on to its codified regulations a section that is dedicated to right whale conservation—titled "Northern Right Whales"[207]—containing special rules to reduce the risk of entanglement of right whales in the fishing gear it licensed.[208] The MDMF also has produced an annual report on the activities of its MDMF Right Whale Program.[209]

    The MDMF Right Whale Program in practice, however, has not operated to make state-licensed fishing gear whale-safe. It has adopted no requirement that fishing gear be whale-safe. Its whale conservation program is centered upon an agreement executed with a fishing indus-

---

create a risk of entanglement for these whales," implying that other portions of the gear, like vertical lines, should have been regulated. *See Id.* (emphasis added).

   204 *See* Strahan v. Coxe, 127 F.3d 155, 168 (1st Cir. 1997).

   205 Interview with David Hoover, Legal Counsel, Massachusetts Division of Marine Fisheries, in Boston, Mass. (Apr. 1999).

   206 *See* Erin Burke & Dan McKiernan, Mass. Div. of Marine Fisheries, Right Whale Conservation, www.mass.gov/dfwele/dmf/programsandprojects/ritwhale.htm (last visited Apr. 27, 2009). "*MarineFisheries* Conservation Program was established in 1997 with input from the Massachusetts Endangered Whale Working Group. The Working Group was appointed by the federal court and charged with devising measures to minimize harm to Northern Right Whales in state waters." *Id.*

   207 322 Mass. Code Regs. §§ 12.00–.11 (2006).

   208 *See id.* § 12.01.

   209 Erin Burke & Dan McKiernan, Div. of Marine Fisheries, Massachusetts Division of Marine Fisheries Right Whale Conservation Program: 2005 Projects and Accomplishments (2005). Because the *Strahan v. Coxe* injunction only required ac-tions to benefit the right whale and no other great whale species, the state agency, like NMFS, targeted its rules to reduce entanglement risks for right whales alone, without di- rect regard for the migration patterns and locations of other species of great whale. *See* 322 Mass. Code Regs. §§ 12.01–.11; Strahan v. Coxe, 127 F.3d 155, 158 (1st Cir. 1997).

try association and an NGO intervening in the *Strahan v. Coxe* lawsuit,210 calling for use of sinking ground lines with no meaningful restraints on vertical buoy lines, and funding for another NGO to seek out entangled right whales and attempt disentanglement.211 In practice, the MDMF Right Whale Program serves to shield the agency from being subjected to further court orders requiring it to actually end the entanglement of whales in state-licensed fishing gear.

   Since no other state has been subjected to a lawsuit, no Atlantic coastal state other than Massachusetts has initiated its own state-based conservation effort for great whales to reduce the risk of entanglement. The initiative for whale conservation is deemed primarily to be a federal problem—a "top down" government problem. By contrast, marine fisheries regulation is deemed a "bottom up" regulatory scheme where states have the major role in coastal fisheries—in direct terms by licensing fishing in state waters, and on the federal level by state dominance of federal regional fisheries management councils. Since the fishing industry has dominating influence in the state fishing agencies, it effectively controls NMFS. To close this circle, it can be observed that some of the most progressive politicians in coastal states are ironically among the most ardent supporters of the fishing industry's "self-regulation."212 Coupled with consistent support in Congress,213 the industry has been aided by state fisheries agencies in resisting efforts to force fisheries to comply with ESA prohibitions on whale entanglement and state environmental review laws.

---

210 The Massachusetts Lobstermen's Association (MLA) and the Conservation Law Foundation (CLF) brokered the deal with the state. *See* Strahan v. Coxe, 939 F. Supp. 963, 963 (D. Mass. 1996) (showing that CLF did intervene in the suit).

211 Currently the MDMF gives funding to the Provincetown Center for Coastal Studies to look for right whales—especially entangled ones. Provincetown Center for Coastal Studies, Annual Report 2007: A Year in Review 7, 11 (2008), *available at* http://www.coastalstudies.org/pdf/AnnRep07_2.pdf (stating that the group disentangles large whales and identifying the Massachusetts Division of Marine Fisheries as a donor).

212 Richard Gaines, *Senators' Moves to Right Fishing Rule in Limbo*, Gloucester Daily Times Online (Mass.), Mar. 18, 2009, http://www.gloucestertimes.com/punews/local_story_077221439.html?keyword=topstory (describing northeastern Senators' united front against a specific federal fishing regulation).

213 In Massachusetts, Senators Kennedy and Kerry consistently support the fishing industry's self-regulation, as do Senators Collins and Snowe in Maine. Like the late Representative Gerry Studds, federal legislators who are otherwise among the most progressive have regularly championed the commercial fishing industry's interests. *See id.*

### III.  The Green Knight Has Left the Building:
### Failure of the Current Societal Paradigm
### for Protection of Great Whales

Over the past century, our national policies and strategies for environmental protection have been fundamentally based on the ideas and efforts of individual altruistic citizens who organized others in citizen-based political movements for environmental protection.214 These are the "Green Knights" whose efforts are almost wholly responsible for current state and federal regulatory schemes for protecting environmental quality for the general benefit of the public. First with the late 19th century "conservation" movement and then the later 1970s "environmental" movements, more than two dozen federal statutes were drafted and regulatory systems designed and pushed by these private entities—not by legislatures, business, or by the normal established players in our system of government.215 Individual Green Knights have been the primary driving forces for enforcement of most of the breakthrough and precedent-setting lawsuits enforcing environmental laws.216 Statutes are written, agencies are created to implement the statutory policies, and—faced with the traditional ability of regulated industries to constrain regulatory agencies—citizen groups have to fight a chronic battle to push agencies and courts to enforce the laws as written.217

Individual Green Knights have generally been driven by idealism, philosophy, and science, not by prospects for personal financial enrichment. Green Knights like Aldo Leopold,218 Rachel Carson,219 Jane Goodall,220 Ralph Nader,221 and Dian Fossey,222 are some of the exam-

---

214 Zygmunt J.B. Plater et al., Environmental Law and Policy: Nature, Law, and Society 73 (3d ed. 2004). The first Earth Day in 1970 was the idea of such an individual.

215 For an excellent history of the creation and evolution of environmental law, specifically as it pertains to national parks, see Joseph L. Sax, Mountains Without Handrails: Reflections on the National Parks (1980).

216 The National Environmental Policy Act, for example, has never been actively enforced by the federal government against the federal agencies that were its primary addressees. Plater et al., *supra* note 214, at 477. Many other statutes have had their primary enforcement from voluntary citizen efforts rather than official enforcement. *See* James R. May, *Now More Than Ever: Trends in Environmental Citizen Suits at 30*, 10 Widener L. Rev. 1, 2 (2003).

217 *See* Zygmunt J.B. Plater, *Dealing with Dumb and Dumber: The Continuing Mission of Citizen Environmentalism*, 20 J. Envtl. L. & Litig. 9, 26–27 (2005).

218 *See generally* Aldo Leopold, A Sand County Almanac (1949).

219 *See generally* Rachel Carson, Silent Spring (1962).

220 *See generally* Jane Goodall, In the Shadow of Man (rev. ed. 1988).

221 *See generally* Ralph Nader, Unsafe At Any Speed (1965).

ples of the tradition, inspiring pioneering laws protecting the environment, beginning with the very American idea of national parks.223 The National Forest system, laws protecting migratory birds and raptors, the Clean Water Act, the Clean Air Act, the Endangered Species Act, and the ban on DDT are just a small part of their accomplishments.224

Sadly, however, no individual Green Knight has come forward to protect great whales in the Urban Sea. There indeed are a number of whale interest organizations among the community of "Ocean NGOs" — the amalgam of NMFS-licensed whale researchers, non-profit corporations, commercial fishermen associations, and other miscellaneous entities that evince an interest in whales and other marine mammals.225 However, despite the horrific harm and threat of extinction for great whales that result from commercial fisheries' practices, in the author's observation, most of these organizations have been markedly hesitant to confront the commercial interests that cause whale entanglement, and sometimes take positions disfavoring common sense protections afforded whales by law.226

The refusal of Ocean NGOs to demand that NMFS and state fish- ing agencies license only whale-safe fishing gear, including non- entangling vertical lines, is a prime example of how professional actors

---

222 *See generally* Dian Fossey, Gorillas in the Mist (1983). According to many sources, the last words in Fossey's journal were, "When you realize the value of all life, you dwell less on what is past and concentrate more on the preservation of the future." *See, e.g.,* Diane Toroian Keaggy, *Who Would You Invite?*, St. Louis Dispatch, Apr. 7, 2007, at 4.

223 George Catlin, a Western artist in the 1830s, is generally credited with first expressing the idea that there should be "a nation's Park containing man and beast" which ultimately led to the creation of the National Park system. Isaac Kantor, *Ethnic Cleansing and America's Creation of National Parks*, 28 Pub. Land & Resources L. Rev. 41, 45 (2007). *See generally* Linda Lear, Rachel Carson: Witness for Nature (1997) (explaining how the publication of Carson's *Silent Spring* lead to the U.S. ban on DDT).

224 An incomplete list of environmental laws that allow for citizen enforcement would number more than a dozen; the author believes that citizen action may have spurred the creation of many of these. *See* Plater et al., *supra* note 214, at 407 & n.38.

225 *See, e.g.,* Conservation Alliance for Seafood Solutions, Who We Are, http://www.so-lutionsforseafood.org/whoweare (last visited Apr. 25, 2009) (showing a list of ocean- centric organizations working with the seafood industry); Massachusetts Ocean Partner- ship, Current Partners, http://www.massoceanpartnership.org/partners.html (last visited Apr. 25, 2009) (providing a list of organizations in the Massachusetts Ocean Partnership).

226 This includes their opposition to the enforcement of the ESA and MMPA prohibi- tions against individual commercial fishermen for entanglements. The author had to sub- poena NGO employees to testify as expert witnesses at a federal trial where the Massachu- setts fishing agency was being sued as responsible for unlawful whale entanglements. *See generally* Strahan v. Pritchard, 473 F. Supp. 2d 230 (D. Mass. 2007). These witnesses claimed that sinking ground-line would save whales from entanglement although no one could provide any example of a whale ever being entangled directly in floating ground-line. *See id.* at 238–39.

*Environmental Affairs*                [Vol. 36:431

in marine issues align their positions with commercial interests. Off the record, informed members of these organizations identify vertical buoy lines on lobster pots and fixed gill nets as the critical element in whale entanglement, and the optimal object for stringent regulation to end the cruelty, injuries, and death caused by entanglement. Publicly, how- ever, they shrink from efforts to enforce strict industry compliance with the ESA.

As noted in this essay, vertical buoy lines pose the prime entangle- ment threat to whales, but NGOs have deferred to industry and NMFS preference for the questionable theory that requiring sinking horizon- tal ground-lines should be the focus of regulatory efforts to protect the whales, avoiding the obvious measure of vertical line regulation. In on- going citizen litigation seeking to enforce ESA section 9 prohibitions against placement of vertical buoy lines, moreover, it has not been pos- sible to get NGO testimony in support of those facts.227

The question is raised why NMFS would require lobster pot fish- erman each to spend a good deal of money substituting sinking ground- line for existing ground-line without compelling proof that it works.228 Why too does industry accept an NMFS directive making it spend hundreds of thousands of dollars for a red herring, an unproven fix, in the absence of a lawsuit?229 In part it may be an instance of

---

227 Representatives of the Provincetown Center for Coastal Studies, the New England Aquarium, and the Humane Society of the United States were subpoenaed to testify at trial in both *Strahan v. Pritchard* and *Strahan v. Holmes*. They were asked repeatedly to speculate on whether or not whales are currently being entangled either in Massachusetts or other state coastal waters. Each testified that they did not know and refused to even speculate on the possibility. *See* Strahan v. Holmes, 595 F. Supp. 2d 161, 163–64 (D. Mass. 2009); *Pritchard*, 473 F. Supp. 2d, at 236–38.

228 Congress was lobbied by NMFS and the Ocean NGOs to buy sinking ground-line for the commercial fishing industry. *See* Memorandum from Laura Ludwig, Bottom Line Project Director, Gulf of Maine Lobster Foundation, to all Maine state and federal lobstermen (Dec. 14, 2007), *available at* http://www.gomlf.org/docs/Survey_Letter_and_FAQ_12_07_final.pdf. It appropriated millions of dollars for the buyout. The International Federation of Animal Welfare (IFAW) (known for its campaign against Newfoundland seal hunts) partnered with the MDMF to administer the distribution of the money to commercial fishermen. The IFAW has zealously maintained the need for sinking ground-lines and has opposed NMFS focusing on vertical buoy lines. In January 2008, it also hosted a conference for commercial fishermen in Boston, Massachusetts to discuss the cost, problems, and alleged benefits associated with converting to sinking ground-line. *See* Press Release, Int'l Fed'n of Animal Welfare [IFAW], IFAW and Atlantic Offshore Lobstermen's Association to Host Whale Friendlier Lobster Gear Summit ( Jan. 3, 2008), *available at* http://www.ifaw.org/ifaw_asia_pacific/media_center/ press_releases/01_03_2008_17390.php.

229 In the written comments submitted to NMFS's draft Environmental Impact State- ment and, and during the comment period for the draft 2007 ALWTRP, there is not a sin- gle letter from a licensed commercial fisherman or any established NGO complaining that

NMFS selecting the most easily accommodated adjustment—a simple substitution of one line type that works in effectively the same manner as existing lines—for which, moreover, the federal government could be expected to subsidize the cost.230 In addition, the industry and NMFS may not want to set a precedent where commercial fisheries are aggressively targeted to comply with environmental laws.

The sinking ground-line theory originated from a negotiated process between commercial fisherman and the Massachusetts Division of Marine Fisheries (MDMF), with the active collaboration of several Ocean NGOs, in the working group ordered by the court in *Strahan v. Coxe*. The MDMF chose employees of the New England Aquarium (NEA), the Provincetown Center for Coastal Studies (CCS), and two fishermen to be its representatives on this working group.231 The judge's order in *Coxe* required the working group to produce a recommendation to the court on how fixed gear could be made safer for right whales—with no reference to other endangered whales.232 A one-vote majority—an alliance between the state parties (NEA, CCS, MDMF), commercial fishermen, and the Conservation Law Foundation (CLF),233 a major NGO—recommended the use of sinking ground-lines, with continuation of disentangling attempts for entangled right whales, and data collection in right whale aerial sighting surveys that would be done by the CCS and NEA under contract to the MDMF.234 Dissents came from the author, the Sierra Club, the HSUS, and an independent scientist.

The *Strahan v. Coxe* lawsuit then ended in 2001 after the judge accepted a joint 2001 intervention motion from CLF and the Massachu-

---

there was no factual basis to assert that sinking ground-lines reduce the threat to great whales. Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations, 72 Fed. Reg. 57,104, 57,132–36 (Oct. 5, 2007) (codified at 50 C.F.R. pts. 229, 635, 648) (showing that no party challenged the factual basis for the ground-line changes).

230 *See* 50 C.F.R. § 229.32(c)(1)(ii)(D)–(E) (2008); Dan McKiernan, *Lobstermen Gear-up with Whale-safe Lines: Federal Grant Subsidizes Replacement Line*, DMF News, Second Quarter 2004—Third Quarter 2004, *available at* http://www.mass.gov/dfwele/dmf/public-ations/dmfn_q3_04.pdf.

231 *Court Orders Additional Right Whale Protection Measures*, DMF News, Fourth Quarter 1996, *available at* http://www.mass.gov/dfwele/dmf/publications/dmfnq496.htm.

232 *Id.*

233 The Conservation Law Foundation is an environmental law group based in Massachusetts. Conservation Law Foundation, Home, http://clf.org/ (last visited Apr. 25, 2009).

234 Every meeting of the working group was audio taped by the MDMF and copies of those tapes were supplied to the author. The author also attended most of the meetings.

*Environmental Affairs* [Vol. 36:431

setts Lobstermen's Association (MLA).235 The court then accepted a five-year settlement agreement—signed by CLF, MDMF, and the MLA, but not the author, who maintained the litigation—adopting the working group's one-vote majority proposal for sinking ground-line regulations, plus surveys and disentanglement efforts, and dismissed the case. CLF initially requested more than $300,000 in attorneys' fees but later withdrew the demand. The outcome was that the judge, who earlier had found that state licensing of entangling gear violated ESA section 9's prohibition, simply dismissed the case with prejudice. Massachusetts then instituted a remedy that lacked in scientific evidence of effectiveness, ignored the primary role of vertical line entanglement, and only nominally attempted to reduce the entanglement of endangered right whales in state-licensed fishing gear. Other states' fixed gear fisheries thereafter also agreed to a NMFS mandate for sinking ground-lines, which was included prospectively in the 2007 ALWTRP.236

After the *Coxe* order was signed, the MDMF issued a contract to CCS to do aerial survey and disentanglement work,237 and provided grants to the NEA for further research.238 The commercial industry then successfully lobbied Congress to fund lobstermen's conversion to sinking ground-lines, in the program managed by the International Federation of Animal Welfare.239

In 2008, two Ocean NGOs—the Whale and Dolphin Conservation Society and the Ocean Conservancy—engaged in a campaign with the

---

235 The CLF and the MLA intervened in a joint effort to terminate the action after the author insisted on going to trial. In the author's opinion, the CLF was a "Trojan Horse" plaintiff—an intervening plaintiff who seeks to serve the interests of the current defen- dant—entering the case to help the state get a resolution in its favor by posing as the re- quired plaintiff for a settlement deal. *See* Strahan v. Coxe, 127 F.3d 155, 157, 161, 171–72 (1st Cir. 1997); *see also* Strahan v. Pritchard, 473 F. Supp. 2d 230, 233 (D. Mass. 2007) (dis- cussing the outcome of *Strahan v. Coxe*).

236 Diane Borgaard et al., Nat'l Oceanic and Atmospheric Admin., Guide to The Atlantic Large Whale Take Reduction Plan 3 (2008), *available at* http://www.nero. noaa.gov/whaletrp/ plan/ALWTRPGuide.pdf. In the author's opinion, Maine and other states made formal protests of the requirement, but filed no administrative appeals, to estab- lish an appearance that the rule represents a middle-ground compromise. *See* John H. Cushman Jr., *Lobstermen See Threat in Whale Protection Plan*, N.Y. Times, May 5, 1997, at A10.

237 Erin Burke & Daniel McKiernan, Mass. Div. of Marine Fisheries, Right Whale Conservation Program: 2006 Projects and Accomplishments 3 (2007), *available at* http://www.mass.gov/dfwele/dmf/programsandprojects/rwcp_2006.pdf.

238 *See* David C. Hoover, *Massachusetts' Actions that Help Protect the Northern Right Whale*, DMF News, Second Quarter 1996, *available at* http://www.mass.gov/dfwele/dmf/publica- tions/dmfnq296.htm.

239 *See* Memorandum from Laura Ludwig, *supra* note 228. At an informal press event, Senator Edward Kennedy handed a symbolic check to the IFAW president and an industry representative from the MLA. McKiernan, *supra* note 230.

Massachusetts Lobstermen's Association to promote the Massachusetts lobster industry as environmentally safe because of its use of sinking ground-lines.240 The parties to the campaign hope to convince the public to buy Massachusetts lobsters as a "green alternative" to lobsters caught by Canadian and Maine fisheries, which are not required to use sinking ground-lines.241

Some of the reasons for the political passivity and avoidance of scientific data by the agencies and some—though not all—NGOs are readily apparent. The commercial fishing industry enjoys well-organized political representation in Congress and in coastal states.242 The industry and its coalitions exercise substantial influence upon state marine fishing agencies and NMFS itself.243 The industry's political heft is discernible in financial "greenmail" grants to certain NGOs from oil companies and developers in exchange for nonconfrontation on issuance of potentially threatening development permits.244 Because most financial support for marine research comes from entities responsive to exploitative uses of the ocean—primarily NMFS, the U.S. Navy, and the federal Min-

---

240  Press Release, Whale and Dolphin Conservation Society, Ocean Conservancy, Whale and Dolphin Conservation Society and Massachusetts Lobstermen Launch "Massa- chusetts Lobster Fishing: The Right Way" ( July 3, 2008), *available at* www.wdcs-na.org/ downloads/MassLobsterJuly08.pdf. The press release states that they—along with the Massachusetts Lobstermen's Association and Massachusetts Division of Marine Fisheries— are "working with local restaurants, fish markets and seafood dealers to ensure that residents and visitors know to buy locally caught lobster." *Id.*

241  *See id.*; Alan Burke, *Green Lobster Bands Mark Whale-Safe Fishing*, Gloucester daily Times Online, July 8, 2008, *available at* http://www.gloucestertimes.com/punews/local_ story_190110942.html. The MLA fishermen now put "green bands" on their lobsters to identify them in the marketplace as "whale safe," as affirmed by the NGOs. *Massachusetts Lobster Fishing: The Right Way*, Right Whale News, August 2008, at 1, 4 (stating that "[a] new labeling and education program in Massachusetts will encourage businesses and con- sumers to buy lobsters caught locally, using fishing practices that are safer for whales").

242  *See* James M. Acheson, *Lobster and Groundfish Management in the Gulf of Maine: A Rational Choice Perspective*, 65 Hum. Org. 240, 240, 249 (2006); Walter W. Fondren III, Coastal Conservation Association, http://www.joincca.org/TIDE/Stand%20Up.html (last visited Apr. 25, 2009). In 2008, Massachusetts passed an act that, in the author's opinion, protects commercial fishing as valuable to the state, with insignificant attention given to protecting marine wildlife from development. *See* 2008 Mass. Acts 143.

243  *See* Acheson, *supra* note 242, at 240, 249; Fondren, *supra* note 242.

244  *See* Patrick Anderson, *LNG Port Operator's Donations Go Beyond Minimums*, Gloucester Daily Times Online, June 9, 2008, *available at* http://www.massenergy.com/news/Glouster DailyTimes-2008-06-09-LNG_port_operators_donations_go_beyond%20_minimums.pdf. In 2008, two international liquid natural gas (LNG) companies (Neptune LNG LLC and Excelerate Energy LLC) seeking to develop LNG port facilities in Massachusetts each agreed to pay $23.5 million to a consortium of commercial fishermen and NGOs in exchange for the issuing of required permits by state and federal review agencies. This arrangement was a stated requirement for the state to approve its permit for the project. *See id.*

eral Management Service—successful research grant applicants reflect a strong incentive toward research paths that do not conflict with commercial interests.

A number of the NGOs involved in ocean issues—soliciting mil- lions of dollars annually from well-intentioned contributors to their ap-peals for ocean conservation—have chosen to develop and maintain acquiescent "partnership" relationships with the commercial fishing industry.245 Some Ocean NGOs supported the 1994 MMPA Amend-ment scheme of granting blanket immunity to fishermen who entangle whales. The linkage has been explained as a battle between  which of the two becomes endangered: whales or fishermen.246

The issue is not that such relationships are inappropriate per se, but rather that they are inappropriate if they derogate efforts for con-serving threatened marine life. That NGOs have avoided eliminating, reducing, or redesigning vertical buoy lines is only one primary indica-tion that such relationships are inappropriate. In response, a justifica-tion voiced by these NGOs is that no regulation at all would be possible if politically opposed by the industry, so that NGOs must take whatever they can get as better than nothing.247 NGOs that conduct whale re-search, in particular, are understandably sensitive to the commercial fishing industry.248 Researchers rely on receiving ESA and MMPA per-mits issued by NMFS, and need to be attuned to the agency's political position and orientation. Many professional field researchers rely on commercial whale-watch operations, which typically have originated from or been linked to commercial fishing operations, as "platforms of opportunity" for their observations and research and as a source of supplementary funding.249 As with the fisheries regulatory agencies and many Ocean NGOs, the resulting professional conflict-avoiding alignment of researchers with the fishing industry reflects a symbiosis.

---

245  *See*  Conservation Alliance for Seafood Solutions, *supra*  note 225; Massachusetts Ocean Partnership, Current Partners, *supra* note 225.

246  *See* Tora Johnson, Entanglements: The Intertwined Fates of Whales and Fishermen 4, 264 (2005).

247  *See* IFAW, *supra* note 228 (noting collaboration between conservationists and industry is necessary).

248  *See id.*

249  *See* Whale Watching Tours, Whale Watch trips from Cape Ann, North of Boston, http://www.yankeefleet.com/ (last visited Apr. 25, 2009). *See generally* Stacie Koslovsky, Wan-dering Whale Watchers: The Effectiveness of Whale Watches as a Platform of Opportunity for Data Collection (May 2008) (unpublished M.S. thesis, Duke University), *available at* http://dukespace.lib.duke.edu/dspace/bitstream/10161/516/1/MP_smk20_a_200805.pdf.

## IV.  A New Paradigm for Whale Survival in the Urban Sea: Whales as Protected Features of the Urban Sea, Like Mountains or Rivers

### A.  *What Is to Be Done Generally?*

Great whales should no longer be conceived merely as wildlife. Their legal status should be as protected essential features of the environment, like notable mountains or river valleys that are preserved solely for their aesthetic value.250 They should formally be treated as "Twenty-Ton Canaries" by federal and state governments, protected not just for their own welfare, but also to ensure the generic welfare of the whole ocean ecosystem. Whales' current status as a "living resource" managed by agencies designed to support commercial fisheries must be changed if great whales are to be adequately protected or expected to survive in the long term.

### B.  *Remedial Propositions*

1.  Transfer Management Authority for Great Whales Away from NMFS and Re-Task the Marine Mammal Commission to Oversee Actions for Protection of Great Whales.

Implementing a rationally based and effective conservation effort for great whales requires legal responsibility to be transferred to an agency whose employees see getting the job done as their core task. At a minimum, the conservation responsibilities for great whales should be transferred to NOAA's National Ocean Service (NOS) or NOS's Office of Ocean and Coastal Resource Management (OCRM)—established by the Coastal Zone Management Act (CZMA).251 Either would be a far better platform for overseeing the protection and recovery of endangered whale populations.252 The ESA and MMPA state that direct re-

---

250 *See generally* Jim Thorsell & Larry Hamilton, *A Global Overview of Mountain Protected Areas on the World Heritage List* (Int'l Union for Conservation of Nature, Working Paper No. 6, 2002), *available at* http://www.unep-wcmc.org/wh/reviews/MOUNTAIN_PROTECTED_AREAS.pdf; Nat'l Park Serv., National Heritage Areas Program, http://www.nps.gov/history/heritageareas/VST/INDEX.HTM (last visited Apr. 25, 2009) (describing various "Heritage Areas" that are nationally protected).

251 Coastal Zone Management Act, 16 U.S.C. §§ 1451–1452 (2006);, Nat'l Ocean Serv., Nat'l Oceanic & Atmospheric Admin., Office of Ocean and Coastal Resource Manage- ment, http://coastalmanagement.noaa.gov/welcome.html (last visited Apr. 25, 2009).

252 Both of these agencies' missions are—in their statutory charges—focused on holistic protection of the marine ecosystem, and neither of them license or regulate any commercial

*Environmental Affairs* [Vol. 36:431

sponsibility for great whales is assigned to NOAA under these acts, but this need does not require subdelegation to NMFS; NOAA has full statutory discretion to transfer these duties to NOS from NMFS.253

Additionally, Congress should transfer responsibilities from NMFS to the Marine Mammal Commission to oversee and approve issuance of research licenses on great whales; the adoption of MMPA take reductions plans (TRPs) and other tasks to be performed under MMPA section 118; the issuance of ESA section 10 incidental take permits (ITPs) and ESA section 7 biological opinions involving great whales; and the appointment and administration of ESA recovery teams for the great whales.

## 2. Transfer State Management Authority for Great Whales to a State's Coastal Zone Management Office or at a Minimum to Its Endangered Species Agency

States should adopt a whale-safe standard for management of coastal industrial projects and state commercial fishing. Management responsibilities for great whales in a state's coastal waters should be established within that state's Coastal Zone Management office. A whale-safe environmental standard to be enforced pursuant to state environmental review laws could indeed utilize great whales as "Twenty-Ton Canaries" where the status of their population's health would be used to generally indicate the health of the local marine environment. The safety of the great whales and the overall health of the marine envi-

---

activity at all. These agencies mostly conduct scientific research on the ocean environment and review the impacts of commercial development on the marine environment. Nat'l Ocean Serv., Nat'l Oceanic & Atmospheric Admin., NOAA's National Ocean Service: Program Offices, http://oceanservice.noaa.gov/programs/ (last visited Apr. 25, 2009); Nat'l Ocean Serv., Nat'l Oceanic & Atmospheric Admin., NOAA Office of Ocean and Coastal Resource Management: Our Programs, http://coastalmanagement.noaa.gov/programs/welcome.html (last visited Apr. 25, 2009). The web site for NOS states that "NOAA's National Ocean Service (NOS) is the nation's premier science agency for oceans and coasts" and its mission is "[t]o provide science-based solutions through collaborative partnerships to address evolving economic, environmental, and social pressures on our oceans and coasts." Nat'l Ocean Serv., Nat'l Oceanic & Atmospheric Admin., About the National Ocean Service, http://oceanservice.noaa.gov/about/ (last visited Apr. 25, 2009). NOS administers the National Marine Sanctuaries Program. The web site for OCRM similarly emphasizes its mission is to *protect* the coastal marine environment. NOAA Office of Ocean and Coastal Resource Management: Our Programs, *supra*.

253 *See* 16 U.S.C. § 1536(a)(2) (2006). It could be argued that NOAA from the start should have assigned its MMPA and ESA duties to a subagency other than NMFS. ESA requires that NOAA take no action that would jeopardize the survival of listed species, and in weighing that choice it could have been expected that NMFS would dilute regulatory protections conflicting with the commercial fishing industry. *See id.*

ronment would be reinforced if every proposed marine activity was assessed for its impact on great whales during any environmental review process. Alternatively, state jurisdiction over great whales should be transferred away from state agencies linked to the commercial fishing industry and assigned to the state agencies committed to endangered species protection.

### 3. Vigorously Enforce the Prohibitions of the ESA, MMPA, and Applicable State Laws Against Commercial Fishermen Whose Gear Entangles Whales

The NMFS's de facto offering of safe harbor to fishermen from ESA or MMPA enforcement must end. There is no market incentive for private enterprise to develop further whale-safe fishing technologies if commercial interests are not required to utilize them. The current blanket refusal by NMFS and state law enforcement agencies—and the Coast Guard, which has concurrent enforcement authority under ESA254—to prosecute fishermen whose gear entangles whales is a primary factor responsible for the continuing entanglement-related killing and injuring of great whales.

### 4. Radically Redesign Federal and State Regulation of the Commercial Fishing Industries

No single programmatic change would better benefit the conservation of the ocean's wildlife than a radically conceived redesign and redirected regulation of the fishing industry, ending the jurisdiction of industry-oriented "private" government fishing agencies. A modern redesign would charge protection-focused agencies to serve the purposes of ensuring that fisheries resources are not depleted by the industry, that the industry will be conducted in an environmentally whale-safe manner, and that industry will experience full review under state and federal environmental laws. Elements of this agenda include: (1) ending industry-dominated commissions that oversee fisheries agencies, and changing the fisheries agencies' core operating duty to the task of assuring that commercial fishing permits comply with environmental protection goals; (2) retasking the function of the revised fisheries regulatory agencies from promoting commercial fisheries to an oversight duty of protecting a public resource from industry exploitation; (3) ensuring, in the issuing of fishing leases to private parties, that

---

254 *Id.* § 1540(e)(1) (2006).

*Environmental Affairs* [Vol. 36:431

whale-safe and environmentally sound fishing practices are required on the lease-holders' part, and that fees for fishing lease holders assist in offsetting the cost of environmental law compliance, including the cost of developing whale-safe fishing technology; (4) installing a system of market-based access to fisheries resources for specified areas, thereby ending the process of issuing annual permits for the right to fish for a minimal, fixed processing fee;255 and (5) giving "green fishermen" preference in access to state and federal fisheries resources.256

### 5. Impose Professional Ethical Standards on Licensed Whale Researchers and on NGOs Who Accept Funds to Lobby for Whale Conservation

Ethical standards of professional conduct should be enforced on all who are licensed under the ESA or the MMPA to conduct research on endangered whales.257 The need for professional ethical standards is especially strong for publicly funded researchers and those directly licensed by government agencies to do research on great whales under those statutes. Ethical standards for researchers need to provide public

---

255 Five-year leases could be issued for fishing in specific designated blocks of 100 square miles, under competitive bidding processes without perennial renewals of individ- ual fishing licenses. Leases would not be issued to individual fishermen but to collective groups or business interests with the financial resources to pay for environmental mitiga- tion. The substantial revenue from such lease sales could fund scientific research to estab- lish effective quotas. Restraints on commercial fishing practices would be spelled out in the individual lease agreements, rather than being imposed as government regulations.

256 As part of any bid for a lease, bidders would include a conservation plan to insure that commercial fishing under the lease would not have an unacceptable impact on the marine environment. An offer to use innovative whale-safe technology could be part of that plan. The cost of conservation programs would be borne by the bidders, and they would be allowed to compete as to the most aggressive conservation measures. Bidders that make a significant commitment to "green fishing" in excess of other bidders would be given "green credits" to offset higher bids from "non-green" bidders. As a result, "green fishing" would be promoted based on individual motivation. Non-green bidders would over time be driven out of the market, unlikely to wait five years without fishing after a losing bid, to return and offer a non-green bid. If anything, the most realistic way for a new bidder to seize control of a leased area would be to offer an even "greener" bid than the current lease holder.

257 The Wildlife Society (TWS) is an NGO that conducts a "certified wildlife biologist" program that requires a wildlife biologist to comply with a set of professional ethical standards in order to be certified. The Wildlife Society, The Wildlife Society Certification Program, http://joomla.wildlife.org/index.php?option=com_content&task=view&id=29&Itemid=234 (last visited Apr. 25, 2009). The ethical standards promoted by TWS directly address the problem of a wildlife biologist becoming influenced to serve the vested interests that determine the funding for its research activities. The Wildlife Society, Ethics and Professional Conduct for Wildlife Biologists, http://joomla.wildlife.org/index.php?option=com_content&task=view&id=72&Itemid=72 (last visited Apr. 25, 2009).

disclosure of field data about whales obtained in the course of licensed research (for example, accessibility of photographs and databases of whale sightings and locations). Licensed species conservation research should not be based on funding from commercial interests or agencies that promote commercial activity.

Ethical conduct requires that transparency standards be imposed on agency scientists doing research and assisting in environmental reviews. Agency employees should not consult with commercial interests until reviews have been completed, and discussions with reviewing agency staff should be recorded and conducted under protocols that preserve the independence of the reviewing staff. NGOs that publicly advertise a commitment to protect wildlife should open themselves to public review and comment to insure that these purposes are served with objectivity and accuracy.

The failure to protect great whales is in no small part due to such failures on the part of whale researchers and advocacy NGOs. Only researchers who become certified under professional ethical standards should be allowed to obtain research permits under the ESA or the MMPA. Even NGOs that professionally involve themselves with wildlife conservation should be subject to an ethics oversight certification.

## 6. Amend the ESA and MMPA to Correct the Defects that Prevent These Acts from Fulfilling Their Intent to Protect Great Whales

The ESA and MMPA are substantively deficient in their abilities to protect whales.[258] ESA section 9 prohibitions should be amended to explicitly prohibit activities in a specific habitat (for example, lobster pot fishing in Cape Cod Bay) that are operating in a manner as a whole that has resulted in numbers of killed or injured members of a listed species in that habitat in the past. Injunctive relief against individual fishermen could be issued upon a simple showing that a party was at- tempting to conduct the prohibited activity, without any need to prove that a member of a listed species might be taken in the future by parties conducting the activity. This would compel regulated parties to apply for and receive ESA section 10 incidental take permits and bear the burden of proving the stringent requirements for avoiding killing or injuring listed species.

This change would also assist citizen suit plaintiffs in protecting great whales from commercial fishing as regulated by state agencies.

---

[258] *See generally* Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361–1407 (2006); Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1544 (2006).

Perhaps due to the Eleventh Amendment of the United States Consti-tution and comity considerations, and despite the liability holding in *Strahan v. Coxe*, federal courts appear unwilling to enjoin state agencies' licensing activities that incidentally take ESA-listed species. The pro-posed change would support successful enforcement suits by expressly rejecting the plaintiffs' unprovable burden of demonstrating by the preponderance of evidence that a specific piece of gear will more likely than not entangle a great whale in the future.

## 7. Rethink Participation in the International Whaling Commission

The International Whaling Commission (IWC) is an old-school whaling entity, not a modern resource conservation agency. It needs to be replaced by a new kind of treaty organization. Until then, the United States should simply pull out of participation in the IWC and rigorously impose sanctions on whaling nations so long as the IWC maintains its role as a harvest-regulating agency. This current role is inconsistent with modern standards of treating whales as essential at- tributes of the marine environment. The IWC should be replaced with a new protocol forever banning hunting of whales, establishing them under international law as "Twenty-Ton Canaries," with their health and welfare serving as an international environmental standard for en-suring ocean conservation.

## Conclusion

The "Twenty-Ton Canary" is trying to tell us something. Our na-tion's current operating paradigm for protecting the environment and preventing the irreparable loss of biodiversity and ecosystems appears to be insufficient as applied to great whales living in the Urban Sea of the United States and Canada. Great whales continue to be killed and injured by a number of avoidable human causes, including entangle- ment by fixed commercial fishing gear in the Urban Sea of the United States and other nations where they live and breed. The avoidable harm continues despite the passage of the MMPA and the ESA and the broad support of the public for the welfare of whales. The destruction of the great whales is occurring as collateral damage to the exponen- tially increasing industrial exploitation of the ocean by a nation that in principle reveres them and has extensively protected them under law.

The essential elements of the Green Knight paradigm are: (1) fo-cused and uncompromising advocacy for the environment; (2) an alerted public and press who demand action; (3) willingness on the part of a democratic government to pass effective and comprehensive

environmental protection laws; (4) willingness on the part of agencies to incorporate the normative mandate to protect wildlife; and (5) the willingness of courts to force agencies and industry to protect the environment. For the great whales, some aspect of each of these essential elements has simply failed to crystallize.

It is proposed that things must fundamentally change. The great whales should be legally treated as protected attributes of the environment like mountains and rivers, and no longer regulated in the cate- gory of a harvestable living resource. NOAA should reassign great whales from NMFS to an agency solely interested in protecting biodi- versity in the ocean, such as the National Ocean Service. NGOs should change their modus operandi to that of a Green Knight, taking respon- sibility to develop whale-safe fishing gear and working to assure that the fishing industry is legally bound to use it. The great whales still await a Green Knight to come to their rescue.